UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____ x

JOHN B. OHLE, III,                            :

              Petitioner,          :          13 CV 450 (JSR) (AJP)
                                         08 CR 1109
                v.          :          ECF Case

UNITED STATES OF AMERICA,          :

              Respondent.          :
_____ x


## OHLE MEMORANDUM IN SUPPORT OF MOTION TO PERMIT DISCOVERY AND <u>TO ALLOW HIM TO SECURE HIS FILES FROM HIS PREVIOUS ATTORNEYS</u>

This memorandum is respectfully submitted by Petitioner John B. Ohle, III in support of his motion to permit discovery and allow him to secure his legal files from his prior attorneys. In the interests of judicial efficiency and economy, this memorandum also provides the Court with appropriate background regarding the ongoing corrupted file issues related to Mr. Ohle's discovery databases.

These problems have persisted throughout Mr. Ohle's prior representation by Stuart Abrams and Priya Chaudhry. Petitioner requests that this Court order the government and/or its vendor to produce uncorrupted discovery databases of Mr. Ohle's discovery, allow Mr. Ohle to review this discovery, and permit Mr. Ohle to file a supplemental motion supporting his 2255 claims.

Additionally, Petitioner is asking this Court to permit him to subpoena his files and documents from prior counsel, contract attorneys, experts, accountants and investigators, which are not being voluntarily turned over by his prior counsel and their contractors, to subpoena relevant filings with the IRS, and to subpoena certain medical records related to his prior counsel's medical conditions during his representation.

Petitioner also requests that this Court pursuant to 28 U.S.C. 2255(b) hold an evidentiary hearing, if necessary, to resolve certain factual disputes such as whether the discovery databases are corrupted, whether the government and/or its vendor or Mr. Ohle's prior counsel are responsible for the inability to review his discovery databases and whether certain documents were filed with the IRS that refute the government's theory of Mr. Ohle's case and expose JPMorgan Chase & Company's incorrect representations to this Court regarding its alleged entitlement to certain HOMER fees.

1

Mr. Ohle has asserted ineffective assistance claims relating to the failure of his trial counsel, Mr. Abrams, to pursue avenues of both investigation and trial presentation that would have changed the outcome of his criminal trial.  At the core of these 2255 claims was an absence of meaningful review of the discovery databases produced by the government in Mr. Ohle's case.

As a matter of fundamental due process, Mr. Ohle and his counsel should be afforded the opportunity to review the government's document production for the first time and to identify documents in support of his 2255 claims.  Exculpatory documents are known to exist in the government's document production.  This knowledge is based upon Mr. Ohle's review of the 116 boxes of Jenkens & Gilchrist documents, his knowledge of the facts and the production of documents in civil litigation.

**ABRAMS RECEIVES DISCOVERY DATABASES IN MARCH 2009**

Mr. Ohle's case ultimately involved millions of documents that were provided to Mr. Abrams via a series of databases (hereafter, cumulatively referred to as "Discovery Databases").  Mr. Abrams was initially provided information to obtain these databases via emails from the government on March 30, 2009 and March 31, 2009. See Motion to Vacate under 28 U.S.C. 2255 filed pro se by Mr. Ohle on March 14, 2012, Case No. 1:12-cv-01909-JSR ("Ohle 2255"), emails from government to Abrams regarding discovery, Exhibits 1-3(a) - 1-3(c).  Subsequently, additional databases were added to the government's production. Seven months later, Mr. Abrams described the arduous task of reviewing the evidence as well as the critical importance of such review in a letter requesting an adjournment of the trial date, sent to Judge Leonard B. Sands on November 5, 2009:

   "The volume of discovery materials in this case is vast.  There are almost 500,000 [this estimate understates the actual production by, at least, six million] documents that have been produced by the government in electronic form in discovery.  While we have been diligently engaged in the process of cataloging and analyzing these documents, we have not completed doing so and do not believe the current trial schedule permits sufficient time for us adequately to complete this process so as to be fully prepared to defend against the very serious charges against Mr. Ohle in this case." See Ohle 2255, November 5, 2009 letter from Abrams to Judge Sands, Exhibit 1-4.

We now know that Mr. Abrams had not been "diligently engaged" in cataloging and analyzing these Discovery Databases.  In fact, Mr. Abrams explained the true purpose of his extension request in a response to his co-counsel Steve Blanc's email asking why Mr. Abrams requested an extension on November 13, 2009.  Mr. Abrams replied, "We got an extension because one of the lawyers I am working with is out of town." See Ohle 2255, November 13, 2009 email from Abrams to Blanc, Exhibit 1-5.  In October 2011, Sandor Frankel, Mr. Abrams' partner, revealed to Mr. Ohle that no other attorneys at Frankel & Abrams had knowledge or were involved in Mr. Ohle's criminal matter. See Ohle 2255, in globo emails from Frankel to Ohle regarding Abrams' legal representation, Exhibits 1-2(a)-(j)).

More importantly, according to Mr. Ohle, Mr. Abrams was not forthright with the Court.  Mr. Abrams did not buy the required software to access the Discovery Databases until February 18, 2010 (see Ohle 2255, Frankel & Abrams Cash Disbursement Schedule, Exhibit 1-6) over four months after he represented to the Court that he had been diligently cataloging and analyzing the Discovery Databases.  In fact, Mr. Abrams then had to hire US Legal Support to install the Concordance software and train him.  The detailed invoice from US Legal Support shows that the Concordance software was not properly installed until April 29, 2010 - only twelve days before Mr. Ohle's criminal trial began. See Ohle 2255, U.S. Legal Support Invoice, Exhibit 1-7, p. 3.

Under any reasonable circumstances, Mr. Abrams should have moved the Court for a second continuance to prepare Mr. Ohle's case with the ongoing discovery issues and only weeks before trial.  Instead, Mr. Abrams made a fateful decision for Mr. Ohle - to continue with the trial as scheduled despite Mr. Abrams' failing health and his inability to review the Discovery Databases.

**ABRAMS' FIRST ATTEMPTS TO REVIEW DISCOVERY DATABASES IN MARCH OF 2010**

In March 2010, an overwhelmed Mr. Abrams contacted Mr. Okula requesting "a breakdown as to what categories of documents in the discovery materials pertain to the upcoming trial." See Ohle 2255, March 4, 2010 email from Abrams to Okula, Exhibit 1-8.  Mr. Okula responded with a list of categories that did not include exculpatory documents from Jenkens & Gilchrist.  In fact, Jenkens & Gilchrist's discovery responses to plaintiffs in its civil litigation and to the IRS in its tax shelter promoter audit (as well as related IRS tax filings) would have provided direct exculpatory evidence refuting the government's case.  Those materials were provided to both the Department of Justice and IRS by Jenkens & Gilchrist and should have been produced to Mr. Ohle.  In fact, those documents are fatal to the very foundation of the government's indictment against Mr. Ohle because they conclusively demonstrate that Bank One was not and could not have been defrauded out of any money or property.

It was those documents - the production from Jenkens & Gilchrist - that provide direct, exculpatory evidence that Bank One was not entitled to two percent on each HOMER transaction, that Jenkens & Gilchrist was the payor of third party service provider fees (not Bank One) and that third party service provider fees were not "referral fees" as "accepted" without evidence in Mr. Ohle's criminal trial (but objected to by Mr. Paul Daugerdas' counsel in his criminal trial).

Mr. Ohle was never provided with these Discovery Databases by Mr. Abrams.  In fact, Mr. Abrams repeatedly reassured Mr. Ohle that attorneys at Frankel & Abrams were reviewing the government's production (which Mr. Ohle now knows to be untrue).  Due to his frustration with the lack of progress on discovery, Mr. Ohle sent a list of documents that Mr. Abrams should obtain including Jenkens & Gilchrist's Form 1099s and information related to the tax shelter promoter audits of Jenkens & Gilchrist, Deutsche Bank and Bank One.  Mr. Abrams forwarded an email to the government regarding these items.  Mr. Okula responded that only Form 1099 in its possession was produced. See Ohle 2255, April 25,

2010 letter from Abrams to Okula and April 30, 2010 email response from Okula to Abrams, Exhibits 3-4(a)-(b). This representation by the government will prove to be incorrect.

Mr. Abrams' difficulties with discovery continued.  On March 29, 2010, Mr. Abrams wrote Mr. Okula and Ms. Nanette Davis, "I am becoming concerned about what we have and might not have in the discovery materials, and the accessibility of these materials."  He closes, "Thank you for your continuing assistance."  Mr. Okula responded, "You have all the HOMER J&G files and all the Bank One files, all of which are formatted in the Concordance databases.  These have been in your possession for over a year.  You also have all the client responses docs."  Mr. Okula concluded, "It seems that this is not a matter of us having produced them, but the timing of the focus on them.  That having been said, I am happy to have our folks walk your folks through the search criteria to find them." See Ohle 2255, March 29, 2010 email from Okula to Abrams, Exhibit 1-9.

Having warned Mr. Abrams about his late review of the evidence, Mr. Abrams responded, "If you produced them, then I am not intending to criticize the government.  However, it would be very helpful if your paralegal could spend some time with (paralegal) Bill Brady tomorrow explaining exactly how to locate specific documents in the various databases.  Again, in the email that we received today, I don't see anything itemized as J&G documents, but again we are apparently missing something.  Part of the problem seems to be that the databases are split up among numerous different disks." See Ohle 2255, March 29, 2010 email from Abrams to Okula, Exhibit 1-10.

Mr. Okula then sent Mr. Abrams three hard drives on April 2, 2010, noting that the databases "were previously either provided or made available to you."  On April 8, 2010, Mr. Abrams alerted the government that the databases have tag histories, highlighting certain documents.  Mr. Abrams then stated, "we have not looked at these histories, nor have we attempted to identify the documents to which they pertain."  Mr. Okula instructed Mr. Abrams on how to clear these highlighted documents.  On April 12, 2010, Mr. Abrams' software consultant worked on the removal of tag history links from the Jenkens & Gilchrist database as millions of documents on the three hard drives were loaded. See Ohle 2255, in globo emails between Abrams and Davis/Okula, Exhibit 1-11.

As of today, Mr. Ohle's previous counsel have not been able to locate any production by the government of Brady/Giglio evidence.

The failure to load and review the Discovery Databases led to a cascading series of problems for Mr. Abrams prior to Mr. Ohle's trial, including the reluctance of Mr. Abrams to subpoena documents, interview witnesses, obtain the forensic accountant expert report, hire experts, investigate key witnesses and, ultimately, to present a defense in Mr. Ohle's trial.  Further, this clear failure to review the discovery databases and pursue investigative leads, which was most likely the result of Mr. Abrams' failing health, undermines any government claim of "trial strategy."

**116 BOXES OF EVIDENCE NOT PRODUCED BY GOVERNMENT PRIOR TO TRIAL**

During the trial, Mr. Ohle repeatedly observed many troubling issues related to Mr. Abrams' preparation and knowledge of the case.  Mr. Ohle had numerous pointed conversations with Mr. Abrams regarding these issues.  During the trial, Mr. Abrams was forced to "consult" with Mr. Ohle after each witness due to his lack of preparation.  His cross-examination of witnesses was also ineffective when the witnesses lied or provided inaccurate testimony because Mr. Abrams was unprepared.  This issue has become increasing evident in the civil litigation where these misrepresentations are being exposed (as will more fully be set forth in Mr. Ohle's Supplemental Brief in support of his 2255 Motion).

On September 17, 2010 at Mr. Ohle's Fatico hearing, Mr. Abrams was alerted by counsel in United States v. Daugerdas et al., S3 09 Cr. 581 (WHP), that 110 boxes of evidence had not been previously produced by the government.  See Ohle 2255, Letter from Okula to counsel in Daugerdas proceedings, Exhibit 2-3.  Due to Mr. Abrams' failure to investigate discovery prior to Mr. Ohle's trial, Mr. Ohle, his wife and mother-in-law flew to New York to personally review each document in what turned out to be 116 boxes of evidence that had not been produced prior to trial. See Ohle 2255, September 27, 2010 email from Abrams to government discovery technician, Exhibit 2-4.  Mr. Abrams, meanwhile, indicated that he would review the same electronically via Concordance.  Facing an enormous number of documents and little time, Mr. Ohle discovered six banker boxes of exculpatory evidence. Those documents were promptly delivered to Mr. Abrams' office.

**ABRAMS FAILS TO OBTAIN DOCUMENTS FROM J&G IRS TAX SHELTER PROMOTER AUDIT**

However, an issue continued to persist.  Mr. Ohle was not allowed to copy CD disks found in the 116 Jenkens & Gilchrist boxes onto his computer.  Instead, the government insisted on providing Mr. Ohle with a hard drive containing millions of documents that ultimately proved to be unsearchable.

Mr. Ohle believes that those disks contained the IRS tax shelter promoter audit of Jenkens & Gilchrist.  The government in its letter to counsel in the Daugerdas case, admitted that, in error, it failed to turn over documents related to the IRS' civil audit of Jenkens and Gilchrist. Those documents included 120,000 images in Concordance format that the IRS received from Jenkens & Gilchrist in response to civil summons enforcement.  To date, Mr. Ohle's previous counsel has not found these documents filed with the IRS.

After Mr. Ohle raised the issue of these IRS filings with Mr. Abrams, Mr. Abrams emailed Mr. Okula on October 16, 2010, "Your original letter about the J+G materials made reference to summons enforcement materials.  It was not clear whether or not we already had these." Ohle 2255, October 16, 2010 email from Abrams to Okula/Davis, Exhibit 2-5.  But the government failed to respond.  So, once again, Mr. Ohle raised the issue with Mr. Abrams in an email exchange on October 17-18, 2010:

Mr. Ohle:  Did we ever receive the audit materials?

5

Mr. Abrams:  I'm not sure what you mean by 'audit materials'.  Okula's letter referred to summons enforcement materials, which I believe we already have.  I point that out in my motion for an adjournment, and the government did not respond.  I have asked Okula for clarification."

See Ohle 2255, October 17, 2010 emails between Ohle and Abrams, Exhibit 2-5)

Mr. Ohle requests that this Court allow him to subpoena filings related to the IRS' tax shelter promoter audits of Jenkens & Gilchrist and Bank One.

**OHLE PROVIDES ABRAMS WITH INDISPUTABLE "PROOF" THAT J&G PAID THIRD PARTIES OUT OF ITS FEES, NOT FEES BANK ONE ENTITLED TO**

Meanwhile, Mr. Ohle and his family discovered the proverbial "needle" in the haystack - Jenkens & Gilchrist's response to the IRS Information Document Request ("IDR") in its tax shelter promoter audit.  On April 21, 2010, Mr. Abrams at Mr. Ohle's direction sent the government a letter specifically requesting production of certain items including "all relevant 1099 forms" including those that "J&G issued to third parties."  Mr. Okula responded on April 30, 2010, "The only Form 1099 we have is the one marked by us, relating to Bradley."  See Ohle 2255, April 25, 2010 Letter from Abrams to Okula and April 30, 2010 email response from Okula to Abrams, Exhibit 3-4(a) and (b).  In fact, Form 1099s for all unincorporated third party service providers were attached to Jenkens & Gilchrist's response to Form 4564 IDR submitted by Jenkens & Gilchrist Chairman of the Board on May 11, 2005.

Question 3 of the IRS' IDR instructed Jenkens & Gilchrist to provide,

"a worksheet showing the breakdown for the J&G payments made to so-called 'other service providers' including the name of the payee, the amount paid, the date paid, a description of the services provided and the client's name.  For purposes of the IRC section 6707 penalty computation (tax shelter promoter penalty), provide evidence if payments to these 'other service providers' were paid out of the J&G fee."

The IDR continued, "If any such referral fee paid by J&G on a third party invoice which has been forwarded to J&G is not so proven, then the Service will use the gross fee figure."

Note 2 to the IDR provided, "The term, 'other service provider' was used by J&G on its own internal tax shelter participants lists."

See Ohle 2255, Information Document Request, Exhibit 1-14, p.1.

Jenkens & Gilchrist responded to IDR Question 3 with a list of "Third Party Payments - 1999-2002."  This list included 200 third party service providers paid out of Jenkens & Gilchrist's operating account in the amount of $44,077,570.94, including all three third party service provider payments at the core of Mr. Ohle's conviction.  This IRS filing proves that Jenkens & Gilchrist, not Bank One, paid American Capital Financial Corporation

$81,500, Bradley Law Firm, L.L.C. $255,000, and Invested Interest $920,000. Ohle 2255, Third Party Payments 1999-2002, Exhibit 1-14.  These payments are at the core of the wire fraud count in this case, and the resulting tax evasion counts.

The government inexplicably claimed, despite the clear language of the Services Agreements and these IRS filings, that these third party payments defrauded Bank One of its property, that Bank One was the payor of these third party service provider amounts, and that these third party service provider payments were "referral fees."  The government's "support" for this inference at the trial was ISG member Paul Ferguson's hearsay testimony and the mischaracterization of a spreadsheet introduced through Sandra Burnside, the secretary for Jenkens & Gilchrist attorney Paul Daugerdas.

Had the government claimed that Mr. Ohle defrauded Jenkens & Gilchrist, Mr. Ohle would have proved that Jenkens & Gilchrist made these payments knowingly and purposefully to secure financing for its third party purchasers in HOMER transactions (Ken Brown in 2001 and Invested Interest in 2002).  In addition to showing that there was no fraud on Jenkens & Gilchrist, Mr. Ohle would not have been subjected to the 10 year statute of limitation related to wire fraud against financial institutions, and the indictment in this case would have been untimely.

Jenkens & Gilchrist's response also listed, as a Third Party Payment, its payment of $5,246,300 to Bank One.  This IRS filing also contradicts the government's claim that Bank One was entitled to two percent of each HOMER transaction based on a fee splitting agreement with Jenkens & Gilchrist.

In addition to the $44 million in payments listed above, Jenkens & Gilchrist lists an additional nineteen third party service providers as being paid out of the Jenkens & Gilchrist trust account in 1999 in the amount of $4,965,300.25.  None of the third party payments in Mr. Ohle's case were paid from Jenkens & Gilchrist's trust account, only from legal fees in its operating account.

Jenkens & Gilchrist then provided "evidence" that payments to these "other service providers" were paid out of Jenkens & Gilchrist's legal fees by attaching Form 1099s for each and every unincorporated third party service provider in excess of the IRS $600 threshold.  Those Form 1099s included Jenkens & Gilchrist payment to Invested Interest in the amount of $920,000 which was not produced by the government prior to trial.

These IRS filings also expose the government's claims in its opposition to the new trial motion.  The government called Mr. Abrams' inclusion of the Invested Interest Form 1099 "irresponsible," declaring the exhibit a draft that did not include an amount.  In fact, Jenkens & Gilchrist filed this exact same document with the IRS to prove that the payment of $920,000 (which is included in the shaded box) to Invested Interest was made by Jenkens & Gilchrist out of its legal fees, and, in fact, it was beyond "irresponsible" for the government to claim that this document was a draft.

Jenkens & Gilchrist's IDR response provides unequivocal proof that Bank One was not entitled to two percent on each HOMER transaction, that Bank One was not the payor of the third party service provider fees and that the payments by Jenkens & Gilchrist to these third parties were not always "referral fee" payments, but also payments for services rendered.  Each attorney associated with responding to the IRS' tax shelter promoter audit IDR (including attorneys from outside counsel McDermott, Will & Emory) could have been called by Mr. Abrams as a witness as well as Jenkens & Gilchrist's accountants at Ernst & Young.

Further, documents will show that Jenkens & Gilchrist provided similar representations regarding HOMER fees to plaintiff attorneys in its civil litigation.  Similarly, attorney notes from Jenkens & Gilchrist attorneys will confirm the purposeful payment of third party service providers by Mr. Daugerdas and will memorialize these conversations between Mr. Daugerdas and the third party services providers.

**ABRAMS' FAILURE TO UNDERSTAND THE DOCUMENTS DISCOVERED BY OHLE**

Despite finding the "needle in the haystack," Mr. Abrams failed to understand the documents produced by Mr. Ohle.  In fact, Mr. Abrams presented the IDR as three separate exhibits in his Motion for a New Trial:

    Exhibit 11 - J&G list of Third Party Payments - 1999-2002;
    Exhibit 14 - Two copies of J&G Form 1099 to Invested Interest (poorly copied so that the shaded box no longer reveals the amount of $920,000); and
    Exhibit 17 - Form 4564 IDR requesting third party payments and evidence of such amounts being "paid out of the J&G fee."

See Ohle 2255, Ohle Exhibits 11, 14 and 17 from Abrams' Motion for New Trial, Exhibit 2-6.

So, Mr. Abrams effectively cut the "needle in the haystack" into three separate parts and reinserted them into the haystack.  This inexplicable action by Mr. Abrams allowed the government to cloud the issue with claims that the 1099 was a draft and with claims dismissing the "pieces" of the IDR as not being exculpatory.  Clearly, an IRS filing from Jenkens & Gilchrist stating that the amounts were paid out of Jenkens & Gilchrist's legal fees would preclude a reasonable juror from finding that "common experience" dictated that Bank One had some "set across-the-board percentage" to split Jenkens & Gilchrist's legal fees, an unethical and illegal action under Illinois state law.  This IRS filing also clearly validates the Services Agreement language which the government asked the jury to ignore.

Mr. Abrams failed to comprehend this core issue in Mr. Ohle's case, namely that Jenkens & Gilchrist made all payments to all third party service providers including Bank One.  Four months after the trial, the following email exchange occurred:

    Mr. Ohle:  What did gov't claim Bank One was 'owed' on each transaction?
    Mr. Abrams:  The fees it received plus the fees paid to Steger, Invested Interest and Bradley.  How is the document review (of the 116 Jenkens & Gilchrist boxes) going?

    Mr. Ohle:  What was percentage Gov't contends Bank One was 'due'?

    Mr. Abrams:  I believe the govt claimed that Bank One's fee net of trustee fee was to be 1.8 percent.  I am digging out Okula's schedule and will forward it shortly.

    Mr. Abrams:  I double-checked Okula's rebuttal and he said that the normal Bank One fee was 1.8% of the transaction.

See Ohle 2255, October 19 and 20, 2010 emails from Abrams to Ohle, Exhibit 2-7.

However, after reviewing the Jenkens & Gilchrist attorneys' notes, Mr. Abrams concluded that Bank One's base fee was 1%, not 2%, but could be increased on specific deals.  He concluded, "This is the opposite of what the government argued, namely that their fee would be 1.8% unless reduced by the payment of third-party fees (see Ohle 2255, Exhibit 2-7)".

This document alone resulted in Mr. Abrams concluding that the HOMER fee arrangement was "opposite" of what the government argued at trial.  Mr. Abrams' "new" conclusion was also consistent with the evidence, namely the Services Agreements, the IRS filings and Mr. Dye's FBI interviews, all of which Mr. Abrams failed to review and/or present at trial.

Mr. Abrams also failed to understand that every 1099 from 2001 included a shaded box in the amount.  Due to the repeated copying of these IRS filings, the amounts on Form 1099s were unreadable.  Capitalizing on Mr. Abrams' lack of understanding, the government argued that Invested Interest's Form 1099 was a draft, did not contain an amount, and was not exculpatory.  The Court accepted the government's assertions, resulting in this Court's finding that the new evidence in the 116 boxes from Jenkens & Gilchrist was not exculpatory.  However, Jenkens & Gilchrist's Form 1099 for Invested Interest does report an amount, namely $920,000 which was included in Jenkens & Gilchrist's response to the IRS' tax shelter promoter audit to prove that this payment came out of Jenkens & Gilchrist's legal fees.

## ABRAMS FAILED TO REVEAL HIS DISCOVERY FAILURES AND LACK OF PREPARATION IN OHLE'S NEW TRIAL MOTION

While Mr. Abrams belatedly continued to get "up to speed" on these cores issues in Mr. Ohle's criminal trial, his next actions demonstrated that he had proceeded to trial in Mr. Ohle's case without being able to meaningfully review the Discovery Databases produced by the government.

First, Mr. Abrams revealed on November 11, 2010 that he never properly searched the Discovery Databases provided by the government prior to Mr. Ohle's trial, "We are having a lot of problems with Concordance disks.  I don't know if this is due to anything the government did, or merely a result of our technical shortcomings.  Prior to trial we had worked with an IT consultant in using Concordance." See Ohle 2255, November 11, 2010 email from Abrams to Ohle, Exhibit 2-8.

By sending the attached invoice which clearly indicated that the technical problems in accessing the Discovery Databases had never been resolved, Mr. Abrams inadvertently alerted Mr. Ohle for the first time that Mr. Abrams had failed to properly review the evidence prior to trial, had failed to alert the Court to these discovery issues and had failed to seek a continuance.  Despite this failure prior to trial, Mr. Abrams once again did not search the newly-produced electronic discovery of the 116 boxes of Jenkens & Gilchrist documents and the 120,000 images that the IRS received from Jenkens & Gilchrist in response to civil summons enforcement, failing to load this "new" evidence into his Concordance database.

Mr. Abrams, however, had to convince Mr. Ohle that he was reviewing the "new" evidence, so on November 24, 2010, in an Outline for the Motion for New Trial, Mr. Abrams states:

   "This selection also includes a description the nature and volume of the undisclosed materials, and the steps the defense has undertaken to analyze them, including a document-by-document review of hard copies, document-by-document review of materials on disks, and searches of the Concordance databases.  The process highlights the shortcomings of the Concordance format database in which the government has provided discovery, both with respect to these newly-disclosed materials and with respect to materials that were disclosed prior to trial.  Many of the most relevant documents are in the form of handwritten notes, which do not show up in a Concordance search of the database."

See Ohle 2255, November 24, 2010 email from Abrams to Ohle attaching Abrams' Outline for New Trial Motion, Exhibit 1-13.

Despite this statement and Mr. Abrams' assurances, Mr. Abrams failed to load and/or search the "new" Jenkens & Gilchrist database.  And, as usual, Mr. Abrams did not meet his December 7, 2010 deadline for a draft of the Motion for New Trial.  Instead, on December 12, 2010, Mr. Abrams emailed Mr. Ohle, "Just an update.  I have gone through all of the documents you left and have organized them along with earlier materials.  I have not yet finished a draft, but I am working on it and will send it along as soon as possible."  Ohle 2255, December 12, 2010 email from Abrams to Ohle, Exhibit 2-2.  Mr. Ohle desperately wrote Mr. Abrams seeking an opportunity to review the Motion for New Trial:

   "After the judge granted the 45 day adjournment, I emphasized the importance of having Motion to me by December 7, last Tuesday.  When we met, you apologized for not having it complete by the 8th because you got tied up in a new matter.  You also stated that I would receive by this weekend.  Sunday, you emailed indicating you would send ASAP.  I responding [sic] confirming Sunday.  Since I have had no response and you have not taken nor returned my calls.  This is extraordinarily stressful given the importance of this matter."

See Ohle 2255, December 13, 2010 email from Ohle to Abrams, Exhibit 2-2.

Similar emails continued until Mr. Ohle received the draft at 9:37 p.m. on December 15, 2010.  See Ohle 2255, December 15, 2010 email from Abrams to Ohle, Exhibit 2-2.  On December 16, 2010, Mr. Ohle wrote an email asking Mr. Abrams to disclose to this Court that Mr. Abrams could not review the "new" Jenkens & Gilchrist evidence because the discs provided by the government would not properly load.  Further, Mr. Ohle asked Mr. Abrams to alert this Court that, after four weeks, Mr. Ohle was only able to review one-third of the government's hard drive production of the disks found in the 116 Jenkens & Gilchrist boxes.  Ohle 2255, December 16, 2010 email from Ohle to Abrams, Exhibit 2-9.

Specifically, the government provided a hard drive with millions of documents that were not indexed and contained multiple copies of the same documents with highly relevant documents found in between documents from prior years.  Mr. Ohle now knows that some of these Jenkens & Gilchrist discs contained direct, exculpatory evidence from Jenkens & Gilchrist's responses to plaintiff attorneys in its civil litigation and to the IRS in its tax shelter promoter audit.  Mr. Ohle concluded his email, "Should we provide Judge [Rakoff] with copy of hard drive?  Or at least offer to make it available to Judge [Rakoff]?"  See Ohle 2255, December 16, 2010 email from Ohle to Abrams, Exhibit 2-9, at ¶ 4.  Once again, Mr. Ohle requests that the Court conduct an evidentiary hearing, if necessary, to determine the government's responsibility related to this discovery production.

We now know that not only did Mr. Abrams fail to review the "new" evidence, but incredibly Mr. Abrams had failed to review the corrupted Discovery Databases prior to trial.  Mr. Abrams never disclosed his failure to review the Discovery Databases or the "new" evidence to this Court or the Second Circuit Court of Appeals.  Instead, Mr. Abrams refused to make this  critical disclosure which directly resulted in this Court dismissing Mr. Ohle's Motion for New Trial and sending Mr. Ohle to prison for five years.  Likewise, Mr. Abrams refused to disclose this failure to the Second Circuit in Mr. Ohle's direct appeal, and instead made sufficiency and venue arguments, resulting in the Court of Appeals denying Mr. Ohle's appeal, and Mr. Ohle losing his freedom for the past 3 1/2 years.

**ABRAMS SELECTS 33 DOCUMENTS TO INCLUDE IN NEW TRIAL MOTION, BUT INEXPLICABLY EXCLUDES KEY DOCUMENTS**

In a moment of complete self-preservation, Mr. Abrams excluded from his Motion for New Trial all newly discovered documents from the six banker boxes provided by Mr. Ohle that Mr. Abrams was able to find in his Discovery Databases through a Bates-number search.  The result of this action was that many documents, which should have been identified prior to trial and used in Mr. Ohle's defense, were not available during trial, then excluded in Mr. Abrams' Motion for New Trial.  As an example, the Jenkens & Gilchrist attorneys notes that Mr. Abrams described "as the best thing" in the "new evidence" (and which led him to state that the inference was opposite from the government's contention) were not discovered prior to Mr. Ohle's trial but then excluded from Mr. Abrams' Motion for New Trial.  Ohle 2255, October 27, 2010 email from Abrams to Ohle, Exhibit 2-7.  Due to Mr. Ohle's protests, some of these documents were presented by Mr. Abrams in his reply to the government's opposition, but were not considered or referenced in this Court's order denying the Motion for New Trial.

11

Mr. Abrams also failed to provide Mr. Ohle with a copy of the documents attached to the Motion for New Trial prior to its filing.  As a result, Mr. Ohle only learned of Mr. Abrams' inexplicably separating Jenkens & Gilchrist's response to the IRS' tax shelter promoter audit IDR after the motion was filed.

Despite Mr. Abrams' "careful" selection of thirty-three documents (not found in his Discovery Databases), the government claimed in its opposition to Mr. Abrams' Motion for New Trial that most of these thirty-three documents were previously produced in Mr. Abrams Discovery Databases.  In response to the government's opposition, Mr. Ohle asked Mr. Abrams on January 3, 2011, "Also, do you know which of the documents we submitted were in fact already in database?"  Mr. Abrams responded, "The only one I actually found is that Steger confidentiality agreement which as I explained does not come up when you search for Steger." See Ohle 2255, January 3, 2011 emails between Ohle and Abrams, Exhibit 2-10.

Now knowing that Mr. Abrams' Discovery Databases were corrupted, it is clear that Mr. Abrams could not search the Discovery Databases.  However, the issue whether the government is culpable for the corrupted production is an open issue.  In fact, this corruption issue most likely led to the factual disparity between Mr. Abrams' statements in his Motion for New Trial and the government's representations in its opposition.  As a result, Mr. Ohle requests that this Court hold an evidentiary hearing to determine whether fault rests with Mr. Abrams or the government in accordance with 28 U.S.C. 2255(b).

**ABRAMS ADMITS THAT "NEW" JENKENS & GILCHRIST DOCUMENTS UNDERMINE JURY VERDICT**

Mr. Abrams' own words indicate the prejudice to Mr. Ohle's defense by failing to review the "new" Jenkens & Gilchrist evidence (as well as to search the Discovery Databases). "Documents drawn from the undiscovered boxes undermine the correctness of the jury's verdict, cutting across all aspects of the government's case."  Motion for New Trial, filed December 17, 2010, Case No. 108-cr-01109-JSR, Docket No. 157, p. 11.

The significance of the "new" Jenkens & Gilchrist evidence which was not reviewed by Mr. Abrams (and was corrupted on the Discovery Databases) is clear when examined in light of the government's "conspiracy theory" set forth in the government's Opposition to Petitioner John B. Ohle, III's Motion to Vacate, Set Aside, and Correct Sentence Under 28 U.S.C. 2255, filed July 13, 2012.  In that opposition, the government listed twelve steps that were part of their alleged conspiracy.  See Government's Memorandum in Opposition to Ohle 2255, Case No. 1:12-cv-01909-JSR, pp. 6-7.

Prior to limiting his submission to thirty-three documents because of his failure to search the Discovery Databases, Mr. Abrams summarized in an email the importance of the evidence discovered by Mr. Ohle, his wife and mother-in-law that was then provided to Mr. Abrams (who never performed a separate search himself). See Ohle 2255, Outline for

Motion for New Trial attached to November 24, 2010 email from Abrams to Ohle, Exhibit 1-13.  Those areas included:

(1) "material disproving the government's claim that Bank One was defrauded" (which would refute Steps 1, 2, 5, 6, 7 and 10);

(2) "material establishing J&G's knowing participation in the payment of the fees" (which would refute Steps 5, 6 and 7);

(3) "material rebutting [Doug] Steger's testimony (which would refute Steps 3, 5, 6 and 7);

(4) "material rebutting the claim that the fees were Ohle's income" (which would refute Steps 2, 3, 5, 6 and 8);

(5) "material rebutting Brown's testimony" (which would refute Steps 2 and 8);

(6) "material rebutting [Kurt] Anderson's testimony" (which would refute Step 12);

(7) "material rebutting [Robert] Goldstein's testimony" (which would refute Step 12);

(8) "material rebutting [Sandra] Burnside's testimony" [or the inferences drawn by the government from spreadsheets introduced through her] (which would refute Steps 5, 6 and 7);

(9) "material rebutting [John] Gilliam's testimony" (which would refute Steps 5, 6 and 7);

(10) "material relevant to the Fatico hearing" (which would refute Steps 1); and finally

(11) "materials that show a long background to the relationship between J&G and Bank One including tax-related transactions in 1999, and that show Trey Dye, the [Ohle] supervisor, handled the J&G relationship, rebutting the prosecutor's contention that Defendant rather than Dye, instigated Bank One's relationship with J&G" (which would refute Steps 1, 5, 6 and 7).

Mr. Abrams' undeniable failure to review the corrupted Discovery Databases combined with his acknowledgment of the breadth and importance of the evidence should result in this Court setting aside Mr. Ohle's conviction, or, at a minimum, ordering an evidentiary hearing to resolve disputed factual issues as to whether the government produced corrupted Discovery Databases or whether the failure to review the government's document production was the fault of Mr. Abrams.

## ABRAMS' MOTION FOR NEW TRIAL BLAMES GOVERNMENT, FAILS TO DISCLOSE HIS RESPONSIBILITY AND LIMITS DISCLOSURE OF NEW EVIDENCE

Mr. Abrams wrote in a letter to Judge Jed S. Rakoff, "J&G's absence from the case was a significant point at trial"; "defense had not received J&G documents that logically should

have existed, such as retainer agreements between J&G and the HOMER clients and 1099 forms relating to the 'referral fees' (note Mr. Abrams' emphasis on the claim that the third party service provider payments were 'referral fees')"; "the extent of J&G's involvement with Kenneth Brown as the third party in the HOMER transactions" and "J&G's communications with Deutsche Bank", including "analysis of various issues of tax law including the 'economic substance doctrine that was key part of the government's presentation at the evidentiary hearing." See Letter dated October 1, 2010 from Abrams to Judge Rakoff, Case No. 108-cr-01109-JSR, Docket No. 146, pp. 1-3.

Due to Mr. Abrams' failures pre-trial to review the Discovery Databases (which we now know were corrupted), investigate Mr. Ohle's leads, interview witnesses, and subpoena documents, Mr. Abrams first discovered evidence exposing Bank One's fraudulent claims in December 2010 when Mr. Ohle produced six bankers boxes of evidence referred to in Mr. Abrams' J&G Exculpatory Evidence email.

The evidence proved that Bank One was not "owed" 2% (or 1.8% net of its 0.2% trustee fee) on each HOMER transaction; that Bank One was not the payor of the third party service provider fees;  and, that the third party service provider fees were not only for referral fees, but also paid by Jenkens & Gilchrist for "services rendered", namely the funding of the third party purchaser in the HOMER transaction after the mid-November 2001 change in the unitrust note from secured to unsecured.  These facts alone should vacate Mr. Ohle's conviction.

However, the evidence also contained numerous documents undermining the creditability of the government's two key witnesses, Mr. Steger and Mr. Brown; evidence undermining the finding of a single conspiracy; evidence confirming that Jenkens & Gilchrist never required Mr. Brown to have "financing" (as alleged by Mr. Brown) to act as third party purchaser in the HOMER transaction; evidence demonstrating that the HOMER document packet contemplated Mr. Brown's entities acquiring the unitrust interest through a note, not cash (directly contradicts Mr. Brown's testimony); evidence contradicting Mr. Steger's claim that he had no direct dealing with Jenkens & Gilchrist; evidence showing that Mr. Brown lied to Deutsche Bank (at Jenkens & Gilchrist's direction) about his net worth and income; and, evidence demonstrating that Jenkens & Gilchrist had a policy against the payment of "referral fees" to non-attorneys, and only paid fees for "services rendered." Ohle 2255, Motion for New Trial, Docket No. 157, pp. 8-10.

The unproduced boxes also contained handwritten notes by lawyers at Jenkens & Gilchrist exposing Bank One's incorrect claims that it was entitled to 2% on each HOMER transaction.  Instead, the attorney notes prove that Jenkens & Gilchrist knowingly and purposefully paid American Capital Financial Corp., Bradley Law Firm, L.L.C. and Invested Interest.

Mr. Abrams' "careful" selection of thirty-three documents from this hoard of exculpatory evidence combined with his attempt to cast all blame on the government for his repeated failures to review the Discovery Databases resulted in his Motion for New Trial being denied due to (1) the court accepting the government's contention that most of the thirty-

three documents had been previously produced (this contention is questionable in light of the corrupted data); and (2) that the selected thirty-three documents (of which three were Jenkens & Gilchrist's IDR) were not exculpatory.

Mr. Abrams drafted a Motion for New Trial that improperly failed to reveal his responsibility in failing to review the Discovery Databases and that limited the presentation of the "new" evidence so as not to highlight his failures.

**EVIDENTIARY HEARING REGARDING DISCOVERY DATABASES AND JENKENS & GILCHRIST TAX SHELTER PROMOTER AUDIT**

In light of the issues discovered since the Motion for New Trial regarding the Discovery Databases, including Mr. Abrams' admission regarding his failure to get Discovery Databases working and Ms. Chaudhry's finding that the Discovery Databases were corrupted, we request that this Court hold an evidentiary hearing, if necessary, in order to make findings of fact regarding the production of corrupted Discovery Databases to Mr. Ohle.

Further, Mr. Abrams' incomprehensible handling of Jenkens & Gilchrist's response to the IRS' tax shelter promoter audit and the government's incorrect representations regarding the same, should also be the subject of the evidentiary hearing. As a result of Mr. Abrams' failures and the government's incorrect representations, this Court accepted the incorrect claim by the government that the Jenkens & Gilchrist's Form 1099 was a "draft" and never issued. This Court found, "the form is blank as to the amount of payment, suggesting that it is a draft. Second there is no proof that J&G issued the 1099 to Invested Interest or filed it with the IRS, and the Government's search of IRS records has indicated that the 1099 was never issued to the tax identification number list on the 1099." See Memorandum Order denying Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 182, p. 15. In fact, Jenkens & Gilchrist filed (in connection with its response to IRS' tax shelter promoter IDR) this Form 1099 as "proof" that Jenkens & Gilchrist paid $920,000 out of its legal fees to Invested Interest. Further, this original Form 1099 will show that $920,000 is included in the shaded amount box on the Form 1099.

**COURT'S RULING IN MOTION FOR NEW TRIAL CLEARLY STATES THAT THE DISCOVERY ONUS WAS ON OHLE'S COUNSEL ABRAMS**

Mr. Abrams consistently represented in his Motion for New Trial and through his appeal motions that "he had been unable to find the documents in the database prior to trial, even using normal search terms, emphasizing that the contents of handwritten notes could rarely be detected through search of the database." Mr. Abrams also pointed out, "the database contained millions of documents, amounting to several gigabytes of data, and that finding these documents without the ability to conduct useful searches would have been like finding needles in a haystack. Indeed, the government conceded that it had not been able to find these documents in the database prior to trial, and that it had been able to do so only after seeing the hard copies of the documents included with Ohle's motion." See Motion for New

Trial, Docket No. 157.

This Court found in its Memorandum Order denying a new trial: "Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything, the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client. This is especially true consider that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located." See Memorandum Order denying Ohle's Motion for New Trial, Docket No. 182, pps. 9-10.

Accordingly, in light of this Court's findings regarding the adversarial system and the burdens imposed on defense counsel as well as Mr. Abrams' email on November 11, 2010, which stated, "We are having a lot of problems with Concordance disks. I don't know if this is due to anything the government did, or merely a result of our technical shortcomings," (Ohle 2255, November 11, 2010 email from Abrams to Ohle, Exhibit 2-8), this Court should find that Mr. Abrams proceeding to trial without properly reviewing the Discovery Databases" resulted in a breakdown of the adversarial process and a clear violation of the Mr. Ohle's Sixth Amendment right to effective assistance of counsel.

**FOLLOWING APPEAL, ABRAMS' DISCOVERY PROBLEMS AND ILLNESS ARE UNCOVERED**

Mr. Abrams filed an appeal on behalf of Mr. Ohle on June 7, 2011, participated in the oral arguments before the Second Circuit Court of Appeals on October 3, 2011, lapsed into a coma shortly thereafter, and died on October 13, 2011. Given this Court's finding that the discovery onus was on Mr. Abrams and Mr. Abrams' knowledge of his failure to review the Discovery Databases, Mr. Abrams should not have represented Mr. Ohle on appeal without disclosing this material information to the Second Circuit Court of Appeals.

In fact, Mr. Abrams' actions related to the Jenkens & Gilchrist tax shelter promoter audit are suspect. Mr. Abrams repeatedly represented to Mr. Ohle that he was obtaining the original source documents from Jenkens & Gilchrist tax shelter promoter audit (which would contradict the government's unsupported claims that the Form 1099 was a "draft"). Despite numerous conversations and emails (see Ohle 2255, describing communications in detail, pp. 12-13), Mr. Abrams never attempted to obtain these documents or raise the issue on appeal.

Following Mr. Abrams' death, Mr. Ohle learned from Mr. Abrams' firm, Frankel & Abrams, that Mr. Abrams was not supported by assistant counsel within his firm which directly conflicted with representations made by Mr. Abrams. Specifically, Mr. Ohle was advised that "Mr. Abrams is the only attorney in this firm with knowledge of Mr. Ohle's case," and that Mr. Ohle needed to find substitute counsel and another firm immediately as Mr. Abrams was the only attorney "with the requisite expertise in this area (criminal defense)." Ohle 2255, October 11, 2011 email from Frankel to Kelly, Exhibit 1-2(f).

Following Bank One's continuing refusal to pay Mr. Ohle's legal fees as provided under Delaware law (and based on its fraudulent claims of entitlement to 2% of each HOMER transaction), Mr. Ohle requested documents, emails and files from Frankel & Abrams. Sandor Frankel refused to provide the requested production, but did provide emails between Mr. Abrams and the government.  These emails and other evidence clearly established Mr. Abrams' failure to properly search the Discovery Databases. Ohle 2255, emails in globo, Exhibits 1-3 through 1-11.

Despite Mr. Abrams' remarkable reputation, Mr. Ohle only now has learned that Mr. Abrams was a "one man show" with terminal cancer who failed to search the Discovery Databases.

**UNREPRESENTED AND INCARCERATED, MR. OHLE FILES HIS 2255 MOTION**

On April 25, 2012, Mr. Ohle filed his Supplemental Brief to Movant's 28 U.S.C. 2255 alleging Mr. Abrams' ineffective assistance of counsel and prosecutorial misconduct.  The government filed its opposition on July 13, 2012.  Due to Mr. Ohle's incarceration, Mr. Ohle was not able to search the Discovery Databases (which we now know are corrupted in any event) at FPC Pensacola or review the files from Frankel & Abrams.

On August 13, 2012, Mr. Ohle filed a motion requesting that this court order FPC Pensacola to allow him to review the Discovery Databases and Frankel & Abrams' files.  The government opposed Mr. Ohle's motion, and the Court denied Mr. Ohle's motion.

On July 29, 2012, Mr. Ohle requested a 45 day extension of time to file a rebuttal to the government's opposition.  This Court granted an initial extension through August 20, 2012 but also provided that when counsel appeared, they could seek additional time.  Mr. Ohle stated in his letter request, "Petitioner is currently attempting to retain Priya Chaudhry who has been in contact with your Honor's clerk.  Petitioner is unable to retain Ms. Chaudhry without reimbursement of past due legal fees and costs by Chase and its advancement of one-half of Petitioner's legal fees." See August 15, 2012 Letter Request from Ohle to Judge Peck, pp. 1-2.  It should be noted that Bank One/Chase stopped paying its one-half of Mr. Ohle's legal fees prior to trial (without cause) and has since refused to advance Mr. Ohle's legal fees (based on its fraudulent claims of entitlement to 2% of each HOMER transaction).

Unable to obtain advancement of legal fees and unable to pay the legal fees himself, Mr. Ohle filed with this Court for the appointment of counsel (due to Bank One's continuing wrongful refusal to advance his legal fees) and an extension request for filing his reply to the government's opposition.  Those requests were denied on August 16, 2012.  In the order, this Court specifically referenced Mr. Ohle's failure to obtain counsel due to "his problems with Chase."  The Court further stated, "There is no indication Ohle will resolve his dispute with Chase anytime soon. See August 16, 2012 Memo Endorsed Order of Judge Peck.  Having filed this Section 2255 petition, Ohle must proceed with it (or dismiss it

without prejudice and re-bring it before the AEDPA 1 year S/L expires)." Mr. Ohle elected to withdraw his 2255 motion without prejudice on August 20, 2012.

**OHLE HIRES CHAUDHRY TO REVIEW DISCOVERY DATABASES, REPRESENT HIM IN 2255 MOTION**

Mr. Ohle retained Ms. Chaudhry in October 2012 to represent him in his 2255 motion. Ms. Chaudhry's fee for the engagement was $50,000, payable in two installments of $25,000. Through gifts from family and friends, Mr. Ohle paid $49,000 of the $50,000 (the second payment was $24,000, instead of $25,000). As a result, only $1,000 remained outstanding on Ms. Chaudhry's engagement fee when the client-attorney relationship broke down over Ms. Chaudhry's "requirement" that Mr. Ohle pay an additional $30,000 in computer expenses that this Court found were not "necessary," but for counsel's "convenience."

[Note: Email excerpts between Ohle and Ms. Chaudhry provide support for the factual assertions made herein. These email excerpts are attached in globo as Exhibit 2 to this motion].

In the Motion for New Trial, this Court found that the government had fulfilled its duty in producing the Discovery Databases and that the onus was on Mr. Abrams to review the materials. Mr. Ohle's 2255 motion maintains that Mr. Abrams failed to review the Discovery Databases, and that his failure resulted in Mr. Abrams failing to identify documents and pursue investigative leads which would have changed the outcome of Mr. Ohle's trial.

Accordingly, as part of the engagement, Ms. Chaudhry agreed to review the Discovery Databases to identify documents and investigate leads to support Mr. Ohle's 2255 motion. In addition to Ms. Chaudhry's review, Ms. Chaudhry also agreed to assist Mr. Ohle gain access so that he could also review the Discovery Databases at FPC Pensacola. Neither Ms. Chaudhry nor Mr. Ohle were able to review the Discovery Databases due to corruption issues. These corruption issues also led to problems in the attorney-client relationship as Ms. Chaudhry required Mr. Ohle to pay an additional $30,000 (an amount Mr. Ohle could not afford) to cover expenses related to searching the corrupted Discovery Databases, rather than the $4,000 originally required.

Mr. Ohle's inability to pay for Ms. Chaudhry's IT consultant to search the Discovery Databases led to Ms. Chaudhry refusing to communicate with Mr. Ohle through legal calls, failing to request subpoena powers to develop evidence in support of her 2255 motion, refusing to file a reply to the government's opposition (or obtain an extension), refusing to review the CACI Discovery Database, refusing to allow Mr. Ohle to review the CACI Discovery Database and refusing to review the available discovery or pursue other remedies.

To this day, neither Mr. Ohle, Mr. Abrams nor Ms. Chaudhry has been able to search the corrupted Discovery Databases.

**ABRAMS' DISCOVERY DATABASES ARE UNUSABLE BY OHLE'S COUNSEL CHAUDHRY**

In November 2013, the Discovery Databases used by Mr. Abrams were sent to Ms. Chaudhry to begin her review, while a copy of Mr. Abrams' Discovery Databases were mailed to Mr. Ohle at FPC Pensacola.  Mr. Ohle's copy was returned by FPC Pensacola as "prohibited electronic materials."  Mr. Ohle immediately alerted Ms. Chaudhry that FPC Pensacola refused him access to the Discovery Databases.

With less than two weeks before the January 18, 2013 deadline to file Mr. Ohle's 2255 motion, Mr. Abrams' Discovery Databases were still being "loaded" by Ms. Chaudhry's office.  Only a few days later, however, on January 9, 2013, Ms. Chaudhry informed Mr. Ohle that Mr. Abrams' Discovery Databases were unusable.

As a result, Ms. Chaudhry filed Mr. Ohle's 2255 motion without supporting materials.  But Ms. Chaudhry sought and was granted an additional 30 days to supplement her 2255 motion.  Further, the government agreed to provide Mr. Ohle and Ms. Chaudhry with new Discovery Databases (hereafter, "CACI Discovery Databases").

**DUE TO CORRUPTED DATABASES, OHLE SENDS CHAUDHRY ORIGINAL DOCUMENTS, ABRAMS' WORKING FILES**

With the approaching January 18, 2013 deadline to file Mr. Ohle's 2255 motion, Ms. Chaudhry requested the working files of Mr. Abrams (his "yellow legal pads") and other documents to support her 2255 claims.  In addition to Bates-numbers of relevant documents, Mr. Ohle also sent Ms. Chaudhry many original documents without Bates-numbers.  Due to the Discovery Databases corruption issues, Ms. Chaudhry could not access the documents by Bates-numbers and has refused to return the original documents and Mr. Abrams' working files, claiming a retaining lien on Mr. Ohle's files.  In addition to these documents, Ms. Chaudhry also refused to provide Mr. Ohle with his copy of the CACI Discovery Databases.  These documents are necessary to Mr. Ohle's 2255 motion and should be returned to Mr. Ohle, notwithstanding Ms. Chaudhry's retaining lien claims.

**OHLE WARNS CHAUDHRY THAT DISCOVERY DATABASES MIGHT BE RETURNED BY FPC PENSACOLA**

In August 2012, Mr. Ohle filed a motion pro se with this Court to review the Discovery Databases at FPC Pensacola (which was denied by this Court due to Mr. Ohle failing to pursue administrative remedies).  Over a year later in December 2013, Mr. Abrams' Discovery Databases were sent to Mr. Ohle at FPC Pensacola, but returned as "prohibited electronic materials."  Due to these ongoing issues, Mr. Ohle alerted Ms. Chaudhry that she must engage FPC Pensacola personnel before sending the CACI Discovery Databases to Mr. Ohle.

Ms. Chaudhry told Mr. Ohle that CACI Discovery Databases sent to FPC Pensacola directly from the government were allowed.  However, FPC Pensacola promptly returned the CACI Discovery Databases following their receipt.  Ms. Chaudhry was incorrect about FPC

Pensacola's policy.  Ultimately, Ms. Chaudhry suggested that Mr. Ohle spend $18,000 to obtain the Discovery Databases on multiple discs (instead of the hard drive).  This option would have also failed to gain Mr. Ohle access to the Discovery Databases due to the corruption issues.

While the corruption issues prevented review of the Discovery Databases by anyone, it is now without question that Mr. Ohle can not obtain access to the Discovery Databases at FPC Pensacola.  In response to Mr. Ohle's administrative remedy request, Mr. Everhart, Mr. Ohle's unit manager at FPC Pensacola who handles administrative appeals of decisions by Mr. Ohle's counselor and case manager, stated that hard drives would not be permitted at FPC Pensacola under any circumstances.  Mr. Ohle respectfully requests that this Court order that uncorrupted Discovery Databases be provided to Mr. Ohle through his counsel and that Mr. Ohle is allowed to review such Discovery Databases (now that he and his counsel have exhausted administrative remedies).

**CHAUDHRY LEARNS CACI DISCOVERY DATABASES ARE CORRUPTED**

Following Ms. Chaudhry's 2255 filing on January 18, 2013, the Court granted Ms. Chaudhry 30 days to supplement her filing.  Three weeks later, Ms. Chaudhry requested another extension due to her continuing inability to access the CACI Discovery Databases.  The Court granted a further extension until March 4, 2013.

On February 26, 2013, Ms. Chaudhry learned that the CACI Discovery Databases were corrupted (affecting one-third of the total production).  Mr. Ohle was told that the CACI Discovery Databases were inaccessible.  Ms. Chaudhry went back to Court for another extension.  This time, the Court granted Ms. Chaudhry an extension until March 25, 2013.

Ms. Chaudhry proposed that Mr. Ohle spend $30,000 to hire an information technology ("IT") consultant to attempt to resolve the corruption issues.  Instead, Mr. Ohle asked Ms. Chaudhry to contact CACI regarding fixing the corrupted data.  Ms. Chaudhry refused, stating that Mr. Ohle must pay her IT consultant and citing the upcoming March 25, 2013 deadline.  Ultimately, Ms. Chaudhry required the payment of this proposed computer expense fees (which this Court found were 'not necessary' but for counsel's 'convenience') to continue her representation (including reviewing the non-corrupted Discovery Databases, filing a motion for an evidentiary hearing, contacting CACI and/or the government to correct the corruption issues or filing a reply to the government's opposition).

**OHLE IS UNABLE TO RETAIN CHAUDHRY'S IT CONSULTANT, PETITIONS COURT FOR FUNDS**

Mr. Ohle informed Ms. Chaudhry that he was unable to pay the proposed $30,000.  Other options were suggested by Mr. Ohle such as having CACI and/or the government produce uncorrupted Discovery Databases, seeking relief from this Court regarding the corruption or seeking funds from the Court to address the corruption issues.

Ms. Chaudhry filed a supplement to her 2255 motion on March 25, 2013, making legal arguments regarding Bank One's purported property interests in the illegal HOMER tax shelter fees.

Then, on March 29, 2013, Ms. Chaudhry petitioned this Court for the payment of her IT consultant's computer expense fees.  This Court denied, without prejudice, Ms. Chaudhry's request that the Court authorize a $17,000 disbursement of funds pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. 3006A(e)(1)&(e)(3), to purchase discovery services from a vendor named Court Discovery Management."  On April 24, 2013, Ms. Chaudhry renewed the request for funding to cover discovery services, and appended an affidavit that demonstrated Mr. Ohle's inability to pay such expenses.

This Court denied Mr. Ohle's application with prejudice, finding, "The funds sought are simply designed to make more convenient counsel's review of discovery she has already received.  Ohle's counsel is currently in possession, in electronic form, of the entirety of the discovery from the underlying criminal action.  The discovery 'services' she seeks are not necessary to permit review of the underlying files--the so-called 'native files' in the parlance of e-discovery.  Rather the discovery services would simply permit easier searching of the discovery on counsel's Concordance database system.  The convenience of searching, as against access to the electronic files in the first instance, is not a sufficient predicate for a finding that the services are 'necessary,' much less that the services are of an 'unusual character' required for a disbursement above the statutory limit."

## OHLE PREJUDICED BY CORRUPTED DISCOVERY DATABASES

Without reviewing the Discovery Databases, Ms. Chaudhry was unable to identify supporting documents, investigate leads or obtain additional discovery.  Further, Mr. Ohle was not provided an opportunity to file a reply to the government's opposition memorandum.

Mr. Ohle engaged Ms. Chaudhry to review the Discovery Databases (something that Mr. Abrams admittedly failed to do).  Ms. Chaudhry stated that the Discovery Databases were corrupted, requiring major expense to access.  This Court found that such an expense was not necessary to permit review of the underlying files, but simply permit easier searching.  Mr. Ohle asked Ms. Chaudhry to contact CACI regarding delivering uncorrupted Discovery Databases pursuant to its contract.  Alternatively, Mr. Ohle suggested that Ms. Chaudhry seek an evidentiary hearing regarding these corruption issues.  Ms. Chaudhry refused to pursue either remedy.  So since 2008, neither Mr. Ohle, who has been incarcerated more than 3 1/2 years in federal prison, nor his counsel has ever had access to the Discovery Databases (which are corrupted).

## OHLE HIRES COUNSEL EASTLAND

Due to the breakdown in Ms. Chaudhry's representation, Mr. Ohle retained Hiram C. Eastland in July 2013 in connection with his 2255 motion and ongoing issues regarding his discovery.  Following a legal visit with Mr. Ohle, Mr. Eastland field a pro hac vice

appearance in Mr. Ohle's case on August 1, 2013.  On August 8, 2013, Mr. Eastland requested an adjournment of the oral arguments, or, alternatively, an opportunity to supplement the filings.  Judge Rakoff denied Mr. Eastland's oral application without prejudice.  Mr. Eastland renewed his request in a written motion on August 9, 2013.

In that motion, Mr. Eastland stated that according to Mr. Ohle, Mr. Ohle had a total breakdown in communications with Ms. Chaudhry, along with the refusal by counsel to engage in legal calls to discuss the issues, a refusal by counsel to file a reply brief (which was granted by this Court on or before June 3, 2013), a refusal by counsel to review existing discovery, a refusal by counsel to turn over discovery from CACI for Mr. Ohle to review, a failure by counsel to review the discovery obtained from CACI, a failure by counsel to allege as a claim in the 2255 motion that Mr. Abrams failed to disclose in his new trial motion and on appeal that he was responsible for failing to review the discovery, and a refusal by counsel to request additional discovery and/or an evidentiary hearing.  As noted above, Exhibit 2 attached to this motion consists of the email excerpts between Ohle and Ms. Chaudhry detailing these issues.

## CHAUDHRY ARGUES 2255 MOTION

Judge Rakoff denied Mr. Eastland's motion, pointing out that Ms. Chaudhry was the appropriate party to argue the prima facie issue on her 2255 motions.

In her oral arguments, Ms. Chaudhry summarized the core issue in Mr. Ohle's case, "Mr. Ohle's claims mostly hinge, aside from the legal arguments, around an ineffective assistance by failure of his trial counsel to pursue several avenues of both investigation and trial presentation that would have had an effect on the outcome of his case.  At the core of this, as the Court has heard, was an absence of a meaningful review of the discovery provided by the government in this case."  See Transcript of Oral Arguments on Ohle's 2255 Motion, August 9, 2013, p. 2.

Ms. Chaudhry responded to the Court's question, "What is the basis for saying that?" with the following points.  (Id., pp. 2-4):

   - "Mr. Abrams' own admission of that, both at hearings before this Court and in written submissions . . . ";
   - "communications between Mr. Ohle and Mr. Abrams made clear, in addition to the communication between Mr. Abrams and the government, that he never reviewed a concordance database before";
   - "something of a perfect storm that he was struggling with a terminal illness, that he was trying a case that started as one thing and by the time it reached trial turned into something completely different; that this was a mammoth case, that there were scores and scores of thousands of documents that he never was able to review because he'd never done the concordance review of anything before";
   - "And my personal basis for believing that is when Mr. Abrams' files, those actual files were sent to my office, they were in a format that was not reviewable.  They were

corrupted.  We couldn't even look at them, which has actually given rise to some of the discovery costs that we'd later asked the Court to assist with"; and,

   - The tragedy as I stand here is Stuart Abrams was never able to review [Discovery Databases] thoroughly and I've never been able to review it thoroughly.  And so no one has actually from the defense side reviewed those documents thoroughly."

Ms. Chaudhry concluded her oral argument, "For these reasons there's a man who is sitting in prison serving a sentence who had an entire trial with a lawyer who was compromised and never actually reviewed the discovery, and who has a lawyer who is standing before you who is not compromised but also never had the chance to review the discovery but we know at least a few leads without my having to go through it all to say there would have been a different outcome and at least enough to get a hearing here so that we can know for sure that the man sitting there serving the sentence is serving a sentence on the correct outcome, that we can all feel that the outcome was sound and it wouldn't have changed had his lawyer actually reviewed all the discovery and presented what he found as part of his defense." Id. at 8-9.

Ms. Chaudhry was effective in her oral arguments, and, as the Court pointed out, was the correct attorney to handle this hearing.  Notwithstanding this fact, Ms. Chaudhry was unable to fully support her 2255 motion because, once again, the Discovery Databases were corrupted and never searched.

**GOVERNMENT ARGUMENTS AT THE 2255 HEARING ARE NOW CLEARLY INCORRECT AND DISPUTED IN LIGHT OF NEW EVIDENCE**

Ms. Nanette Davis handled oral arguments for the government.  There are four statements which demonstrate the factual dispute between the government's assertions and Mr. Ohle's counsel's assertions:

1.  "The government's position is that, first of all, the evidentiary record as it stands is that the government provided discovery multiple times to Mr. Ohle and his counsel, both electronically to Stuart Abrams and again to Ms. Chaudhry and as well in paper form.  The contention that there are somehow documents out there that would contradict the overwhelming evidence at trial, we submit is speculation of the best of days." Id. at p. 11.

Mr. Dye's deposition testimony alone demonstrates new evidence that the government's "theory" was fundamentally flawed, and Mr. Ohle's conviction should be vacated since the government can not show that Bank One was a victim of a wire fraud because it was never entitled to the fees paid to third party service providers by Jenkens & Gilchrist.  However, Jenkens & Gilchrist documents, including its tax shelter promoter audit, discovery in the civil litigation, IRS filings, notes from Jenkens & Gilchrist attorneys and documents produced in subsequent civil litigation, directly refute the government's "overwhelming evidence."  In fact, the government's evidence of Mr. Ohle's wire fraud of Bank One was hearsay testimony of Paul Ferguson (which was factually wrong and directly contradicted in civil litigation deposition testimony by Harry M. Dye, III, Director of Bank One's ISG) and

the mischaracterization of a spreadsheet put into evidence through Sandra Burnside who offered no testimonial support to the government's position.

Neither Mr. Abrams nor Ms. Chaudhry were provided with discovery in paper form.  Both Mr. Abrams and Ms. Chaudhry have stated that they could not access the electronic Discovery Databases.  It is now established as fact that one-third of the production on these Discovery Databases are corrupted, and not accessible.

Mr. Ohle has never had access to the Discovery Databases.  His hard copy review of the Jenkens & Gilchrist 116 boxes provided the only meaningful review of discovery in his case. Then, only thirty three of those documents were presented. Jenkens & Gilchrist's responses to IRS's Information Document Request alone disprove the government's contentions that Bank One was owed two percent on each HOMER transaction, that Bank One was payor of third party service provider fees and that third party service provider fees were "referral fees" only.

2.  "First of all, we do know that there was some review of discovery because we had communications, as we had outlined in our declaration, with Mr. Abrams about the electronic discovery that he was reviewing and he was asking for us documents that he viewed as missing from the record which we subsequently provided to him."

These communications were initiated by Mr. Abrams' hiring of forensic accountants Citron Cooperman, not Mr. Abrams' review of discovery. Mr. Ohle requests the Court to allow him to subpoena Citron Cooperman's files that will refute the government's incorrect statement. In any event, the government pointed out in response to Mr. Abrams' requests that many of the requested items were in the Discovery Databases (which led to Ms. Davis' characterization 'that he viewed as missing from the record').

It should be noted that Citron Cooperman failed to produce its forensic accounting report and/or testify at Mr. Ohle's trial due to Mr. Abrams failing to obtain banks statements and other items requested by Citron Cooperman and Mr. Abrams failing to obtain from Bank One its one-half of these expert fees.  Mr. Ohle was not aware of these failures until the day before the government rested its case.  This expert was vital to countering the government's "tracing" theory.

Ms. Chaudhry's review of the Discovery Databases established that Mr. Abrams' Discovery Databases were "in a format that was not reviewable." Id. at p. 11.

3.  "I would also note that the concordance database that was provided was reviewed by our technical person who initially did enormous number of hours of work before it went out and it worked fine on his computer so I don't really understand the assertion that it was not reviewable by any counsel, because that certainly was not the case when it went out the door from our office." Id. at p. 11.

Clearly, Mr. Ohle should be granted an evidentiary hearing related to the factual disputes related to these corruption issues.  The government contends that Mr. Ohle's Discovery

Databases were searchable and uncorrupted.  Mr. Ohle has now had two separate attorneys who both have repeatedly stated that Mr. Ohle's Discovery Databases were compromised. Ms. Chaudhry unequivocally stated in her oral arguments that neither Mr. Abrams nor herself could review the Discovery Databases.

The government's letter, dated August 14, 2014 (see below), reinforces this ongoing factual dispute.

4.  Ms. Davis attempts to side step the corrupted file issues stating, "We believe that as a matter of law the Court could find that even if there was ineffective assistance of counsel by Mr. Abrams, which we are by no means conceding and we've laid out our arguments as to why that is, that on the prejudice prong Mr. Ohle could never succeed and that the evidence in this matter was overwhelming, that it was clear that the fees, the bogus referral fees that were paid to Mr. Ohle and his co-conspirators were coming out of Bank One's hide, not Jenkens & Gilchrist's hide and nothing Mr. Ohle could say now could have made any sort of difference at trial." Id. at pp. 13-14.

As will be set forth in the Supplemental Brief, Mr. Dye's testimony alone destroys the government's case.  Bank One was only entitled to the amounts set forth in the Services Agreements.  All third party service provider payments were paid by Jenkens & Gilchrist from its legal fees, not by Bank One.  The government's case is also disproved in light of Hugh Uhalt's fraudulent testimony in Mr. Ohle's criminal case, the misrepresentations by Ecetra Ames and her attorney, John Wogan, to the IRS, documents from John Wogan's investigation of Mr. Ohle, Carpe Diem and Douglas Steger, and work papers from Murphy & North.

It should also be noted that Mr. Dye also provided statements in two different government interviews that Bank One was not owed two percent on each HOMER transaction and that third party service payments were paid by Jenkens & Gilchrist, not Bank One, so these third party payments were not his (or Bank One's) concern.  The government ignored Mr. Dye's statements to the FBI and proceeded to "create" a knowingly false inference to the jury in its rebuttal.  Judge Rakoff stated that he would not allow the "two percent argument" if he was aware of HOMER transactions where Bank One was not entitled to two percent. Neither Mr. Abrams nor the government provided Judge Rakoff with the many examples of non-Bank One clients (where Bank One only received one percent).  Simply, as Mr. Dye stated in his deposition testimony (as will be fully set forth in Mr. Ohle's Supplemental Brief) the Services Agreements were the only monies to which Bank One was ever entitled. Jenkens & Gilchrist knowingly and purposefully paid Mr. Steger's company and Mr. Manella's nominees, Invested Interest and Bradley Law Firm, L.L.C.

Further, Mr. Ohle will show that the government had documents in its possession which definitively proved that Bank One was not defrauded, including, but not limited to, responses by Jenkens & Gilchrist to the IRS' IDRs, responses by Jenkens & Gilchrist to plaintiffs in its civil litigation, notes by Jenkens & Gilchrist attorneys and emails between Paul Daugerdas and various third party service providers.  Despite this evidence, the government argued that the Invested Interest 1099 was a "draft", was not issued and did

not have an amount in its shaded box.  Those representations by the government to the court *are not supportable by the facts in this case.*

## OHLE AWAITS COURT'S DECISION, CASE STAYED

Following oral arguments on Mr. Ohle's 2255 motion, a stay order was issued in October 2013 due to the government shut down.  That stay order remained in place until June 30, 2014 when Mr. Eastland filed Petitioner Ohle's Motion for Leave to File a Supplemental Brief Regarding New Evidence Supporting Petitioner's 2255 Claims.

The new evidence was obtained from civil litigation involving the parties in the transactions at issue in Petitioner Ohle's criminal trial.  As will more fully be set forth in Mr. Ohle's Supplemental Brief, the new evidence is in the form of deposition testimony and documents that bear directly on and support the merits of Mr. Ohle's 2255 claims argued by Ms. Chaudhry at the August 9, 2013 hearing.

The new evidence demonstrates that 1) Bank One, not Mr. Ohle, was culpable for its fraudulent tax shelter activities; 2) Bank One was not entitled to any HOMER transaction fees beyond those amounts set forth in the Services Agreements between Jenkens & Gilchrist and Bank One; 3) Douglas Steger, not Mr. Ohle, received the commissions on the sale of Societe Generale Leveraged Warrants; 4) Hugh Uhalt provided false testimony at Mr. Ohle's criminal trial; 5) Ecetra Ames made material misrepresentations to the IRS; and, 6) Mr. Ohle's representation to Greenberg Traurig was not fraudulent.

This Court granted Mr. Ohle leave to file a supplemental brief with the evidence obtained in various civil litigation proceedings.  As alluded to in Mr. Ohle's motion for leave, the evidence is substantial and cumulative.  It also demonstrates that certain government witnesses perjured themselves and contradicts the testimony of other government witnesses.  The testimony and documents unequivocally refute the inferences created by the government at trial.  While Mr. Ohle's conviction should be vacated on this evidence alone, Mr. Ohle's should also be entitled to obtain discovery in his case to support his 2255 claims.

In that regard, Mr. Eastland has attempted to informally resolve these ongoing issues with the following individuals and/or entities who have discovery relevant to Mr. Ohle's 2255 claims:

### Sandor Frankel, Frankel & Abrams

Following Mr. Abrams' death in October 2011, Michael Kelly contacted Mr. Frankel on Mr. Ohle's behalf, requesting Frankel & Abrams turn over files and documents related to Mr. Ohle's criminal case.  Mr. Frankel provided a limited production at that time.  Mr. Kelly then sent Mr. Sandor at Frankel & Abrams a letter directing Mr. Frankel to retain all files, emails and electronic materials related to Mr. Abrams' representation of Mr. Ohle. See Ohle 2255, October 11, 2011 email from Kelly to Frankel, Exhibit 1-2(f).  In 2013, Ms. Chaudhry

contacted Mr. Frankel regarding these materials.  Mr. Frankel told her that Frankel & Abrams no longer had Mr. Abrams' computer or other materials.

In addition to files and documents at Frankel & Abrams, Mr. Ohle requests that this Court allow him to subpoena his files and documents from contract attorneys, experts, accountants and investigators hired by Mr. Abrams in his representation of Mr. Ohle.  Some of these persons and/or entities were not paid by Bank One, thereby leaving amounts outstanding.  In fact, this failure by Mr. Abrams to obtain the timely payment from Bank One resulted in his inability to obtain their work product in time for trial.  Mr. Ohle should be able to subpoena these files and documents to support his claims that Mr. Abrams' failed to investigate and present the evidence at trial.  These parties include David Hammer, Citron Cooperman, Cadillac
Investigations, James Harkins and US Legal Support.

The files and documents from Citron Cooperman will include the spreadsheets provided by Mr. Ohle's former counsel Mr. Blanc, bank statements and other financial information which counters the government's "tracing."  Had these reports been produced and presented at trial, Mr. Ohle would have proved that Mr. Steger received the commissions on the Societe Generale leverage warrant investments.  This accounting would also have shown that Mr. Manella (which he split with Mr. Ferguson) received $500,000 in February 2002 from Mr. Ohle which was not accounted for in the government's "tracing."

On July 22, 2014, Mr. Eastland sent the letter attached as Exhibit 1 to Mr. Frankel.  To date, Mr. Frankel has failed to respond.

**Priya Chaudhry, Harris O'Brien**

As detailed in the attached Exhibit 2 (excerpts emails between Ms. Chaudhry and Mr. Ohle), Ms. Chaudhry has refused to return  Mr. Abrams' working files, original documents, and other files, claiming a retaining lien.

In this instant case, the exigent circumstances should require Ms. Chaudhry to return Mr. Ohle's documents and files.  First, Ms. Chaudhry was fully aware of Mr. Ohle's financial circumstances when she accepted the engagement, namely that Mr. Ohle recently had applied to Magistrate Judge Peck for appointment of counsel (due to Mr. Ohle's lack of funds), that Mr. Ohle paid her legal fee of $50,000 (a balance of $1,000 remains) through gifts from family and friends.  In fact, Mr. Ohle required two separate installment payments which Ms. Chaudhry agreed to in the engagement letter.  Second, Ms. Chaudhry petitioned this Court on behalf of Mr. Ohle for payment of these IT computer consultant fees (including the financial affidavit provided by Mr. Ohle).  Third, the nature of Mr. Ohle's representation, a criminal case, should also factor into the return of these important files and documents.  Fourth, it must be noted that Ms. Chaudhry was never able to complete her engagement, namely the review of the Discovery Databases, due to the corruption issues.  And, finally, that this Court found the IT computer consultant fees that Ms. Chaudhry includes in Mr. Ohle's fees as not "necessary", but only for counsel's "convenience."

Mr. Eastland has made several requests for the return of Mr. Ohle's files and documents. Ms. Chaudhry has respectfully refused, stating that she has an attorney's lien on the files based upon unpaid legal fees.  Most recently, on July 22, 2014, Mr. Eastland sent Ms. Chaudhry the letter attached as Exhibit 3 requesting Mr. Ohle's files and documents.  Ms. Chaudhry replied in an email attached as Exhibit 4.  In the email, Ms. Chaudhry again refused to return the files and documents, citing her lien on the files.

## CACI, Inc.

Given the current record establishing the corruption of the CACI Discovery Databases, Mr. Ohle should be granted access to uncorrupted Discovery Databases.  Ms. Chaudhry informed this Court that Mr. Abrams' Discovery Databases were in a format that was not reviewable.  When Ms. Chaudhry received the CACI Discovery Databases, she determined that one-third of the government's production was corrupted and inaccessible. Accordingly, due process requires that Mr. Ohle receive uncorrupted Discovery Databases and that Mr. Ohle and his counsel have the opportunity to complete their review and submit applicable documents in support of his 2255 motion.

Mr. Ohle's previous counsel has never found IRS documents related to the tax shelter promoter audits of Jenkens & Gilchrist and/or Bank One.  Those documents provide direct exculpatory evidence, contradicting claims made by the government in its opposition to Mr. Ohle's new trial motion.

On or about July 28, 2014, Mr. Eastland sent Beth Gavin, Program Manager for CACI, Inc., the letter attached as Exhibit 5 requesting that CACI, Inc. correct the corruption issues in the CACI Discovery Databases pursuant to Schedule A, paragraph 6, Professional Standards which provides that CACI, Inc. will perform "in accordance with industry standards governing the work."  Mr. Eastland also requested that CACI, Inc. certify whether the discovery related to the 116 boxes from Jenkens & Gilchrist and the 120,000 images related to Jenkens & Gilchrist civil summons enforcement are included in the CACI Discovery Databases.

Mr. Okula responded, not CACI, Inc., to Mr. Eastland's letter.  Mr. Eastland provided Mr. Okula with a list of the corruption issues detailed in his letter to CACI, Inc.  On August 14, 2014, Ms. Davis responded on behalf of the government in a letter attached as Exhibit 6. The government acknowledged many of the issues set forth in the letter but then concluded that the discovery databases were properly searchable.  This contention directly conflicts the position of Mr. Ohle's prior counsel.

## Government

Mr. Ohle should be allowed to subpoena documents filed with the IRS.  These documents which have been in the government's control since 2004 include, but are not limited to, Jenkens & Gilchrist tax shelter promoter audit filings, Bank One tax shelter promoter audit filings, and other IRS filings by Bank One and Jenkens & Gilchrist.

These documents will show that Jenkens & Gilchrist paid the third party service providers out of its fees, that Jenkens & Gilchrist was the payor, not Bank One, that Form 1099 was issued to Invested Interest by Jenkens & Gilchrist, and that multiple Form 1099s from Jenkens & Gilchrist (including Form 1099s issued to Bradley Law Firm, LLC and Invested Interest) were attached to Jenkens & Gilchrist's response to IRS' tax shelter promoter audit IDR to prove that those third party service provider fees were paid out of Jenkens & Gilchrist's fees, not Bank One's fees.

Further, these documents will disprove the government's contentions that Form 1099 issued to Invested Interest does not exist (as government stated in response to Mr. Abrams' inquiry prior to trial), that Form 1099 to Invested Interest was a "draft", that Form 1099s were not exculpatory (they were attached to Jenkens & Gilchrist responses to IRS' tax shelter promoter IDR specifically to prove that these payments were made out of Jenkens & Gilchrist's legal fees), and that Form 1099 issued to Invested Interest did not contain an amount in the shaded box.  These incorrect assertions in the government's opposition to Mr. Abrams' Motion for New Trial were accepted by this Court, and harmed Mr. Ohle.

Despite undersigned counsel's attempts to resolve these discovery issues, these disputes remain unresolved.  Mr. Ohle's due process rights demand that the Court provide Mr. Ohle with an opportunity to review uncorrupted Discovery Databases and to allow Mr. Ohle to subpoena these files and develop evidence supporting his 2255 motion.

For all of the foregoing reasons, Mr. Ohle respectfully moves this Court for an order directing the government and/or its vendor to produce an uncorrupted database containing all discovery produced in Mr. Ohle's case and permitting Mr. Ohle and his counsel to review this discovery in its entirety for the first time and to file a supplemental motion supporting his 2255 claims.  Additionally, in accordance with Rule 6 of the Rules Governing Section 2255 Proceedings, Petitioner moves this Court to permit him to subpoena his files and documents from prior counsel, contract attorneys, experts, accountants and investigators, to subpoena relevant filings with the IRS, and to subpoena certain medical records related to Mr. Abrams' medical conditions during Mr. Ohle's representation.  Finally, Petitioner requests that this Honorable Court hold an evidentiary hearing, if necessary, to decide certain factual disputes including, but not limited to, the corruption of Mr. Ohle's Discovery Databases, the responsibility of the government and/or its vendor regarding the corrupted Discovery Databases, the responsibility of Mr. Ohle's prior counsel related to their inability to review the Discovery Databases, and the existence and relevance of certain filings with the IRS.

DATED:  September 15, 2014

Respectfully submitted,

/s/ Hiram C. Eastland, Jr.
EASTLAND LAW OFFICE, PLLC
307 Cotton Street

Greenwood, Mississippi 38930
662-897-0495
eastlandlaw1@gmail.com
MS. Bar # 5294

COUNSEL FOR JOHN B. OHLE, III

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF filing system will be sent electronically on September 15, 2014, to the registered participants as identified on the Notice of Electronic Filing and that a paper copy will be sent via United States mail to Special AUSA Nanette L. Davis and AUSA Stanley J. Okula, Jr. on the above date.

/s/ Hiram C. Eastland, Jr.
COUNSEL FOR JOHN B. OHLE, III