**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____ x

**JOHN B. OHLE, III,**                                    :

                **Petitioner,**          :          **13 CV 450 (JSR) (AJP)**
                                             **08 CR 1109**
                **v.**                                       :          **ECF Case**

**UNITED STATES OF AMERICA,**                   :

                **Respondent.**         :
_____ x

**PETITIONER OHLE'S SUPPLEMENTAL BRIEF REGARDING NEW EVIDENCE**
**SUPPORTING PETITIONER'S 'S § 2255 CLAIMS**_____

**Table of Contents**

Table of Authorities.........................................................................................................4

INTRODUCTION.............................................................................................................5

  A.  Procedural History.................................................................................10

  B.  Government's Charges Against Ohle...................................................12

  C.  Factual Background Regarding Ineffective Assistance of Counsel....................14

I.  SECTION I Regarding Ohle § 2255 Claims One, Five and Six.  Trial counsel's failure to investigate Bank One/Chase's lack of entitlement to greater HOMER fees and Ohle's ignorance of any such entitlement was ineffective assistance of counsel. Trial counsel's neglect to adequately challenge the government's failures to allege or prove Bank One/Chase's legitimate property interest in the subject proceeds, or, in the alternative, trial counsel's failure to challenge the legitimacy of Bank One/Chase's property interest was also ineffective assistance of counsel . . . . . . . . . .21

    A.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ......................26

      i.  Jenkens & Gilchrist's payment of third party service providers in HOMER
        transactions.................................................................................................33

ii.  Bank One/Chase's continued its tax shelter activities following Ohle's whistle blowing ................................................................................................35

B.  Ohle's wire-fraud and conspiracy convictions based on HOMER third party service provider fees being paid out of Bank One/Chase's property..............43

i.  Ferguson's Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...............43

ii.  Jenkens & Gilchrist's HOMER Client "Tracking" Spreadsheet . . . . . . . . . . . .....47

iii.  Government created 2.0% "inference" in its rebuttal summation . . . . . . . .  48

C.  Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate ....................................................................................................49

i.  Bank One/Chase not entitled to two percent on each HOMER transaction .. 51

ii.  Third party service provider payments were paid out of Jenkens & Gilchrist's fees not Bank One/Chase's fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .58

iii.  Bank One/Chase not entitled to any HOMER fees beyond those amounts set forth in the Services Agreements with Jenkens & Gilchrist . . . . . . . . . . . . . . . . 62

D.  Bank One/Chase continues its corporate cover-up . . . . . . . . . . . . . . . . . . . . . . . . . .65

E.  Bank One/Chase is culpable for its illegal tax shelter activities and has no legitimate property interest in fraudulent HOMER fees . . . . . . . . . . . . . . . . . . . . 72

F.  Jenkens & Gilchrist documents provide exculpatory evidence, credible witnesses . . . . . . . . . ........................................................................................84

II.  SECTION II Regarding Ohle's § 2255 Claim Two. Trial counsel's failure to investigate legitimate loans made by Ames Trust was ineffective assistance of counsel . . . . . . . . . . . . . . ...............................................................................................104

A.  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..............117

B.  Ohle's conviction based upon testimony from Uhalt, Steger and Brown . . . .125

C.  Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate . . . . . ........................................................................................134

i.  Uhalt obtained restitution order for his mother Ecetra Ames through perjured testimony . . ........................................................................................135

ii.  Steger obtained probationary sentence through perjured testimony . . . . .141

iii.  Brown's testimony regarding his participation as third party purchaser under Ohle's control is refuted through evidence obtained in Jenkens & Gilchrist's 116 boxes produced after trial. .......................................................148

iv.  Abrams failed to interview attorneys involved in certain transactions and to obtain forensic accountant's report which would have refuted government's "tracing" theory. ..................................................................................152

III.  SECTION III Regarding Ohle's § 2255 Claim Three. Trial counsel's failure to investigate Ohle's good faith claim of a 1256 transaction deduction was ineffective assistance of counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...................153

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ...................156

B. Ohle's 1256 transaction convictions based on fraudulent representation to Gordon . . . . . . ..........................................................................158

C. Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate . ...................................................................................159

i. Kruse's trial testimony that government based its claim that Ohle provided Gordon with false representation letter . . . . . . . . . . . . . . . . . . . . . . . . 160

ii. New evidence including Ohle's Greenberg Traurig legal files, civil deposition testimony and other investigations demonstrate Abrams' failure to investigate the 1256 transaction and resulted in ineffective assistance of counsel . . . . . . . . . . . . . ..........................................................................164

iii. Abrams failed to produce an expert at trial, interview witnesses, investigate Ohle's civil income tax audit and similar audits of other 1256 transaction participants, and the IRS' civil tax shelter promoter audit of Dumaine . . . 169

iv. Government would not prevail on any of its three alternate "theories" related to Ohle's willful evasion of taxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

1. The government argued that Ohle willfully evaded the tax law because the 1256 transaction did not possess "economic substance." . . . . . . 172

2. The government argued that Ohle willfully evaded his taxes because he failed to have a proper "business purpose" for investing in the 1256 transaction . . . . . . . . . ..............................................................................172.

3. The government argued that Ohle willfully violated the at-risk rules of IRC Section 465 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ........173

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ............176

**Table of Authorities**

Cases:

Brady v. Maryland, 373 U.S. 83 (1965)

Carrion v. Smith, 549 F.3d 583, 588 (2nd Cir. 2008)

Cheek v. United States, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991)

Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989)

Mason v. Scully, 16 F.3d 38 (2nd Cir. 1994)

Rice's Toyota World Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985)

Skilling v. United States, -U.S. -, 2010 WL 2518587 (June 24, 2010)

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 674 (1984)

United States v. Ohle, 678 F.Supp 215 (S.D.N.Y. 2010)

United States v. Ohle, 2011 WL 651849 (S.N.D.Y. 2011)

United States v. Ohle, 2011 U.S. App. LEXIS 21275 (2nd Cir. Oct. 20, 2011)
.
.
Federal Statutes:

18 U.S.C. 371

18 U.S.C. 2255

18 U.S.C. 3293

28 U.S.C. 7201

IRC Section 1256

**PETITIONER OHLE'S SUPPLEMENTAL BRIEF REGARDING NEW EVIDENCE
SUPPORTING PETITIONER'S 2255 CLAIMS**

COMES NOW Petitioner John B. Ohle, III, through undersigned counsel, who hereby files this Supplemental Brief regarding this new deposition testimony and documentary evidence in further support of his petition for federal habeas relief under 28 U.S.C. 2255 [see Case No. 1:13-cv-00450-JSR, Docket Nos. 1-4, filed January 18, 2013 and Docket No. 8, filed March 26, 2013 (hereafter "2255 motion")], seeking to vacate his conviction and sentence.  This compelling, newly-presented evidence was obtained primarily in civil litigation involving the various parties in the transactions at issue in Ohle's criminal trial subsequent to last year's August 9, 2013 oral argument on Petitioner's 2255 motion.

## INTRODUCTION

Ohle's 2255 motion pending before this Honorable Court relates to his counsel's ineffective assistance.  The core issues are his counsel's failure to review the government's document production prior to trial, failure to investigate leads, and failure to interview witnesses which ultimately led to Ohle's counsel, Stuart Abrams, failing to present a defense case.

This Brief provides deposition testimony by Ohle's former supervisor who plainly states that Bank One was not entitled to two percent of each HOMER transaction, that Jenkens & Gilchrist paid the third party service provider fees out of its legal fees and that Bank One was not entitled to any monies beyond those set forth in the Services Agreements.

This deposition testimony alone requires this Court to vacate Ohle's conviction and sentence.  In the government's oral argument on Ohle's 2255 motion, Nanette Davis argued that "on the prejudice prong Mr. Ohle could never succeed [see Transcript of oral arguments on Ohle's 2255 motion, August 9, 2013, (hereafter "2255 Tr."), Case No. 1:13-cv-00450-JSR, Docket No. 22, p. 13]."  This assertion was based upon the government's claim that "the fees, the bogus referral fees that were paid to Mr. Ohle and his co-conspirators were coming out of Bank One's hide, not

Jenkens & Gilchrist's hide and nothing Mr. Ohle could say now could have made any sort of difference at trial [2255 Tr., p. 14]."  Had Abrams called Ohle's supervisor Harry M. Dye III, who was Director of Bank One/Chase's Innovative Strategies Group ("ISG"), Dye's testimony would have definitively proved that the payments were NOT "coming out of Bank One's hide" and that Bank One/Chase had no property interest in the allegedly "fraudulent" payments by Jenkens & Gilchrist.

As discussed below, the evidence presented herein is substantial, cumulative and dispositive, and should result in this Court vacating Ohle's conviction and sentence based upon his counsel's ineffective assistance.  The circumstances which led a well-respected attorney to inexplicably blow this case seem to be a perfect storm.

First, Abrams suffered from brain cancer during his representation of Ohle. During his successive representation of Ohle during his direct appeal, Abrams lapsed into comas and eventually died ten days after oral arguments in Ohle's direct appeal.  Abrams failed to disclose his medical problems to Ohle until five days before his oral arguments before the Second Circuit Court of Appeals on October 3, 2011. Abrams died on October 13, 2011.  See Motion to Vacate under 28 U.S.C. 2255, filed pro se by Ohle on March 14, 2012, Case No. 1:12-cv-01909-JSR, Docket No. 1 and Supplemental Brief to 2255 Pro Se Motion, filed on April 25, 2012, Docket No. UNKNOWN (Clerk failed to place on docket sheet)(hereafter "2255 Pro Se Motion" refers to Supplemental Brief), p. 1-2, and in globo emails from Abrams/Frankel to Ohle regarding Abrams' legal representation, Exhibits 1-1 and 1-2(a)-(j).

Abrams' health issues and their dramatic effect on Abrams' failure to prepare for Ohle's trial were originally set forth in Ohle's pro se 2255 motion [Id., p. 1-2, 11]. But Ohle eventually obtained counsel, Priya Chaudhry, to represent him in his habeas proceedings, whereby he withdrew his pro se 2255 motion [see Case No. 1:12-cv-01909-JSR, Docket No. 20].

Chaudhry addressed Abrams' health in her Memorandum of Law in Support of Ohle's 2255 Motion [Case No. 1:13-cv-00450-JSR, Docket No. 4-1, fn. 4, p. 10], "The chief reason Abrams, a widely respected and seasoned member of this District's defense bar, in spite of his expertise rendered ineffective assistance in this

case lay in his struggle at the time with cancer.  Mr. Abrams died on October 13, 2011, just over a year after he represented Ohle at trial."

Chaudhry again addressed the serious issues related to Abrams' health in her oral arguments before this Court on August 9, 2013 where she stated that David Hammer, a contract attorney who wrote Abrams' motions, said, "Mr. Abrams would say to him quite often this is the most exhausted I've ever been in my life.  I never felt like this before [2255 Tr., p. 15]."  Chaudhry further stated, "But [Stuart's statements regarding his health] did stand out in [Hammer's] mind that this was a common thread of what Mr. Abrams would report during trial prep [Id., p. 15]."  In order to obtain further information regarding Abrams' health, Ohle moved this Court in his Motion to Permit Discovery, filed on September 11, 2014 [see Case No. 1:13:-cv-00450-JSR, Docket Nos. 29, 31 (hereafter "Motion to Permit Discovery")], to allow him to subpoena medical records and develop additional evidence relating to Abrams' health condition.

Second, the government's document production was corrupted.  Neither Abrams nor Chaudhry were able to review the government's discovery.  Chaudhry explained to the court her first-hand knowledge of Abrams' failure to review the government's document production, "And my personal basis for believing [that Abrams failed to review the government's discovery] is when Mr. Abrams' files, those actual files were sent to my office, they were in a format that was not reviewable [2255 Tr., p. 4]."

Chaudhry also pointed out Abrams' own admissions both at hearings before this Court and in his written submissions to this Court where Abrams stated that he had failed to locate exculpatory documents which undermine confidence in the correctness of the jury's verdict [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159 (hereafter "Motion for New Trial", p. 12)].  Abrams further stated that documents he failed to locate prior to Ohle's trial "show that the government presented evidence at Ohle's trial that was false, and that the government may have known, and certainly should have known, that the evidence was false [Id.]."

Chaudhry also pointed out that communications between Ohle and Abrams made clear, in addition to communications between Abrams and the government, that Abrams had never before reviewed a Concordance database [see 2255 Pro Se Motion, p. 3-7, 15-17]. But Abrams failed to raise his inability to access Ohle's discovery databases with this Court in his Motion for New Trial (instead accusing the government of Brady violations) or with the Second Circuit Court of Appeals in Ohle's direct appeal (raising the same arguments made in his Motion for New Trial). In order to properly review his discovery for the first time, Ohle has requested in his Motion to Permit Discovery, filed September 11, 2014, that this Court order the government or its vendor CACI to produce an uncorrupted discovery database, permit Ohle to review such discovery, allow Ohle to subpoena certain documents and grant Ohle leave to address the import of these new documents and information to the Court.

Third, this case was overshadowed by the government's aggressive prosecution of professionals responsible for the tax shelter industry. Ohle's prosecutors were involved in the prosecution of KPMG LLP where many indictments were dismissed due to the government's pressure on KPMG to withhold legal fees to its employees [see United States v. Jeffrey Stein et al, S1-05 Crim. 0888 (LAK); 06 Civ. 5007 (LAK), U.S.D.C.-S.D.N.Y.]. The government found a corporation in  Ohle's former employer Bank One (now J.P. Morgan Chase & Co.), that was willing to make false statements in order to hide its culpability for its participation in this illegal tax shelter industry.

In addition to its false statements, Bank One also wrongfully withheld advancement of Mr. Ohle's legal fees which inhibited Ohle's defense. The world's largest financial institutions, including J.P. Morgan Chase & Co. and Deutsche Bank, instructed its employees to market "tax products" which these institutions represented to their employees and HOMER clients were proper, legal transactions that were not required to be registered under the IRC tax shelter rules. These financial institutions provided a companion tax opinion letter which further provided that the transactions would "more likely than not" result in properly deductible losses. Finally, the financial institutions represented to their employees

and HOMER clients that, in any event, the tax opinion letter would protect investors from tax penalties under the Internal Revenue Code.

The newly presented evidence shows that Ohle was a whistleblower on HOMER in mid-December 2001 when Ohle demanded that Bank One/Chase disclose its failure to properly perform due diligence on the HOMER transaction, including a determination by outside counsel whether the HOMER transaction should have been registered under the tax shelter rules. Bank One dismissed his warnings, silenced his whistle blowing through an "internal investigation," and continued its tax shelter activities including the preparation and signing of tax returns reporting $425 million in fraudulent losses long after Ohle's departure from the bank. Incredibly, Bank One has claimed victim status in this case. The information that Ohle has confirmed in deposition testimony and documents from civil litigation as well as from FBI interviews recently produced by the government in response to the Court's Order herein, which was available to Abrams, proves that Bank One/Chase was responsible for its fraudulent tax shelter activities, not Ohle.

And, most significantly to Ohle's 2255 claims, this newly presented evidence proves that Bank One/Chase was never entitled to any monies beyond those amounts it received under the Services Agreements with Jenkens & Gilchrist, contrary to Bank One/Chase's fraudulent representation to this Court in its Victim Impact Statement. Further, Bank One/Chase and its counsel have had actual knowledge of this fact since December 2, 2013 but have continued the fraudulent cover-up through their efforts to conceal this evidence from this Court and their failure to amend the Victim Impact Statement. Bank One's fraud has resulted in Ohle's wrongful conviction and imprisonment which has now lasted more than 3 1/2 years.

Fourth, the government paraded a cast of characters before this Court who perjured themselves, made material misrepresentations and created false inferences. Had Mr. Abrams been a fraction of his former self and had properly prepared for Ohle's trial, Abrams would have introduced evidence exposing these false, misleading and self-serving statements. The new evidence will show that Hugh Uhalt, who testified in place of his mother, Ecetra N. Ames, under his claims

that he held a power of attorney, did not in fact have a power of attorney.  Further, Uhalt lied about being the trustee for his mother's CRUT which was the basis for the government's "embezzlement" accusations.  Douglas Steger testified that he did not receive commissions related to Ames' investment in Societe Generale Alternative Investment Leveraged Warrants  ("SocGen Warrants") but the newly presented evidence shows that he did in fact receive the commissions.  Ed Doherty misrepresented at trial Ohle's involvement in the payment of these commissions, contrary to his prior statements to Ames' attorney John Wogan.  However, Abrams' failure to investigate these issues including his failure to interview witnesses, subpoena documents, review the government's document production, and present a defense, resulted in inferences, innuendos and false statements which directly resulted in Ohle's wrongful conviction.

**A.  Procedural History**

Ohle has currently served 42 months of his five year sentence.  After a three-week jury trial before this Court, Ohle was convicted on June 2, 2010 on one count of conspiracy in violation of 18 U.S.C. 371 to commit wire fraud by obtaining fees, directly or indirectly, from a national bank and to defraud the Internal Revenue Service ("IRS") and on two counts of tax evasion in violation of 26 U.S.C. 7201 for the years 2001 and 2002, respectively.

Ohle and co-defendant William Bradley originally had been charged in an eight-count indictment, filed November 13, 2008 [see Case No. 1:08-cr-01109-JSR, Docket No. 1].  The government filed a series of superseding indictments.  Between the second and third superseding indictments, five counts relating to Ohle's participation in the sale of a certain fraudulent tax shelter product known as HOMER were severed.  See United States v. Ohle, 678 F.Supp.2d 215, 224-228 (S.D.N.Y. 2010).  The government did not proceed against Ohle on the severed tax-shelter counts, which were dismissed following Ohle's sentencing [see Case No. 1:08-cr-01109-JSR, Docket No. 176].

After trial Abrams filed a motion for judgment of acquittal, which was denied. The government sought and the Court granted a Fatico hearing concerning Ohle's conduct related to HOMER, to be considered at sentencing.  During the Fatico

proceeding, it came to light through developments in United States v. Daugerdas et al., No. 09 CR 581 (WHP), that the government had failed to produce 116 boxes of documents relevant to Ohle's case.

This Court adjourned the sentencing while it considered Abrams' motion for a new trial on the ground that the government's belated production of the boxes had violated Ohle's due process rights and the prosecution's related duties under Brady v. Maryland, 373 U.S. 83 (1965). The motion was denied. See United States v. Ohle, 2011 WL 651849 (S.D.N.Y. 2011). On January 28, 2011, this Court sentenced Ohle to a term of five years' imprisonment and entered an Order of forfeiture against Ohle in the amount of $2.9 million.

Abrams filed a timely appeal of Ohle's conviction, challenging the sufficiency of evidence to establish a fraud against the bank, to establish a single wire fraud conspiracy, to establish venue as to all counts, to establish the criminality of one aspect of Ohle's conduct alleged to constitute tax evasion in the year 2002; challenging related forfeiture order; and challenging the denial of his motion for a new trial. The Second Circuit affirmed this Court's judgment by summary order, which was entered on October 20, 2011 [see United States v. Ohle, 2011 U.S. App. LEXIS 21275 (2nd Cir. Oct. 20, 2011)].

On March 14, 2012, Ohle filed a pro se habeas petition pursuant to 28 U.S.C. 2255. The government replied. Ohle subsequently was able to retain Chaudhry. The Magistrate Judge managing the habeas proceedings permitted Ohle to withdraw his pro se submission and on August 20, 2012, dismissed the case without prejudice [see Case No. 1:12-cv-01909-JSR, Docket No. 17].

Chaudhry filed a habeas petition on Ohle's behalf pursuant to 28 U.S.C. 2255 on January 18, 2013 [see 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket Nos. 1-4] and a supplemental brief on March 26, 2013 [Docket No. 8]. In those papers, Chaudhry argued that Abrams was ineffective for his (1) failure to investigate Bank One's lack of entitlement to greater HOMER fees and Ohle's ignorance of any such entitlement; (2) failure to investigate legitimate loans made by Ames Trust; (3) failure to investigate Ohle's good-faith claim of a tax shelter deduction; (4) neglect to adequately challenge the Government's failures to allege or prove Bank One's

legitimate property interest in the subject proceeds, and, (5) failure to challenge the legitimacy of Bank One's property interest.  Chaudhry also alleged that cumulative errors undermined the confidence of the verdict.  The government filed its opposition on May 1, 2013 [Docket Nos. 13, 14].  No reply papers were filed.  Also in May 2013, this Court set a hearing date of August 9, 2013 on Chaudhry's 2255 motion.

On July 29, 2013, Chaudhry attempted to withdraw as Ohle's counsel before oral argument on her 2255 motion [see Docket Entry on 7/29/13].  This Court denied Chaudhry's motion to withdraw.  On August 5, 2013, this Court granted the motion of undersigned counsel to appear pro hac vice before this Court [see Docket No. 17].  Due to prior representation issues, Ohle filed a motion to adjourn the hearing on August 8, 2013, or, in the alternative, to stay any order on the 2255 motion after the hearing until undersigned counsel familiarized himself with the case and determined what actions were required [Docket No. 19].  The government took no position in its Reply filed on August 9, 2013 [Docket No. 20].  This Court denied the motion [Docket No. 21].  On August 9, 2013, oral argument was held by this Court on Ohle's 2255 motions [Docket No. 22]. This Court took Ohle's 2255 motion under advisement.

At the conclusion of oral argument, this Court granted Chaudhry's motion to withdraw as Ohle's counsel.  On October 1, 2013, a standing order which ordered the stay of certain civil cases was entered in this matter [Docket No. 24].  The stay remained in place until Ohle filed his Motion for Leave to File a Supplemental Brief in Support of his 2255 Motion on June 30, 2014 [Docket No. 27] which was granted by this Court on July 6, 2014.

On September 11, 2014, Ohle filed a Motion to Permit Discovery [Docket Nos. 29, 31] with this Court so that he could obtain an uncorrupted copy of his discovery, obtain certain files and documents in the possession of former attorneys, and subpoena relevant documents related to Abrams' health issues and certain documents in the IRS' possession.

**B.  Government's Charges Against Ohle**

The government's charges against Ohle can be grouped into the following three sections which Abrams argued should not constitute a single conspiracy:

**Section One of government's case** - Ohle's stole Bank One/Chase's tax shelter fees, failed to report those allegedly fraudulent proceeds and then conspired with others to defraud the IRS related to those allegedly fraudulent fees

The centerpiece of the government's case was the charge that Ohle conspired to commit wire fraud against Bank One/Chase by causing fraudulent invoices to be issued to Jenkens & Gilchrist for "referral fees" in connection with certain HOMER transactions. The government's theory was that these tax shelter fees were the legal property of Bank One/Chase. (Count One - wire fraud).

The government claimed that Ohle failed to report the income from these allegedly fraudulently-obtained fees on his 2001 and 2002 income tax returns (Counts Two and Three, respectively).

The government claimed that Ohle also defrauded the IRS through this "scheme" to allegedly defraud Bank One/Chase of its tax shelter fees by conspiring with Ken Brown, Douglas Steger, John Manella and William Bradley to report the income from these allegedly fraudulently-obtained fees on their own income tax returns (Count One - conspiracy to defraud IRS).

**Section Two of government's case** - Transfers from Ames CRUT and commissions on SocGen Warrants were allegedly fraudulent.

The government then recast transfers from the Ames CRUT as fraudulent, arguing that Ohle's failure to report as income certain transfers from Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Unitrust ("Ames CRUT") constituted criminal conduct. More specifically, the government claimed that amounts recorded and approved as bona fide loans by the Civil District Court for the Parish of Orleans in the State of Louisiana and subject to a final Consent Judgment and a separate Settlement Agreement with the Ameses were in fact embezzled funds that constituted additional unreported income by Ohle on his 2001 and 2002 income tax returns (Counts Two and Three, respectively).

The other Ames-related charge related to Ames' payment of a front-end sales load on her purchase of Societe Generale Alternative Investment Linked Leveraged Warrants ("SocGen Warrants") which was alleged to be fraudulent.  Ames' allegedly fraudulent commission of $250,000 was daisy-chained with the Bank One/Chase "fraud," increasing Ohle's forfeiture order from $1.2 million to $2.9 million.

**Section Three of government's case -** Ohle provided fraudulent representation letter to Gordon

The government alleged that Ohle made a fraudulent representation to Greenberg Traurig attorney Jay I. Gordon to induce him to issue Ohle a tax opinion letter related to his father's investment in 16 separate investment contracts, designed by John Kruse of the Royal Bank of Canada and known as the "1256 transaction".  Alternatively, the government argued three other theories commonly presented in civil tax audits, including economic substance, business purpose and at-risk rules.

**C.  Factual Background Regarding Ineffective Assistance of Counsel**

Ohle was arrested in this matter on November 18, 2008.  Bank One/Chase refused to advance legal fees to Ohle's counsel David Spears, resulting in Ohle being unrepresented.  Ohle hired Steve Blanc to obtain advancement of legal fees from his former employer Bank One/Chase, as explicitly provided in Ohle's separation agreement with Bank One/Chase.

Bank One/Chase refused advancement of Ohle's legal fees citing allegations of Ohle's involvement in defrauding HOMER clients of their monies [see Sealed Indictment, Case No. 1:08-cr-01109-JSR, Docket No. 1].  This theory of fraud by Ohle was later changed in the government's second superseding indictment to wire fraud against his former employer Bank One/Chase.

Blanc obtained an agreement with Bank One/Chase to pay one-half of Ohle's legal fees since Bank One/Chase claimed it was only responsible for the HOMER-related counts.  [see Exhibit A, Declaration of John B. Ohle, III (hereafter "Decl. of Ohle"), para 5; see Exhibit B, Declaration of Steven Blanc (hereafter, "Decl. of Blanc"), para. 4]  Ultimately, as shown herein, Ohle was tried primarily on allegations that he defrauded Bank One/Chase of its property.  The evidence presented herein shows

that Bank One/Chase had no property interest in any fees paid to third party service providers by Jenkens & Gilchrist.

In early 2009, Ohle hired Abrams and Blanc as his defense team  [see Declaration of John B. Ohle, III in Support of 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket No. 3 (hereafter "Decl. of Ohle 2255"), para. 5; Decl. of Ohle, para. 6; Decl. of Blanc, para. 1].  Blanc had previously represented Ohle in the IRS' civil income tax audit.  During this representation, Blanc had obtained from Robert Goldstein an analysis of each inflow and outflow from Ohle's accounts.  Blanc provided this analysis and other accounting information to Abrams for use at Ohle's trial. [Decl. of Ohle, para. 7; Decl. of Blanc, para. 5-6]

Abrams, Blanc and Ohle agreed to hire an accountant to produce a forensic accounting report to rebut the government's "tracing" allegations at trial and to hire an expert to refute the government's tax theories related to HOMER and the 1256 transaction [Decl. of Ohle, para. 8-10; Decl. of Blanc, para. 7-8].  Further, in preparation for trial, Ohle conferred with Abrams and Blanc numerous times, providing detailed information for investigating certain witnesses and obtaining documents that would serve to refute the charges [see Declaration of Priya Chaudhry in Support of 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket No. 2 (hereafter "Decl. of Chaudhry"), para. 15; Decl. of Ohle 2255, para. 8-13].  Yet Abrams never interviewed or subpoenaed these critical witnesses nor obtained or subpoenaed these exculpatory documents [Decl. of Chaudhry, p. 5-7, 15; Decl. of Ohle 2255, para. 12-13, 17].

Abrams hired Citron Cooperman to produce the forensic accounting report and provide expert testimony at Ohle's trial [see Exhibit C, F&A Cash Disbursement, where Abrams paid Citron Cooperman $3,750 on 4/16/10].  However, Abrams failed to obtain the report or produce an expert at Ohle's trial.  Similarly, Abrams hired other experts to investigate Douglas Steger and Ecetra Ames but failed to obtain a work product [Id., where Abrams hired Cadillac Investigations (Steger) and James Harkins (Ames)].  [Decl. of Ohle, para. 11-12].  Ohle has asked this Court for permission to subpoena files from these contractors in his Motion to Permit Discovery, filed on September 11, 2014.

Specifically, Ohle alerted Abrams and Blanc to the following four critically important documents:

1.  Services Agreement between Jenkens & Gilchrist and Bank One/Chase, signed on behalf of Bank One/Chase by ISG Director Dye and ISG member Conrad and on behalf of Jenkens & Gilchrist by Paul Daugerdas and Donna Guerin [Decl. of Ohle 2255, para. 9].  Had Abrams investigated facts based on this document, including interviewing Dye, Conrad and Bank One/Chase attorney John Kramer, Abrams would have presented direct evidence demonstrating that Ohle did not defraud Bank One/Chase of its property and proving Ohle's actual innocence of wire fraud against Bank One/Chase.  See Section One.

2.  Consent Judgment entered in the Civil District Court for Orleans Parish, State of Louisiana, approving Ohle's final accounting of Anthony M. & Ecetra N. Ames 1999 Charitable Remainder Trust ("Ames CRUT").  Ohle told Abrams and Blanc that this final accounting was the result of an extensive investigation in these matters by John Wogan of Liskow & Lewis.  Ohle also provided information related to the attorneys who represented him in the matter at Baldwin & Haspel LLC.  [Decl. of Ohle 2255, para. 10; Decl. of Chaudhry, para. 15; Decl. of Ohle, para. 13].  Had Abrams investigated the matters that led to this final judgment of the Ames CRUT accounting, including interviewing Wogan, his accountant Kyle Theard and Baldwin & Haspel attorney John Rouchell, Abrams would have obtained Wogan's investigation files and other documents to impeach witnesses at Ohle's trial and establish that Ohle's actions as trustee were completely legal.  More importantly, Abrams would have presented direct evidence that transfers from the Ames CRUT were properly reported as loans, disproving the government's allegations of embezzlement which were highly prejudicial.  Abrams would have also obtained reports, emails and other correspondence relating to Douglas Steger's receipt of commissions on the sale of the SocGen Warrants.  See Section Two.

3.  Promissory Notes and related loan documents between Ames CRUT and Gamma Trading Partners LLC.  Ohle told Abrams and Blanc that transfers from the Ames CRUT were part of a tripartite series of loan agreements involving Gamma and

the Ames CRUT on the one hand, and Gamma, Dalton Ventures LLC and Ohle on the other hand [Decl. of Ohle 2255, para. 10]. Ohle destroyed all documents related to the Ames CRUT in mid-2007 which was more than three years following the Consent Judgment, a final judgment by the State of Louisiana, approving Ohle's final accounting of the Ames CRUT, and the Settlement Agreement and Mutual Release between Ohle and the Ameses. However, Ohle provided Abrams with witnesses who had direct knowledge of the loans, the repayments and subsequent litigation, including attorneys in Chicago who represented Ohle in this matter. [Decl. of Ohle, para. 14; Decl. of Blanc, para. 9]. Had Abrams presented testimony from a witness such as Rouchell and obtained these documents from Rouchell or other sources, Abrams would have presented direct evidence at trial that these were bona fide loans from the Ames CRUT to Gamma Trading and defeated the government's highly prejudicial claims that these amounts were embezzled. See Section Two.

4. Representation letter from Montgomery Global to Greenberg Traurig. Ohle told Abrams that Roger Groh at Montgomery Global had provided a representation letter on which Ohle based all investment-related representations [Decl. of Ohle 2255, para. 10]. Had Abrams obtained Mr. Ohle's legal files from Greenberg Traurig and interviewed Groh, Abrams would have presented direct evidence that Ohle's representations were not fraudulent and based upon his father's counterparty's representations and the underlying written contracts. See Section Three.

Abrams' medical issues and his failure to review Ohle's discovery are set forth in more detail in Ohle's Motion to Permit Discovery, filed herein September 11, 2014. This failure to review Ohle's discovery was fatal, resulting in the complete breakdown of the adversarial process. As this Court held in its Memorandum Order denying Abrams' Motion for New Trial, "Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once. Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything, the onus is on defense counsel to conduct a more diligent

search for material potentially favorable to his client.  This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located [see Order Denying Abrams' Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 182, p. 9-10]."

In light of this Court's ruling, Abrams clearly did not fulfill his responsibility to review Ohle's discovery.  Abrams' failure to review the discovery and his failure to investigate facts related to the four critical exculpatory documents noted above clearly fell below an objective standard of reasonableness [see Decl. of Chaudhry, para. 8-13].  As will be shown in the following sections, had Abrams investigated these matters and subpoenaed the witnesses, the outcome of Ohle's trial would have been different.  Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); Mason v. Scully, 16 F.3d 38, 42 (2nd Cir. 1994).

The evidence presented herein is substantial, dispositive and cumulative. Nevertheless, Ohle submits this Supplemental Brief without ever having his counsel (or himself) review the discovery databases [2255 Tr., p. 1-4].  As his attorney Chaudhry stated during oral arguments on Ohle's 2255 motion, "The tragedy as I stand here is Stuart Abrams was never able to review it thoroughly and I've never been able to review it thoroughly.  And so no one has actually from the defense side reviewed those documents thoroughly [2255 Tr., p. 4]."  For the foregoing reasons, Ohle requested leave, in his Motion to Permit Discovery, filed September 11, 2014, to brief this court, following receipt of uncorrupted discovery databases and his review of same, regarding the import of documents and information identified in his discovery.

Abrams acknowledged his inability to review Ohle's discovery in statements to this Court and in his filings with this Court, but Abrams may have never understood that his problems related to corrupted data [see 2255 Tr., p. 4, where Chaudhry states that she had personal knowledge that Abrams' discovery files were unreviewable].  This failure to load and review the discovery databases led to a cascading series of problems for Mr. Abrams prior to Mr. Ohle's trial, including Abrams' failures to investigate the aforementioned documents, interview witnesses,

18

subpoena documents, hire tax experts, obtain the forensic accountant expert report, subpoena key witnesses and, ultimately, present a defense on behalf of Ohle.

Had Abrams investigated these documents, Abrams would have subpoenaed witnesses identified on the face of the documents or directly related to the negotiation, drafting and execution of these documents at Ohle's trial.  As shown below, this direct evidence would have proved Ohle's actual innocence.

But Abrams' technological problems alone cannot explain the inexplicable actions of Abrams in this case.  Clearly, Abrams' struggles were related to his cancer.  For example, Abrams went on two trips for the purpose of interviewing witnesses - one to Chicago and the other to New Orleans - but inexplicably failed to interview any witnesses.  Abrams told a frustrated Ohle that he would return at a later date to interview the witnesses.  Abrams never returned to conduct these interviews.  [Decl. of Chaudhry, para. 5-7; Decl. of Ohle 2255, para. 11, 17].

Unable to review Ohle's discovery databases, Chaudhry set forth Ohle's claims of ineffective assistance in her Memorandum of Law in Support of Ohle's 2255 Motion to Vacate his Sentence and Judgment of Conviction, filed on January 18, 2013 [see Case No. 1:13-cv-00450-JSR, Document No. 4-1, hereafter "Ohle's 2255 motion"; Decl. of Chaudhry, para. 8-13].  Chaudhry outlined Abrams' ineffective assistance in the following four claims [Docket No. 4-1]:

Claim One:  Trial counsel's failure to investigate Bank One's lack of entitlement to greater HOMER fees and Ohle's ignorance of any such entitlement was ineffective assistance of counsel.

Claim Two:  Trial counsel's failure to investigate legitimate loans made by Ames Trust was ineffective assistance of counsel.

Claim Three:  Trial counsel's failure to investigate Ohle's good-faith claim of a tax shelter deduction was ineffective assistance of counsel.

Claim Four:  Numerous Errors by Trial Counsel Gave Rise to Cumulative Error, Undermining Confidence in the Verdict.

Chaudhry was granted leave to supplement her submission based upon her inability to search the discovery databases.  Unfortunately, Chaudhry was still not able to review Ohle's discovery databases due to corruption issues [2255 Tr., p. 4].

Unable to search Ohle's discovery and under a deadline, Chaudhry advanced two further claims of ineffective assistance of counsel based upon legal arguments that Abrams failed to pursue [Docket No. 8]:

Claim Five:  Trial counsel's neglect to adequately challenge the government's failures to allege or prove Bank One's legitimate property interest in the subject proceeds was ineffective assistance of counsel.

Claim Six:  Trial counsel's failure to challenge the legitimacy of Bank One's property interest was ineffective assistance of counsel.

Having set forth the claims of ineffective assistance of counsel, Chaudhry asked in Ohle's 2255 motion that an evidentiary hearing be granted to further develop support for her claims.  That request for an evidentiary hearing was renewed by Chaudhry during her oral arguments.  This Honorable Court has the matter under advisement.

While awaiting this Court's ruling, Ohle obtained substantial evidence that bore directly on his pending 2255 motion.  Ohle sought leave to file this Supplemental Brief providing further evidentiary support for Chaudhry's claims in Ohle's 2255 motion.  This compelling new evidence was primarily obtained from civil litigation involving the various parties in the transactions at issue in Ohle's criminal trial.  The new evidence is in the form of deposition testimony and documents that bear directly on and support the merits of Ohle's 2255 motion argued at the August 9, 2013 hearing before this Court.

## I.   SECTION I Regarding Ohle's § 2255 Claims One, Five and Six.

This section provides supplemental support for the following ineffective assistance of counsel in claims One, Five and Six of Ohle's § 2255 motion:  First, trial counsel's failure to investigate Bank One/Chase's lack of entitlement to greater HOMER fees and Ohle's ignorance of any such entitlement; second, trial counsel's neglect to adequately challenge the government's failures to allege or prove Bank One/Chase's legitimate property interest in the subject proceeds; and third, trial counsel's failure to challenge the legitimacy of Bank One/Chase's property interest.

The basis for the government's prosecution of Ohle was that he defrauded his employer Bank One/Chase of its property, namely HOMER fees (Count One), and that Ohle failed to report those allegedly fraudulent proceeds on his 2001 and 2002 income tax returns (Counts Two and Three, respectively).  The government claimed that Ohle was the perpetrator of the fraud, and that Bank One/Chase was the victim.

As discussed in detail below, Bank One/Chase was hardly a victim.  Instead, Bank One/Chase actively continued its illegal tax shelter activities long after Ohle left his position at Bank One/Chase, including preparing, signing and issuing income tax returns reporting more than $425 million in fraudulent HOMER losses.  In mid-December 2001, Ohle raised serious concerns about HOMER with his immediate supervisors Harry M. Dye, III and Jon Verity, Bank One Investment Advisors ("BOIA") general counsel John Kramer and Bank One/Chase CEO Jamie Dimon. Bank One/Chase orchestrated a corporate strategy to silence Ohle's whistle blowing through "internal investigations" and to suspend Ohle based on a litany of baseless allegations in order to conceal its own culpability and to evade responsibility for decisions made and actions taken by senior executives.

Six years later, Bank One/Chase convinced the government during its tax shelter promoter audits of Jenkens & Gilchrist, Deutsche Bank and Bank One/Chase that Ohle, not Bank One/Chase, was criminally culpable for HOMER, resulting in an eight-count indictment against Ohle which charged Ohle with $100 million tax fraud related to HOMER [see Sealed Indictment, Case No. 1:08-cr-01109-JSR, Docket No. 1].  Incredibly, Bank One/Chase also claimed it was defrauded of additional fees in

its illegal tax shelter transaction based upon its contention that Bank One/Chase was entitled to two percent of each HOMER transaction [see Bank One Corporation's Victim Impact Statement, dated January 10, 2011, where Bank One/Chase claims entitlement to two percent of each HOMER transaction and assigns financial responsibility to Ohle for its illegal tax shelter activities, Case No. 2:12-cv-013240-CJB-DEK, Docket No. 1-2, p. 53-54].

The evidence presented herein provides dispositive proof that Bank One/Chase was not defrauded by Ohle of its property and that Bank One/Chase is solely culpable for its illegal tax shelter activities, not Ohle. Remarkably, this evidence could have been produced at trial by simply subpoenaing Dye, Jeff Conrad and John Kramer from Bank One/Chase, and representatives from Jenkens & Gilchrist to testify that Bank One/Chase was only entitled to those amounts set forth in the Services Agreements; that Bank One was not entitled to two percent of each HOMER transaction; that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers out of its fees, not out of Bank One/Chase's fees; and that Jenkens & Gilchrist's payments to third party service providers were for legitimate services as well as for legitimate referral fees.

Consistent with its corporate strategy to "assign" blame to Ohle for its illegal tax shelter activities, Bank One/Chase failed to advance Ohle's legal fees pursuant to Ohle's separation agreement with Bank One/Chase. Ohle eventually obtained the bank's agreement to advance one-half of his legal fees and expenses [Decl. of Blanc, para. 4]. But, before Ohle's trial, Bank One/Chase breached this agreement which adversely impacted Ohle's ability to obtain proper representation. As a result, Ohle has been imprisoned for more than three and a half years fighting to correct a wrongful conviction in his case in which his former employer Bank One/Chase actively sought to conceal its own culpability and evade responsibility for decisions made and actions taken by its senior executives.

Bank One/Chase's intentions were clear - to cover up its culpability for participating in this tax shelter industry. Bank One/Chase's corporate strategy was to assign blame for its illegal tax shelter activities to a low-level, subordinate employee Ohle and to cooperate with the government in Ohle's prosecution. This

"cooperation" included Bank One/Chase withholding payment of Ohle's legal fees and expenses to impair Ohle's defenses and to submit a false Victim Impact Statement to this Court.  Consistent with its corporate strategy of making it impossible for Ohle to expose the truth about Bank One/Chase's conduct, Bank One/Chase relied on its untruthful Victim Impact Statement to refuse paying Ohle's legal fees and expenses.  The deposition testimony from Dye alone exposes Bank One/Chase's wrongful actions in Ohle's prosecution.

Necessity of casting Bank One/Chase as "victim"

Ohle's third-superseding indictment, and the government's case against him at trial, was an effort to obscure the fact that the anticipated Supreme Court reversal of the honest services fraud provision in *Skilling v. United States*, 2010 WL 2518587 (June 24, 2010), would have eliminated the government's wire fraud charges against Ohle since the statute of limitations had expired prior to Ohle being charged with any fraud offense.

At trial, the government painted a labyrinthine story of fraud.  Dye's deposition testimony that Bank One/Chase was not entitled to any HOMER fees beyond the amounts set forth in the Service Agreements would have eliminated the government's "object of fraud" since Bank One/Chase did not have a property interest in the allegedly fraudulent amounts.  Accordingly, Bank One/Chase was not defrauded of its property, and, as a consequence, the government's reliance on the ten-year statute of limitations pursuant to 18 U.S.C. 3293 also fails.

The changing indictments in Ohle's case reflected the government's attempt to fit charges around Ohle.  The government had its "bad guy," now it needed a crime.  So, with the Supreme Court *Skilling* decision on the horizon, the government turned to Bank One/Chase.  Even though Bank One/Chase actively continued its illegal tax shelter activities (including preparing, signing and issuing tax returns reporting more than $425 million in fraudulent HOMER losses) long after Ohle left Bank One/Chase, the government cast Bank One/Chase, a financial institution, as the victim in the government's second indictment in order to rely on the ten-year

statute of limitations under 18 U.S.C. 3293.  Of course, a necessary element for Bank One/Chase to be the victim was that some property interest of Bank One/Chase's had to be the object of the fraud.

While the government obscured this issue through its presentation of a prejudicial case against Ohle involving multiple fraudulent tax shelters at Bank One/Chase and unproven allegations from Bank One/Chase's "internal investigations," Ohle was not tried or convicted of any of these allegations.  Bank One/Chase, his supposed victim, was not the defrauded taxing authority, nor was it the allegedly duped taxpayer.  It was unrefuted that Bank One was the beneficiary of the HOMER scheme.  Bank One/Chase served as trustee, tax return preparer and financial consultant on these fraudulent HOMER transactions, and received its full, contractually-negotiated fees for its services.  If the HOMER transaction was fraudulent, as determined by this Court in Ohle's Fatico proceedings (see Findings and Conclusion Regarding "Relevant Conduct," Case No. 1:08-cr-01109-JSR, Docket Entry No. 151) and as found by two separate juries in United States v. Daugerdas et al (09 CR 581 (WHP)), then Bank One/Chase did not have a legitimate property interest in HOMER fees, rendering the wire-fraud charge against Ohle legally invalid.

The government did not produce any direct evidence that Ohle had defrauded Bank One/Chase of its property.  Instead, the conviction was obtained by the "inference" that Bank One/Chase was entitled to two percent on each HOMER transaction and the government's assertions that Ohle received monies from some of these transactions.  Had Abrams properly reviewed Ohle's discovery and subpoenaed witnesses identified on critical documents and in FBI interview notes, Abrams would have presented evidence proving that Ohle never received, or intended to receive, anything that was the property of Bank One/Chase.  In fact, Abrams could have simply produced witnesses to confirm the terms set forth in the Services Agreements between Jenkens & Gilchrist and Bank One/Chase.

Ohle, as a former employee of Bank One/Chase, was not charged with defrauding the bank of his honest services; he was charged with defrauding Bank One/Chase of its property.  The evidence presented herein conclusively establishes that Bank One/Chase simply had no property interest in the third-party service

provider fees paid by Jenkens & Gilchrist.  Had Abrams presented readily available evidence, he would have defeated the government's inference that Bank One/Chase had an actual ownership interest in any of the funds.  The government's case was a pre-*Skilling* "honest services" allegation case including alleged nondisclosures, re-labeled as "fraud for money."  The evidence that Abrams should have identified and presented at trial demonstrates that no property interest of Bank One/Chase was put at risk by Ohle.

Because of Abrams' ineffectiveness, the government presented a case describing a series of investments in complex tax shelter transactions and hedge fund products for which Ohle was not charged.  The government also overwhelmed Ohle at trial with prejudicial uncharged allegations from Bank One/Chase's internal investigation which was designed to frame Ohle for the failures of the senior executives of Bank One/Chase who were responsible for reviewing, vetting and implementing these tax shelter transactions.  Ohle's prior counsel Lee Hutchinson of Freeborn & Peters had previously responded to these baseless allegations which ultimately resulted in Ohle receiving a substantial severance payment from Bank One/Chase. [See Exhibit 1-1, July 17, 2002 letter from Hutchinson to Rogoff and related affidavits].

Despite Hutchinson's direct knowledge of Bank One/Chase's unfounded allegations designed to silence Ohle's whistle blowing, Abrams failed to interview Hutchinson on his trip to Chicago and could not present direct evidence refuting the inference of Ohle's involvement [Decl. of Ohle, para. 17].  For example, the government produced testimony from two former HOMER clients Gene Clouatre and James Rutland that they signed false affidavits which stated that Ohle did not refer them to Carpe Diem.  Due to Abrams' failure to investigate, Abrams was forced to rely at trial upon cross examination of these two former HOMER clients when Hutchinson's testimony would have established that Ohle had no role in obtaining these affidavits and no contact with Clouatre and Rutland since Bank One/Chase's original HOMER presentation in November 2001 [Decl. of Ohle, para. 17].  Abrams' failure to prepare for Ohle's trial is now well documented, and the resulting prejudice requires the Court to overturn Ohle's conviction.

Ohle was not convicted of creating, selling or benefiting from these tax shelters.  Instead, Ohle was convicted of defrauding Bank One of its fees from these illegal tax shelter transactions.  The government's presentation of uncharged fraud prejudiced the jury, and Abrams was unprepared to respond, failing to present direct, credible evidence as to the crucial element of the charged offense.

Abrams' failures to investigate Bank One/Chase's illegal tax shelter activities, to investigate Jenkens & Gilchrist's orchestration of a third party purchaser and its belated funding due to securitization issues, to investigate Ohle's lack of knowledge and involvement in Deutsche Bank's HOMER options, and to investigate the fees paid by Jenkens & Gilchrist to third party services providers such as Bank One/Chase, American Capital Financial Corp., Bradley Law Firm, L.L.C. and Invested Interest resulted in Abrams failing to present a defense in Ohle's case dispelling the government's inference that Bank One/Chase had a property interest in these amounts (e.g., Bank One/Chase was entitled to two percent on each HOMER transaction).

Abrams should have investigated and presented evidence, including the evidence presented below, on two separate aspects of Bank One/Chase's involvement in HOMER:  First, whether Bank One/Chase was entitled to any HOMER fees greater than the amounts provided for in the Services Agreements between Jenkens & Gilchrist and Bank One/Chase; and, second, whether Bank One/Chase was culpable for its illegal tax shelter activities and, as a result, Bank One/Chase did not have a legitimate property interest in the fraudulent HOMER fees.

**A.  Background**

Harry M. Dye, III recruited Ohle from the Washington National Tax office at KPMG LLP through a headhunter to join his family wealth services group at Bank One/Chase.  At KPMG, Ohle specialized in estate planning and closely-held business advice in addition to his responsibilities for KPMG's software development which analyzed various financial planning techniques.  In December 1999, Bank One/Chase hired Ohle.  See Exhibit 1-2, Videotaped Deposition of Harry M. Dye, III, taken in Ames v. J.P. Morgan Chase et al., Civil Action No. 11-440, CDC-Orleans

Parish, Louisiana, on December 2, 2013 ("Dye Dep."), p. 25-26, 161-162; see FBI Memorandum of Interview of Harry "Trey" Dye, on January 31, 2008 ("Dye FBI"), Case No. 1:13-cv-00450-JSR, Docket No. 13, Exhibit 4, para. 9.

Through Bank One's wealth planning group, Bank One/Chase planned to enter the high net worth client market through "best of class" financial and estate planning advice that would lead to the sales of financial products such as investment products, insurance policies, loans, trust services and commercial banking relationships [Dye Dep., p. 162-165].  As evidenced by his production at Bank One/Chase in 2001, Ohle was extraordinarily successful, bringing over $1 billion of investable assets in non-tax shelter related engagements, approximately 10 times more than any other ISG member [see ISG 12/31/01 Revenue, GX 3-5 ("GX" refers to government exhibit from Ohle's criminal trial); Dye Dep., p. 127-131, 138; Dye FBI, para. 14].

In addition to reporting to Dye, Ohle also reported to market heads in Chicago, including Jon Verity, the head of trust department at American National Bank ("ANB"), a wholly owned Bank One subsidiary [Dye FBI, para. 14; Dye Dep. p. 165-166].  Ohle and other ISG members in Chicago were officed at ANB with Verity's trust department [Dye Dep., p. 165-166].

Encouraged by the success of Ohle and his Chicago group, Bank One/Chase continued to expand the wealth planning group hiring additional members from other Big Six accounting firms [Dye FBI, para. 7, 15-16].  Those individuals brought relationships and tax products to Dye which led him to expanding the product offerings of the group, and renaming the group the "Innovative Strategies Group" ("ISG") [Dye FBI, para. 18-19; Dye Dep., 176-177].  Dye was ISG Director, while Ohle, David Walser and Vicki Little were ISG Regional Directors.  The remainder of ISG were considered ISG members including Jeff Conrad, Paul Ferguson, Scott Deichmann and others [see Exhibit 1-3, Bank One Private Client Services' ISG roster and phone list].

Conrad, an ISG member in Ohle's Chicago office, discussed an estate planning technique with Dye using a Grantor Retained Remainder Trust ("GRRT") which allowed an individual to "freeze" his estate at a low interest rate, shifting all future

appreciation and income to his heirs, and "step up" the basis of the underlying assets in his family's limited partnership [Dye Dep., p. 175, 184-185; Dye FBI, para. 19]. Dye convened a working group to vet this strategy. That meeting included Robert Coplan, Steve Acres and Vicky Little of Ernst & Young and others [Dye Dep., p. 175-176; see FBI Memorandum of Interview of Vicky Little on March 12, 2008 ("Little FBI"), Case No. 1:13-cv-00450-JSR, Docket Entry No. 13, Exhibit 5, para. 9].

Frustrated with the lack of follow-up from Ernst & Young, Dye authorized Conrad to meet with Paul Daugerdas of Jenkens & Gilchrist to share the GRRT estate planning strategy [Little FBI, para. 11; Dye Dep., p. 185]. Dye had been introduced to Daugerdas in January 2000 by ISG member Mike Quarles who had previously worked with Daugerdas [Dye Dep., p. 173, 185]. Daugerdas and his associate John Beery quickly identified an opportunity to create a "loss generator" from the GRRT estate planning strategy. Shortly thereafter, Jenkens & Gilchrist had named the GRRT estate planning strategy, BART, and the "loss generator" strategy, HOMER [Dye FBI, para. 19; Little FBI, para. 16].

On April 25 and 26, 2001, Dye, with his new title, ISG Director, rolled out this new direction with an ISG meeting in Columbus, Ohio which included presentations by several individuals, including Paul Daugerdas of Jenkens & Gilchrist ("BLISS"), Chuck Bolton of Bolton Capital Planning ("CDS") and Samyak Veera from Counterpoint Capital, LLC ("Partnership Trade"), pitching their tax-advantaged products [Dye Dep., p. 177; see Exhibit 1-4, Agenda for ISG Spring Meeting (4/25-26/01) in Columbus, Ohio; Little FBI, p. 17]. Dye's supervisor Peter Atwater and Atwater's supervisor Kundert attended this ISG meeting [Dye Dep., p. 177].

Having met in Columbus, Ohio at the ISG meeting, Jenkens & Gilchrist and Bolton Capital Planning began discussing the use of BART to "step up" assets held within a partnership used in a tax strategy (CDS) previously sold by Ernst & Young and Bolton Capital Planning [Little FBI, para. 12, 14-15].

In addition to sourcing the transactions, Bolton Capital Planning was originally identified as the unrelated third party purchaser of the GRRT interests. However, under IRC Section 267, the parties agreed that Bolton Capital Planning, as general partner of the tax strategy partnerships was "related" (Exhibit 1-5, email

from Six to Daugerdas regarding Bolton as 3rd party purchaser).  As a result, Daugerdas identified David Smith as a potential unrelated third party purchaser. Ohle learned that Smith had been involved in "tax shelters" at Coopers & Lybrand (Decl. of Ohle, para. 18).  In order to resolve objections by the ISG group, Daugerdas proposed that Ohle identify anyone who could "sign their name" to act as the unrelated third party purchaser in HOMER (Decl. of Ohle, para. 18).

Ohle called his childhood friend Ken Brown and told him that he had just "won the lottery" [Tr. 531].  Ohle introduced Brown to Daugerdas, and in June 2001 Jenkens & Gilchrist accepted Brown and his wife Denise Davila Brown as clients of Jenkens & Gilchrist for the purpose of acting as third party purchaser in HOMER transactions [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 26 and Exhibits 21-24].

With the Browns as third party purchasers, Jenkens & Gilchrist had completed assembling its HOMER transaction "team" - Deutsche Bank as option writer, Bank One/Chase as trustee and Bank One/Chase as tax return preparer [Dye FBI, para. 29].

Meanwhile, Dye shepherded these various tax products, including HOMER, BART, BLISS, CDS and partnership trade through Bank One/Chase's various departments, including trust, legal, compliance, investment, for their independent reviews [Dye Dep., 145-152; Dye FBI, para. 23, 44; Little FBI, para. 19].  Rich McCullen, the lead lawyer for for Bank One/Chase's asset management business, was involved in vetting these tax products with both Dye and Little [Little FBI, para. 19; Dye FBI, para. 25; see FBI Interview Notes of John Kramer on January 25, 2008 ("Kramer FBI"), Case No. 1:13-cv-00450-JSR, Docket No. 13, Exhibit 3, p. 4].

Dye completed Bank One/Chase's internal review of these tax products in early fall 2001 [Dye FBI, para. 23-25, 44].  However, Dye's supervisor Peter Atwater required John Kramer, who was the lead attorney at Bank One Investment Advisors ("BOIA") to provide final approval.  On or about November 2, 2001, Kramer convened the meeting with Bank One/Chase ISG Director Dye, Bank One/Chase senior executive and risk manager Randy Johnanneck, Bank One/Chase trust attorney Robert Garro, Bank One/Chase outside counsel Ed Arrons of Arnstein &

Arrons, LLP and ISG members Ohle, Conrad and Little [Kramer FBI, p. 4].  Kramer then followed up on the tax products with Bank One/Chase General Counsel Christine Edwards on November 6, 2001 before reporting back to Atwater  [Kramer FBI, p. 5-6].

With the call to Atwater, Kramer signed off on the tax products, and Dye instructed his ISG members to introduce Bank One/Chase clients to its transactional partners in HOMER, BART and partnership trade transactions [Kramer FBI, p. 4-5; Dye FBI, p. 30, 44; Little FBI, para. 24; Dye Dep., p. 150-151].

Accordingly, ISG members introduced Bank One/Chase clients to Daugerdas of Jenkens & Gilchrist and Deutsche Bank in conjunction with HOMER and BART transactions and to Jay Gordon of Greenberg Traurig in conjunction with partnership trade transactions [Little FBI, para. 18, 24].  ISG members also introduced HOMER to other tax professionals, such as Jay Gordon of Greenberg Traurig, attorney David Lukinovich, and accounting firm Henry Held among others, which resulted in additional referrals by those tax professionals to Jenkens & Gilchrist [Little FBI, para. 35].

Jenkens & Gilchrist, following its common practice from 1999-2002, paid "other service providers" in its implementation of these tax strategies out of its legal fees [Dye FBI, para. 49; see Exhibit 1-6, J&G Response to IRS IDR (Note:  Exhibit excludes other Form 1099s)].  In that regard, Jenkens & Gilchrist paid "other service providers" for services rendered, not just "referral fees."  Jenkens & Gilchrist would, however, pay attorneys without requiring services to be rendered [see emails from Daugerdas/Guerin stating that J&G would not pay "referral fees" to non-lawyers, Motion for New Trial, Case No. 1:08-cr-1109-JSR, Docket Entry No. 159, p. 20 and Exhibits 9-10].  As financial consultant, Bank One was promised one percent on each HOMER transaction and an additional one percent for any Bank One/Chase client that entered into the HOMER transaction [Dye FBI, para. 26; Dye Dep., p. 213].

In Bank One/Chase client meetings, ISG members provided a brief overview of HOMER including the GRRT structure, the transactions involved in HOMER, the total investment and fees in HOMER which were 6.0%, and relayed important

representations that Jenkens & Gilchrist, Deutsche Bank and Bank One/Chase would make in conjunction with HOMER [Dye FBI, para. 26; Dye Dep., p. 143, 182].

Those representations, which were approved by Bank One/Chase, were based, in part, upon tax opinions from Jenkens & Gilchrist and representations from Deutsche Bank related to the economic substance of its options, including that the HOMER transaction was a proprietary structure of Jenkens & Gilchrist that took advantage of a legal loophole, that the HOMER transaction was legal, that the HOMER transaction was not a tax shelter, that the HOMER transaction would "more likely than not" result in properly deductible losses and that Jenkens & Gilchrist's tax opinion letter would provide IRS penalty protection [Decl. of Ohle, 19].

Ohle never reviewed the tax opinion letter of Jenkens & Gilchrist, the tax registration opinion letter of Jenkens & Gilchrist or Deutsche Bank's options [Decl. of Ohle, 20].  In fact, Ohle was not allowed to participate on conference calls between potential HOMER clients and Deutsche Bank.  Ohle's only duty at Bank One/Chase related to HOMER was introducing clients to Jenkens & Gilchrist [Dye Dep., p. 143, 182; see Exhibit 1-7, Videotaped Deposition of Michael D. Reed, taken in Ames v. J.P. Morgan Chase et al., Civil Action 11-440, CDC-Orleans Parish, Louisiana, on July 23-24, 2014, ("Reed Dep."), p. 314].

Throughout Fall 2001, Daugerdas of Jenkens & Gilchrist was referred potential HOMER clients from ISG, from other tax professionals, and from attorneys at his own law firm [Little FBI, para. 35-36].

On or about November 15, 2001, Jenkens & Gilchrist in collaboration with White & Case, who represented Deutsche Bank as lender and option writer, changed the secured note for the Browns' purchase of the GRRT's unitrust interest to an unsecured not due to securitization issues [See Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 18-19 and Exhibits 4-8].  Ohle protested that the Browns' unfunded entities were proposing to pay for unitrust interests in the HOMER transactions with an unsecured note, pointing out that this transaction would lack economic substance.  Jenkens & Gilchrist, Deutsche Bank and White & Case failed to change the HOMER document package but, to appease Ohle, Daugerdas suggested that Ohle seek financing for the Browns [Id.; Ohle Decl., 21].

31

In late November 2001, Bank One/Chase as trustee began implementing HOMER transactions on behalf of thirty-six clients [GX 2-43]. Conrad coordinated implementation of the HOMER transactions between Jenkens & Gilchrist and Bank One/Chase as trustee [Dye Dep., p. 182]. Ohle was no longer actively involved in HOMER (or so he thought).

On or about December 15, 2001, a troubling issue related to HOMER came to Ohle's attention. ISG members Conrad and Paul Ferguson, at the instruction of Dye, approached Bank One/Chase loan officer Richard Richels regarding a $100 million loan related to a potential BART transaction [Dye FBI, para. 42]. Richels became concerned that Bank One/Chase was offering sophisticated tax products which had not been sufficiently vetted. Richels contacted Kramer and referred the matter to the Risk & Capital Committee ("R&CC") [Dye FBI, para. 42].

As a result of this meeting, Ohle discovered from Dye and Kramer that Bank One/Chase had not properly and thoroughly vetted HOMER tax issues such as the tax shelter registration issue. Ohle demanded that Dye allow ISG members to contact clients referred to Jenkens & Gilchrist and inform them that Bank One/Chase had not completed its due diligence. Dye and Kramer instructed Ohle to not contact the HOMER clients. Ohle then contacted his other supervisor Verity regarding his concerns before placing two urgent calls to Bank One CEO Jamie Dimon [Decl. of Ohle, para 22].

Without permission to contact his clients, Ohle left his position at Bank One/Chase at the end of the day on or about December 15, 2001 [Tr. 1401]. Dye requested that Ohle go home to New Orleans for Christmas, allowing Dye to address issues within Bank One/Chase. Ohle demanded that HOMER clients receive notice of the issues immediately. Dye refused. [Decl. of Ohle, para 22].

Other Bank One/Chase employees quickly became aware of Ohle's objections. For example, former ISG intern Thomas Kane emailed Dye stating, "I can see that while John had some legitimite [sic] issues, he is overreacting. I realize how trying this must be for you and I want to work with you to help John make the right decision [see Exhibit 1-8, December 19, 2001 email from Kane to Dye]. Ohle's

"legitimate issues" in mid-December 2001 while at Bank One/Chase resulted in his incarceration today, thirteen years later.

Ohle left his position as Regional Director in Bank One/Chase's ISG a few days before Kane's email to Dye, returning to New Orleans with his family for the holidays, and never returned to his post at Bank One/Chase [Tr. 1401].

### i. Jenkens & Gilchrist's payment of third party service providers in HOMER transactions

Ohle would note that the exhibits referenced in this subsection are limited to transactions at issue at Ohle's trial.

Jenkens & Gilchrist sent an invoice "for professional legal services" to each of its clients who engaged in the HOMER transaction [see GX 2-10, 2-11, 2-12, 2-13, 2-14, 2-15, 2-16, 2-17, 2-18].

In late December 2001, after Ohle had left his position at Bank One/Chase, Jenkens & Gilchrist coordinated obtaining invoices from its third party service providers and arranged payments to these third party service providers prior to year-end.

As one of Jenkens & Gilchrist's third party service providers, Dye, as Director of ISG, on behalf of Bank One/Chase negotiated its fee on each HOMER transaction with Daugerdas at Jenkens & Gilchrist. At Bank One/Chase's insistence, Jenkens & Gilchrist and Bank One/Chase entered into a separate Services Agreement with respect to each transaction [see DX A, C, D, E, F, G, H, I, K ("DX" refers to defense exhibit at Ohle's criminal trial)]. The Services Agreement set forth the amount of Bank One/Chase's fee in each case, which corresponded to the amount invoiced and received by Bank One/Chase. The Services Agreements were signed by Dye and Conrad on behalf of Bank One/Chase and by Daugerdas and his partner Donna Guerin on behalf of Jenkens & Gilchrist [Tr. 182; DX A, C, D, E, F, G, H, I, K]. Abrams failed to subpoena any of the signatories to the Services Agreements to testify at trial.

Each of the Services Agreements contained the following language:

"[Bank One/Chase's] fee for services for J&G will be an amount not greater than $[the amount of the Bank One/Chase invoice] which shall be invoiced after the [Client] has implemented the Strategies and shall be payable upon J&G's receipt of an invoice. [Bank One/Chase's] fee for services is independent of fees that may be charged by J&G or other parties, including [Bank One/Chase] and its affiliates, for services undertaken as a part of the Strategies."

The Services Agreements were drafted by Kramer with certain changes made by Daugerdas. The specific language quoted above regarding the amount of Bank One's fees was drafted by Kramer or someone else at Bank One/Chase [DX ZZ]. Abrams failed to subpoena Kramer to testify at trial.

Bank One rendered invoices to Jenkens & Gilchrist pursuant to the agreed-upon fees in the Services Agreements [see GX 2-22, 2-23, 2-24, 2-25, 2-26, 2-27, 2-28, 2-29]. Daugerdas authorized all of the payments to Bank One/Chase [Tr. 179]. Accordingly, Bank One/Chase received its fully negotiated fee, as set forth in its Services Agreements and invoices, on each HOMER transaction [see GX 3-8].

Similar to its third party service provider payments to Bank One/Chase, Jenkens & Gilchrist paid others for their services related to the HOMER transaction such as attorney Gordon (through his entity Edward Albert LLC)[Tr. 1547], Steger (through his company American Capital Financial Corp.)[GX 2-32, 2-33], attorney David Lukinovich (through his law firm) [Tr. 1407-1410], Bryan Lee [GX 2-43] and John Manella (through his nominees Invested Interest [GX 2-34, 2-35] and attorney William Bradley (through his law firm) among others [GX 2-36, 2-37, 2-38, 2-39, 2-40]). Pursuant to instructions by Jenkens & Gilchrist, these third party service providers invoiced Jenkens & Gilchrist for "services rendered." None of the invoices presented to Jenkens & Gilchrist made any mention of "referral fees." Daugerdas personally approved the payment of all of the third party service provider invoices [Tr. 180]. As shown below, Bank One/Chase had no property interest in any of these amounts.

In addition to acting as financial consultant to Jenkens & Gilchrist, Bank One/Chase received additional fees from each HOMER client for its role as trustee of the GRRT, a trust that was essential in each HOMER transaction. Bank One/Chase

also prepared tax returns reporting more than $425 million of fraudulent HOMER losses, signing as both trustee and tax return preparer [GX 2-43; Dye Dep., p. 194-195].

In May 2005, Jenkens & Gilchrist, in response to an IRS Form 4564, Information Document Request, dated May 11, 2005 ("IDR") related to its tax shelter promoter audit, disclosed, pursuant to question 3, its third party service providers from 1999-2002, the amount paid to each third party service provider by Jenkens & Gilchrist, and proof that these payments were paid out of Jenkens & Gilchrist fees [see Exhibit 1-6, J&G Response to IRS IDR (Note:  Exhibit excludes other Form 1099s)].

Jenkens & Gilchrist represented to the IRS that the firm had made 'other service provider' payments in the amount of $49,042,871.19 [Id., p. 12].  Further, Jenkens & Gilchrist attached third party service providers amounts paid out of its fees (during the period, 1999-2002), including Bank One/Chase $5,249,300 [Id., p. 9], American Capital Financial Corp. $81,500 [Id. p. 9], Bradley Law Firm, L.L.C. $255,000 [Id. p. 9], Invested Interest $920,000 [Id., p. 10] and two-hundred and sixteen other third party service providers.

In response to Question No. 3 [Id., p. 1], Jenkens & Gilchrist attached Form 1099s to prove that these "other service provider" payments were made out of Jenkens & Gilchrist's fees.  Attached to the IDR response were 2001 Form 1099 for Bradley Law Firm, L.L.C. in the amount of $255,000 [Id., p. 13] and 2001 Form 1099 for Invested Interest in the amount of $920,000 [Id., p. 14].  At Ohle's trial, Abrams failed to present these exculpatory IRS filings or the representatives of Jenkens & Gilchrist who produced and submitted these filings with the IRS (as discussed below).  Further, it should be noted that the government was in possession of this exculpatory evidence which directly contradicted the inferences that it sought to create at Ohle's trial.

**ii.  Bank One/Chase's continued its tax shelter activities following Ohle's whistle blowing and departure.**

Kramer felt "some concern" about the tax transactions after his November 2, 2001 meeting [Kramer FBI, p. 5]. However, instead of further investigating the matters, Kramer met with general counsel Edwards on November 6, 2001 and then called Atwater back approving Bank One/Chase's involvement in these tax transactions [Kramer FBI, p. 6]. In fact, Kramer did not discuss his concerns with anyone other than Edwards and Atwater [Kramer FBI, p. 6].

Despite these alleged concerns, at the conclusion of the November 2, 2001 meeting with ISG, Kramer told Dye, Ohle and others that Bank One/Chase assumed risks everyday it opened its doors, but that the bank typically does not get paid so well for those risks [Dye Dep., p. 201].

While the HOMER transaction began being implemented with Bank One/Chase as trustee, ISG members Conrad and Ferguson identified a $100 million BART transaction [Dye FBI, para. 42]. Unlike the HOMER transactions where Jenkens & Gilchrist had arranged for financing, the financing for BART transactions was not pre-arranged like HOMER transactions [Id.]. Accordingly, ISG members Conrad and Ferguson, at the instruction of Dye, approached Bank One/Chase loan officer Richels regarding a $100 million loan related to a BART transaction [Id.]. Richels became concerned that Bank One/Chase was offering sophisticated tax products and contacted Kramer who was also on the Credit Approval Committee [Id.]. Kramer referred the matter to the R&CC [Id.].

At the meeting, the R&CC approved the $100 million loan in the BART transaction subject to "the Law Department's final review of legal issues" [Exhibit 1-9, December 10, 2001 R&CC Summary of Decisions]. The R&CC also requested that Atwater return in January so that the R&CC could "conduct a review of the Innovative Strategies LOB [Id.]." Kramer reported he was in "reactive mode" following the R&CC's involvement [Kramer FBI, p. 7].

As a result of these developments, Kramer sought outside counsel for legal advice to provide cover for Bank One/Chase's tax shelter activities, eventually hiring John Palmer of Foley & Lardner to evaluate the legality of BART and HOMER as well as to determine the tax shelter shelter registration requirements. Meanwhile, Bank One/Chase hired attorney Richard Rogoff for "litigation support." Rogoff's first

assignment was an "internal investigation" of Ohle and ISG. [Kramer FBI, p. 8-20; Dye Dep., p. 57]. Bank One/Chase had instituted its corporate strategy—obtain legal protection from outside counsel while silencing its employees' whistle blowing.

On January 14, 2002, Atwater and Dye returned to the R&CC and gave a presentation outlining ISG and the tax products which were currently being sold by Bank One/Chase. [see Exhibit 1-10, January 14, 2002 R&CC Agenda]. Dye's presentation [see Exhibit 1-11, January 14, 2002 ISG PowerPoint presentation to R&CC] to the R&CC included the HOMER transaction which Dye called "Grantor Retained Remainder Trust {Funded with Options} [Id., p. 7] and the partnership trade which Dye called "Partnership Transaction." [Id., p. 18]. Further, Dye reported that Bank One/Chase had participated in 30 transactions where Bank One/Chase was "compensated for the value of the idea" (i.e., tax shelter products), earning an estimated $8.9 million. [Id., p. 15].

Dye also disclosed a list of 2001 transactions, including client names, tax opinion writers, Bank One fees, and other pertinent information [Id., p. 19]. Further, Dye suggested a review process to be completed by February 15, 2002 for 2001 transactions which included document review by Bank One/Chase's law department, analysis of tax shelter registration requirements, analysis of list maintenance requirements, formalization of record keeping process and process review by compliance [Id., p. 20].

Long after already instructing its ISG members to introduce these transactions, Dye suggested the following enhancements to Bank One/Chase's "process": (1) having independent tax counsel review transactions, including list maintenance and promoter issues; (2) establishing a product/strategy review committee; (3) streamlining the law department review; and (4) assuring compliance review. [Id., p. 22]. Dye proposed many of the individuals who had previously approved the tax products for the product/strategy review committee, including Atwater and McCullen. [Id., p. 22].

A "revised" Summary of Decisions was issued by the R&CC based on its January 14, 2002 meeting attended by Kramer, Atwater and Dye. [see Exhibit 1-12, January 14, 2002 R&CC Summary of Decisions]. In particular, the R&CC required

Atwater and Dye "to return to discuss the results of its meeting with outside counsel (in conjunction with internal counsel) on the topic of its business proposition and whether it is not, or is likely to be considered an 'Organizer' under IRS guidelines. Based on the resolution of this issue, ISG will describe for the committee what changes, if any, it proposes to its business model going forward.  ISG will address the transactions completed during 2001 and describe the risk mitigation steps, if any, to demonstrate that prudent and necessary steps have been taken. [Id.]."

The meeting had gone terribly for Dye and Atwater [Little FBI, para. 41]. Ohle's whistle blowing was now a potential career-ending threat for Atwater and Dye.  Atwater and Dye left that R&CC meeting and asked Atwater's supervisor David Kundert to fire Ohle based on unproven allegations that he sold investment business away from Bank One/Chase [Dye FBI, para. 36].

Kramer and Rogoff instructed Dye to suspend Ohle with further instructions that Ohle could not contact bank clients or its employees. [see Exhibit 1-13 January 22, 2002 letter from Stanley to Dye, Bank One "suspension pending investigation" precluded Ohle from contacting its employees and customers; Dye Dep., p. 57].

This corporate action was specifically designed to silence Ohle's whistle blowing.

Meanwhile, the R&CC continued its review of the "ISG problem."  As reported in the R&CC's February 4, 2002 Summary of Decisions, "Chris Edwards and John Kramer from the Law Department, Peter Atwater - CEO of Private Client Services and John Palmer of the law firm of Foley & Lardner, led an attorney-client privileged discussion regarding tax-related products.  At the conclusion of the discussion, the Committee confirmed that ISG will present its fully formulated business plan to RCC on February 18, 2002." [see Exhibit 1-14, February 4, 2002 R&CC Summary of Decisions].  Dye was not invited to attend this R&CC meeting. [Id.].

On February 18, 2002, Atwater and Dye returned before the R&CC with a follow up presentation. [See Exhibit 1-15, February 18, 2002 Agenda and ISG Presentation to R&CC].  The presentation began with the statement that the risk profile of the business will be reduced with greater oversight and support. [Id., 8166].  Dye also proposed a committee which included Atwater and Kramer to

provide formalized product review. [Id. 8167].  Additionally, Dye referenced hiring outside tax counsel such as Winston & Strawn, Mayer Brown or Skadden Arps. [Id. 8169].  Then Dye returned ISG services back to their original charter including estate planning, business succession planning, retirement planning and equity diversification strategies [Id. 8171].  The final slide of Dye's presentation provided that ISG would emphasize advice leading to assets under management (as Ohle had done in 2001, bringing in over $1 billion), that all ISG recommendations would be limited to "would/should" transactions (not "more likely than not" like HOMER and partnership trade), that ISG would not participate in tax elimination strategies and that "proprietary/fee based advice to be approved on a "case by case" basis. [Id. 8172]."

A Summary of Decisions was issued by the R&CC based on its February 18, 2002 meeting where the R&CC reviewed recent developments with respect to the Innovative Strategies Group.  The Bank One Law Department reviewed its findings thus far as memorialized in an Attorney Client Privileged memorandum.  The Committee agreed to table any decisions - pending the Law Department's receipt and review of the additional transaction related documents. [see Exhibit 1-16, February 18, 2002 R&CC Summary of Decisions]."  Edwards, Kramer, outside counsel Palmer of Foley & Lardner and Atwater attended this meeting.

Based on the Summary of Decisions issued by the R&CC, Bank One/Chase attorneys Edwards and Kramer returned the following week with outside counsel Palmer of Foley & Lardner, and led an attorney-client privileged discussion concerning the review of deal files for certain transactions completed during 2001. [See Exhibit 1-17, February 25, 2002 R&CC Summary of Decisions].  Certain information was redacted as privileged from the R&CC Summary of Decisions [Id.].

Without resolution of his issues, Ohle officially resigned from Bank One/Chase on February 21, 2002. [Ohle Dep., p. 65].  Shortly thereafter, in March or April 2002, Dye also resigned. [Dye Dep., p. 140].  But Bank One/Chase continued with its illegal tax shelter activities [Dye Dep., p. 141].

While shielding its corporate actions with claims of attorney-client privilege, Bank One/Chase failed to register its HOMER transaction as a tax shelter. Kramer sent Daugerdas a letter stating that "following Bank One/Chase's extensive due diligence on HOMER, Bank One/Chase concluded that it is unlikely that any of the HOMER transactions constitute a 'tax shelter' within the meaning of IRC Section 6111 and, therefore, registration is not required [see Kramer letter to Daugerdas stating Bank One/Chase concluded HOMER was not tax shelter, Case No. 1:08-cr-01109-JSR, Docket No. 164-6, p. 52]". This letter also stated that Bank One/Chase was retained by Jenkens & Gilchrist to provide financial planning and advisory services (but not legal or tax advice) [Id.]. One month later, Bank One/Chase prepared, signed (as trustee and tax return preparer) and issued tax returns reporting more than $425 million fraudulent losses from the HOMER transactions [GX 2-43; Dye Dep., p. 181-182].

More significantly, as part of its extensive due diligence, Palmer and Bank One/Chase's legal department gained access to Jenkens & Gilchrist's legal files on each HOMER transaction which included all transactional documents as well as Deutsche Bank's trade confirmations. Following this review, neither Palmer nor anyone in Bank One/Chase's legal department raised an issue about the economic substance of Deutsche Bank's options, the role of the Browns as third party purchaser or any other concern. Instead, Bank One/Chase decided that registration was not required for HOMER under the tax shelter rules, consistent with its earlier instruction to advise clients of the same.

This failure to protect its clients resulted in civil litigation which was later blamed on Ohle. [See Bank One Corporation's Victim Impact Statement, Case No. 2:12-cv-013240-CJB-DEK, Docket No. 1-2, p. 53-54].

Likewise, Palmer and Bank One/Chase legal department were able to examine all transactional documents executed in the HOMER transactions. These documents disclosed the identity and role of Ken Brown and Denise Davila-Brown as third party purchasers in HOMER transactions. In fact, the Browns and Bank One/Chase, as trustee, signed agreements that transferred over $850 million of Deutsche Bank option contracts. Despite the Browns being recruited by Jenkens &

Gilchrist and being clients of Jenkens & Gilchrist, Bank One/Chase in its "reactive mode" illegally and improperly froze the Browns' banking accounts.  While Bank One/Chase corrected its improper actions, the government claimed that the participation by the Browns in HOMER defrauded Bank One/Chase of its property in the government's original indictment. [Sealed Indictment, dated November 17, 2008, Case No. 1:08-cr-01109-JSR, Docket No. 1].

Clearly, Bank One/Chase through its legal department and R&CC understood that these tax shelter transactions were subject to tax shelter registration requirements and posed extraordinary risks to the bank and its employees.  In addition to not registering the transaction, Bank One/Chase took a much more extraordinary action—Bank One/Chase prepared, signed and issued tax returns reporting $425 million in fraudulent HOMER transaction losses.  These tax returns were signed by Bank One/Chase as both trustee and tax return preparer months after Ohle formally resigned from Bank One/Chase [Dye Dep., p. 182, 195].

Bank One/Chase's refusal to end its participation in the HOMER transactions in December 2001 when Ohle alerted senior executives at Bank One/Chase including CEO Jamie Dimon resulted in a cascading series of problems for the HOMER transactional partners, Jenkens & Gilchrist, Deutsche Bank and Bank One/Chase, the HOMER clients and the professionals responsible for HOMER's investment options (e.g., criminal convictions or pleas for Daugerdas, Guerin and Irwin Mayer, senior attorneys at Jenkens & Gilchrist; David Parse, investment professional at Deutsche Bank).

In December 2002, Dye's supervisor Peter Atwater who was CEO of Bank One/Chase's Private Client Services group was asked to step down by Bank One/Chase CEO Jamie Dimon.

On July 3, 2003, the IRS required that Bank One/Chase produce all information required under the tax shelter promoter rules.  Later in 2003, Dimon fired Christine Edwards as Bank One/Chase's general counsel because she lost credibility with the Board of Directors and the "ISG group dust-up." [Kramer FBI, p. 3].  Apparently in addition to Dimon, the Board of Directors at Bank One/Chase were also aware of issues related to its illegal tax shelter activities.

Then, on November 1, 2004, the IRS commenced a tax shelter promoter audit of Bank One/Chase. Ultimately, Bank One/Chase entered into a Closing Agreement with the IRS admitting that Bank One/Chase participated in various tax shelters, including HOMER, BART, POPS-Lite, BLISS, NIMCRUT and LILO. As a result of its tax shelter activities, Bank One/Chase agreed to pay $2,336,116 under IRC section 6707 to resolve its tax shelter promoter examination. See Exhibit 1-18, Bank One/Chase's Closing Agreement with IRS related to its tax shelter activities, resulting in a $2.3 million penalty.

When the government, as part of its tax shelter promoter investigation of Paul Daugerdas and Jenkens & Gilchrist, approached Bank One/Chase about its tax shelter activities, Bank One/Chase no longer employed Dye, Atwater or Edwards, all individuals directly responsible for Bank One/Chase's participation in illegal tax shelters.

However, many of the senior executives who authorized Bank One/Chase to accept $5.2 million from Jenkens & Gilchrist and to prepare, sign and issue tax returns reporting $425 million of fraudulent tax losses remained at Bank One/Chase to "finger" Ohle, a lower level subordinate employee, as the "scapegoat."

On November 18, 2008, Ohle would become the only Bank One/Chase employee indicted and arrested for his involvement in HOMER despite being the whistle blower in mid-December 2001. Bank One/Chase senior executives who originally approved the HOMER transaction, authorized Bank One/Chase to act as trustee of the GRRT and instructed ISG members to introduce clients to Jenkens & Gilchrist were not charged.

But even more outrageous were the actions and conduct of Bank One's senior executives, including members on its R&CC and in its legal department which allowed Bank One/Chase to continue its illegal tax shelter activities after Ohle's whistle blowing in mid-December 2001. Those individuals failed to register HOMER as a tax shelter and authorized the preparation and issuance of tax returns, signed by Bank One/Chase as trustee and tax return preparer, reporting more than $425 million of fraudulent HOMER losses, but were not indicted or charged for their

actions.  Instead, one of those senior executives, BOIA head legal counsel John Kramer, appeared at Ohle's Fatico hearing and made disingenuous statements assigning blame to Ohle for Bank One/Chase's illegal tax shelter activities.

Had Abrams investigated these matters before trial, he would have presented direct evidence that Bank One/Chase was culpable for its illegal tax shelter activities and not Ohle as the government claimed at trial; that Bank One/Chase should have analyzed the economic substance of the Deutsche Bank options as trustee and tax return preparer, not Ohle, as the government claimed in its Fatico proceedings; that Ohle's introduction of the Browns to Jenkens & Gilchrist as third party purchasers was not improper and fully disclosed to Bank One/Chase; and, that despite Ohle's whistle blowing and its detailed review of Jenkens & Gilchrist's HOMER files, Bank One/Chase failed to register HOMER as a tax shelter and failed to notify its clients of the lack of economic substance in Deutsche Bank's options.  And, most importantly, that Bank One/Chase continued its illegal tax shelter activities with the preparation, signing and issuance of the fraudulent tax returns long after Ohle departed from the bank.

## B.  Ohle's wire fraud and conspiracy convictions based on HOMER third party service provider fees being paid out of Bank One/Chase's property

The government relied upon two pieces of evidence to support its contention that the fees paid by Jenkens & Gilchrist pursuant to the alleged fraudulent invoices reduced the amount of the fees that Bank One/Chase otherwise would have received:  (1) testimony by Paul Ferguson; and (2) spreadsheet GX 2-42 received in evidence during the testimony of Daugerdas' secretary, Sandra Burnside.

### i.  Ferguson's Testimony

Ferguson worked for Bank One/Chase in its Denver office during part of the time that Ohle also worked for Bank One [Tr. 63].  On direct examination, Ferguson provided the only testimony at Ohle's trial on the client's payment of HOMER fees:

Q.  What were the clients charged to enter into the Homer transaction?
A.  They were charged a fee based on the loss that was generated, so it was a percentage of the loss.

Q.  Do you recall what that percentage was?

A.  I believe it was around 5 or 6 percent.

Q.  How was the fee paid by clients?

A.  The fee was paid in to different parties.  Part of the fee was paid to Bank One.
Part of the fee was paid to a subsidiary of Bank One, the trust company, that acted as
the trustee of the trust.  Part of the fee was paid to Jenkens & Gilchrist for the
opinion letter and for drafting documents.  And then there was an investment with
the options traders where part of the funds were invested in the options contracts.

Q.  With what entity were the options traders?

A.  I believe they were with Deutsche Bank.

Q.  In what city?

A.  I think they were in Chicago.

Q.  What if anything did the third party purchaser make in the Homer transaction?

A.  I don't remember the exact numbers; the third party purchaser made a spread on
what they purchased the unitrust interest for and what they sold the assets for, so
they did make a profit.

Q.  Was that part of the Homer transaction?

A.  Yes.

Q.  Was that true for each of the Homer clients?

A.  I don't have personal knowledge about each transaction, but that was my
understanding of how the transaction worked.

[Tr. 90-91]

Ferguson's knowledge of the HOMER fees was clearly limited.  In fact,
Ferguson was not certain whether HOMER clients paid 5 or 6 percent.  Further, his
testimony that the HOMER client paid part of their fee to Bank One was factually
incorrect (see Background above, HOMER clients paid Jenkens & Gilchrist who paid
Bank One/Chase as a third party service provider pursuant to their Services
Agreements).  Yet, Abrams failed to impeach Ferguson's testimony with any of the
relevant documents.  Had Abrams presented Ferguson with Jenkens & Gilchrist's

invoices to its HOMER clients, the Services Agreements between Jenkens & Gilchrist and Bank One/Chase, Bank One/Chase's invoices to Jenkens & Gilchrist, Jenkens & Gilchrist's Form 1099s and Jenkens & Gilchrist's IDR response to its tax shelter promoter audit, Ferguson, who is a certified public accountant, would clearly have corrected his testimony.

But more glaring was Abrams' failure to produce witnesses at Ohle's trial with direct knowledge of Bank One/Chase's entitlement to fees from Jenkens & Gilchrist such as Dye, Conrad, Kramer, and Jenkens & Gilchrist representatives.  In fact, had Abrams called Dye, Dye would have stated, as discussed below, that the amounts set forth in the Services Agreements reflected Bank One/Chase's only entitlement to fees in the HOMER transactions (other than its 20 basis points as trustee fee), proving Ohle's actual innocence.

Following his factually incorrect testimony which Abrams failed to impeach, Ferguson gave the following brief testimony about the payment of the "referral fees" on HOMER transactions, and the impact of such fees on the amount of money received by Bank One/Chase:

Q.  Did you have a conversation with John Ohle about whether referral fees wee paid to outside advisers?

A.  I heard a conversation between John Ohle and Conrad about referral fees.

Q.  What did John Ohle say in that conversation?

[Objections and colloquy]

A.  The conversation was Jeff [sic] Ohle and Jeff Conrad were frustrated that Vicky Little was giving too much away in referral fees on her transactions.

Q.  Did John Ohle say why he was frustrated?

A.  I don't believe he did.

Q.  Who was Vicky Little?

A.  Vicky Little was a member of the Innovative Strategies Group in Texas.

Q.  Do you know what the financial impact on Bank One would be if a referral fee was paid in a Homer transaction?

[Objections and colloquy]

A.  Yes.

Q.  What did you know?

A.  If a referral fee was paid it reduced the fees that Bank One received on the transaction.

[Tr. 92-94]

Having failed to prepare for Ohle's trial, Abrams attempted to correct the record through cross-examination where Ferguson admitted that other than the vague conversation about Vicky Little described in his direct testimony (which may not have even related to a HOMER transaction since Little was the contact person at Bank One/Chase on its partnership trade tax shelter transaction [Little FBI, para. 18]), Ferguson had no conversations with Ohle concerning the impact of referral fees on Bank One/Chase's fee in any particular HOMER transaction. [Tr. 122-124].

But this retraction was not enough.  Abrams repeatedly failed in his "sufficiency" arguments before this Court (see Order denying Motion for a New Trial Pursuant to Rule 29, Case No. 1:08-cr-01109-JSR, Docket No. 139) and the Court of Appeals (see Opinion in Ohle's Appeal, 2011 U.S. App. LEXIS 21275, 2nd Cir. Oct. 20, 2011).  Those arguments would have been unnecessary had Abrams simply presented direct evidence through the testimony of Dye, Conrad and Jenkens & Gilchrist representatives that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers out of Jenkens & Gilchrist's fees, not Bank One/Chase's fees.

Another prejudicial error by Abrams was his failure to object to the government's unsupported labeling of these payments by Jenkens & Gilchrist as "referral fees."  Had Abrams objected to this unsupported labeling, as did defense counsel in United States v. Jenkens & Gilchrist, the remainder of the government's "proof"—namely, statements from certain HOMER clients stating that Bradley had not referred them to HOMER—would have been defeated.

This failure also led to another inference—that the payments by Jenkens & Gilchrist were for "referral fees," not services rendered (e.g., arranging financing for

third party purchasers).  Abrams also failed at trial to object to this untrue characterization.

If Abrams' objected to this unsupported labeling, as defense counsel did in Daugerdas, this Court, similar to Judge Pauley, would have rebuked the government, and another false inference would have been defeated.

### ii. Jenkens & Gilchrist's HOMER Client "Tracking" Spreadsheet

The government admitted into evidence, without objection from Abrams, a spreadsheet [GX 2-42] during Burnside's testimony.  Burnside identified GX 2-42 as a spreadsheet that she created at J&G to "keep track of" clients involved in the HOMER transaction [Tr. 155].  The spreadsheet listed the names of twenty-nine HOMER clients, indicated the amounts of the transactions, whether the losses sought in the transactions were capital or ordinary, other identifying information about the clients, the total anticipated fees in each HOMER transaction, and the amount of fees Jenkens & Gilchrist allocated for anticipated payments to "other service providers." [GX 2-42].

The spreadsheet listed Bank One/Chase on each potential HOMER transaction in a column headed, "Other Service Providers."  On two HOMER transactions, the spreadsheet identified an additional "other service provider": Bryan Lee in Knoedler Archivum, Inc. and J. Lonsdale in Lamar Hunt.  Burnside testified that the numbers appearing on GX 2-42 were given to her by Daugerdas or Guerin [Tr. 189].  Burnside had no further knowledge of the accuracy of any information on the document.  Had Abrams produced direct testimony from Dye, Conrad and Jenkens & Gilchrist representatives, they would have testified that Bank One/Chase was never entitled to two percent on each HOMER transaction, and the government's "tracking spreadsheet" illusion would have been dispelled.

From this scant evidentiary proof, the government, as it argued in its Opposition to Ohle's 2255 Motion, concluded, "Those fees were ultimately divided as follows:  2.6% to J&G; 1.8% to Bank One; .2% to a Bank One subsidiary that administered the trust utilized in HOMER; .15% fee to the third-party purchaser (Ken Brown); and the remainder to Deutsche Bank for the foreign currency options. (Tr. 90-91; GX 2-42, 2-43). [see Gov't Opposition to Ohle's 2255 Motion, Case No.

1:13-cv-00450-JSR, Docket No. 13, p. 10]."  The government continued, "Pursuant to the understanding and practice of J&G and Bank One, these referral fees were subtracted from the total fees that Bank One - as opposed to J&G - would otherwise be paid for a HOMER tax shelter in the absence of a third-party referral. (Tr. 94, 388, 1068; GX 2-42, 2-43).  Referral fees were paid after the third-party referral sources sent invoice to J&G, which fees would have otherwise gone to Bank One. (Tr. 150-55). [Id.]"

Had Abrams prepared for Ohle's trial, he would have produced the evidence presented herein to contradict this "inference " that Bank One/Chase was entitled to two percent on each HOMER transaction.  Abrams should have produced witnesses such as Dye, Conrad, Kramer and Jenkens & Gilchrist representatives who would have testified that Bank One/Chase was promised one percent on each HOMER transaction and another one percent if the client was a Bank One/Chase client [Dye FBI, para. 26; Dye Dep., p. 213].  Dye would have further testified that the only entitlement to HOMER fees (i.e., property interest) that Bank One/Chase had (other than its .2% trustee fee) were the amounts set forth in the Services Agreements [Dye Dep., p. 213-214].  Abrams would have also offered proof that these payments were made out of Jenkens & Gilchrist's fees, not Bank One/Chase's fees, through documents filed with the IRS such as Jenkens & Gilchrist's Forms 1099 and its IDR responses to the IRS' tax shelter promoter audit, making it perfectly clear and irrefutable that Bank One/Chase had no property interest whatsoever in these payments. [See Exhibit 1-6, J&G Response to IRS' IDR].  Instead, Abrams offered no evidence on this core issue as to whether Bank One/Chase was deprived of any fees based on Jenkens & Gilchrist's payments to other third party service providers at Ohle's trial.

### iii.  Government created 2.0% "inference" in its rebuttal summation.

The government created a chart which it presented to the jury to argue in its rebuttal summation that third party service provider fees came out of Bank One/Chase's property.  The chart was titled, "Third Party Fees:  Lowering Bank One's Share of Fees."  The presentation of this chart solidified the government's false inference that Bank One/Chase was entitled to two percent on each HOMER

transaction, created by Ferguson's hearsay testimony and the government's misuse of Burnside's "tracking" spreadsheet.  The chart selectively used certain HOMER transactions to create the misimpression that the record showed that Bank One/Chase received a fixed percentage fee, except for the transactions in which "referral fees" were paid in connection with allegedly fraudulent invoices rendered by the "conspirators."

Had Abrams introduced testimony from Bank One/Chase employees such as Dye, Conrad and Kramer, subpoenaed witnesses that represented Jenkens & Gilchrist in its civil litigation and tax shelter promoter audits, and introduced documentary evidence (including documents filed with the IRS such as Jenkens & Gilchrist's Form 1099s and its IDR responses to the IRS' tax shelter promoter audit), Abrams would have proven Ohle's actual innocence, defeating the government's inference.

## C.  Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate.

No witness from Bank One/Chase or Jenkens & Gilchrist testified that Bank One/Chase was entitled to receive two percent on each HOMER transaction.  Nor did the government introduce any document from Bank One/Chase, Jenkens & Gilchrist or any other source fixing Bank One/Chase's fee entitlement at two percent.  Rather, the government based its argument on a "preliminary" spreadsheet admitted, without objection from Abrams, during Burnside's testimony.  The government's argument was unsupported by any testimony.

The Court described the government's theory as follows:

THE COURT:  What this shows, if I understand the argument that is now being made, this [chart] shows that where there were no referral fees, Bank One percent of the transaction was 1.8 percent [2.0% minus 20 basis point trustee fee].  Where there were referral fees of the kind that were allegedly generated by the conspiracy here, Bank One received various lesser amounts.  The government is representing that the only referral, the only matters not, the only Homer transactions not reflected here are other referral fees not attributable to this conspiracy.

I think that the jury could totally draw the inference, if they so chose, that the normal fee was 1.8 percent and that the bank got deprived of it by these transactions.  If there were in evidence or defense counsel knows of Homer transactions where there was no referral fee where the bank received less than 1.8 percent, that might be a different subject, but that has not been presented.

[Tr. 2185-86]

As stated by the Court, Abrams failed to present evidence that Bank One/Chase had no property interest in HOMER fees beyond those set forth in the Services Agreement and its trustee fee.  In order to defend Ohle from the government's inference, Abrams should have presented evidence to the jury that either:

   (i) Bank One/Chase was not entitled to two percent on each HOMER transaction, or

   (ii) Third party service provider payments were made from Jenkens & Gilchrist's fees, not Bank One/Chase's, or

   (iii)  Bank One/Chase was not entitled to any fees on HOMER beyond those amounts set forth in its Services Agreements with Jenkens & Gilchrist.

Without evidence from the government, Abrams' burden of proof was extremely low.  And, as evidence herein demonstrates, the evidence was abundant.  But Abrams' failure to prepare for Ohle's trial resulted in this evidence not being indentified and presented at Ohle's trial which was ineffective assistance.

Dye's testimony dispels government's illusion

As Director of Bank One/Chase's ISG, Dye was Ohle's immediate supervisor. Dye negotiated Bank One/Chase's fee with Jenkens & Gilchrist's Daugerdas on each HOMER transaction [Dye Dep., p. 211].  Kramer, the head attorney at BOIA, insisted

upon Services Agreements between Jenkens & Gilchrist and Bank One/Chase on each transaction [Kramer FBI, para. 10]. The HOMER fees were negotiated by Dye and the Services Agreements were drafted by Kramer after Ohle left his position at Bank One/Chase [Dye Dep., p. 211; Kramer FBI, para. 12; see Section A(i) above]. Both Dye and Conrad signed each Services Agreement on behalf of Bank One/Chase, while Daugerdas and his partner Donna Guerin signed on behalf of Jenkens & Gilchrist [see DX A, C, D, E, F, G, H, I, K].

Both Daugerdas and Guerin were indicted for their roles in the HOMER tax shelter transactions at the time of Ohle's trial [see United States v. Daugerdas, S3 09 Cr. 581 (WHP)]. However, Abrams should have subpoenaed Dye, Conrad and Kramer of Bank One/Chase to present direct testimonial evidence at Ohle's trial that Bank One/Chase was not entitled to two percent on each HOMER transaction but was entitled only to those amounts set forth in the Services Agreements.

Ecetra N. Ames filed a lawsuit based upon the government's allegations in Ohle's criminal trial (see Ames v. Bank One et al, Case No. 11-440, CDC-Orleans Parish, State of Louisiana). On December 2, 2013, Ohle's supervisor Dye was deposed by Ames' counsel in the proceedings [see Exhibit 1-2, Deposition of Harry M. Dye, III].

Dye's deposition testimony provides additional evidentiary support for Ohle's 2255 motion that claimed Abrams' representation was ineffective under Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed. 674 (1984), thereby violating Ohle's Constitutional rights. Had Abrams subpoenaed Dye to testify at Ohle's trial, Abrams would have presented the evidence herein establishing Ohle's actual innocence.

### i. Bank One/Chase not entitled to two percent on each HOMER transaction.

The government failed to produce a single witness who testified that Ohle had defrauded Bank One/Chase of its property. Instead, the government cleverly used Ferguson's hearsay testimony and its mischaracterization of a spreadsheet introduced into evidence by Burnside (without any further testimonial support) to create an "inference," namely that Bank One was entitled to two percent on each HOMER transaction. This Court, in the government's rebuttal summation, asked for

evidence or knowledge by defense counsel contradicting the government's inference [Tr. 2186]. Had Abrams reviewed Ohle's discovery, including FBI interview notes of Dye, Little and Kramer and document production from Bank One/Chase, Jenkens & Gilchrist and Deutsche Bank, Abrams would have responded to the Court's question with direct evidence that Bank One/Chase was not entitled to two percent on each HOMER transaction.

*In his December 2, 2013 deposition, Dye testified that Bank One/Chase was not entitled to two percent on each HOMER transaction:*

Q. And in fact, as you [stated] in your FBI statement, the basis of how these services agreements were originally anticipated was there was a 1 percent and a 2 percent fee, correct? Do you recall this?
A. I recall the concept, yeah.
Q. Yeah. So 1 percent on transactions, all transactions, and then 1 percent if it was a Bank One client, that's what you said, correct?
A. I think that's correct, John.

[Dye Dep., p. 212-213]

This statement renders the government's inference that Bank One/Chase was entitled to two percent on each HOMER transaction invalid which should upset this Court's confidence in this jury verdict. Further, the reference to "your FBI statement" in the question to Dye referred to Dye's FBI interview on January 31, 2008 with his three attorneys and AUSA Okula, AUSA Davis and Special Agent Christine Mazzella.

This Memorandum of Interview, drafted by Mazzella, stated in paragraph 26, "DYE believes that the client paid a fee of 6% for the HOMER deal. DYE thinks that BANK ONE received 1% of the fee for a J&G client and 2% of the fee for a BANK ONE client. DYE recalled that OHLE worked with BANK ONE on the fee structure. [Dye FBI, p. 6]."

At his deposition on December 2, 2013, Dye re-certified his statements made on January 31, 2008 to the FBI [Dye Dep., p. 31-37].  Incredibly, Bank One/Chase's counsel Mayer Brown authored Bank One/Chase's Victim Impact Statement and also represented Dye at this deposition [see Dye Dep., p. 5-6].  Since Dye's deposition on December 2, 2013, both Bank One/Chase and Mayer Brown have had actual knowledge that its Victim Impact Statement is incorrect.  However, to date, neither party has contacted this Court to correct the record and amend the Victim Impact Statement. [See Exhibit 1-19, Letters from Eastland to Bank One/Chase on April 16, 2014 and July 28, 2014 regarding Bank One/Chase's and Mayer Brown's legal duties to correct its Victim Impact Statement].

Notwithstanding the continuing corporate actions of Bank One/Chase, the existence of this FBI interview statement by Ohle's supervisor Dye, who negotiated HOMER fees on each transaction with Daugerdas at Jenkens & Gilchrist [Dye Dep., p. 211], should present this Court with serious concerns about Abrams' failure to subpoena Dye, and the government's willingness to create this incorrect inference to this Court.

During the government's rebuttal summation arguments, neither Abrams nor the government told this Court that Dye had provided a statement to the FBI that this inference created by the government through its spreadsheet, and as articulated by this Court, was outright false.  This particular failure by Abrams, and the government's silence, allowed the government to present a chart that inaccurately represented the agreement between Jenkens & Gilchrist and Bank One/Chase.

In his deposition, Dye further stated that Bank One/Chase was not entitled to any other funds from Jenkens & Gilchrist other than the amounts set forth in the Services Agreements [Dye Dep., p. 213-214].  Thus, Abrams' failure to subpoena Dye was inexcusable and inadequate assistance of counsel.

In closing arguments, Abrams acknowledged that Dye was the key witness for Ohle, "The person on the Bank One side who really knows what went on between Bank One and Jenkens & Gilchrist was Trey Dye.  He was John Ohle's boss at Bank One.  And I will talk some more about this, but there are documents that in

every single case says exactly what the agreement was between Bank One and Jenkens & Gilchrist.  And who signed them?  Paul Daugerdas and another lawyer who worked with him named Donna Guerin.  You didn't hear from her either.  They signed and behalf of Jenkens & Gilchrist, and Trey Dye signed on behalf of Bank One and you didn't hear from Trey Dye.  So you get secondhand from somebody like Sandra Burnside but you are not hearing from witnesses who really know what they are talking about [Tr. 2079]."

Indeed the jury never heard from Dye.  As Chaudhry confirmed, neither Dye nor Conrad was ever interviewed or subpoenaed by Abrams [Decl. of Chaudhry, para. 6-7].  Neither Dye nor Conrad asserted their Fifth Amendment rights. [Decl. of Chaudhry, para. 6-7].  The government's claim in its Opposition to Ohle's 2255 Motion that Dye would have asserted his Fifth Amendment rights was factually unsupported, and, in fact, contradicted by Dye's testimony in the Ames litigation. [Govt' Opposition to Ohle's 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket No. 13, p. 29-30].  Abrams' assumption that critical witnesses might assert the Fifth Amendment was incorrect and inexcusable resulting in ineffective assistance of counsel. [See Transcript of Ohle's Fatico hearing on September 13, 2010 (hereafter "Fatico Tr."), Case No. 1:08-cr-01109-JSR, Docket No. 147, p. 115].  As this Court indicated, a witness asserting the Fifth Amendment at Ohle's trial would be important evidence in and of itself.

Chaudhry also confirmed with Conrad's counsel that neither Abrams nor the government attempted to contact Conrad despite his involvement in executing each Services Agreement and his intimate knowledge of issues related to the HOMER transaction. [Decl. of Chaudhry, para. 6].

Not surprisingly, after Dye's FBI interview on January 31, 2008, the government decided that Dye would not be called to testify at Ohle's trial.

Abrams failed to review documentary evidence prior to trial.

In addition to failing to interview critical witnesses, Abrams admitted to this Court that he failed to locate documents produced by Jenkens & Gilchrist before

Ohle's trial that logically should have existed such as IRS filings and agreements between Jenkens & Gilchrist and HOMER clients. [see Abrams' letter to this Court, dated October 1, 2010, stating that documents were unavailable to him before Ohle's trial, Case No. 1:08-cr-01109-JSR, Docket No. 146, p. 3].

Following Ohle's review of the 116 boxes of Jenkens & Gilchrist documents that the government failed to produce prior to Ohle's trial, Ohle presented Abrams with six banker boxes of relevant documents.  Two and a half months after his letter to the Court, Abrams concluded that "documents drawn from the undisclosed boxes undermine the correctness of the jury's verdict, cutting across all aspects of the government's case [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 11]."

Having reviewed the documents found by Ohle after his trial, Abrams asserted in an email to Ohle that Bank One/Chase's base fee was one percent, not two percent, but could be increased on specific deals. [see October 27, 2010 email from Abrams to Ohle, 2255 Pro Se Motion, Exhibit 2-7].  Abrams then concluded, "This is the opposite of what the government argued, namely that their fee would be 1.8% unless reduced by the payment of third-party fees [Id.]."  Had Abrams prepared for Ohle's trial, including interviewing witnesses and reviewing documents, Abrams would have known this fact—that that Bank One was never owed 2% on each HOMER transaction—before Ohle's trial when Abrams could have presented evidence to defend Ohle from the government's charges.

Now armed with evidence from Ohle's search of the 116 Jenkens & Gilchrist boxes produced by the government after his trial, Abrams finally advanced arguments in his Motion for New Trial that should have been presented (and Ohle's constitutional rights guaranteed) to the jury at Ohle's trial.

First, Abrams pointed out that no witness testified that Bank One/Chase was entitled to receive two percent on each HOMER transaction. [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 13].

Second, Abrams pointed to documents produced by Michael Cook, the head of Jenkens & Gilchrist's tax department, that, in Abrams' words, "show unequivocally that Bank One's agreement with J&G was that Bank One would be

entitled to a base fee of only 1% -- and not 1.8% -- on HOMER transactions (citing Exhibits 1 and 2 therein) [Id., p. 15].  Had Abrams properly prepared for Ohle's trial, Cook, Sharon Perkins and other unindicted attorneys at Jenkens & Gilchrist would have been called to testify that Bank One/Chase was not entitled to two percent of each HOMER transaction. [Id., p. 27].

Third, as Abrams pointed out to the court, the government's rebuttal summation arguments relied completely on the false inference that Bank One/Chase was entitled to two percent on each HOMER transaction:

"This is a chart that reflects third-party fees paid in a number of the Homer transactions.  What you see at the top is a listing of transactions where there were no third-party referrals.  Look very carefully because the aggregate amount paid to Jenkens & Gilchrist, remember the testimony you have is the first payment goes to Jenkens & Gilchrist, is 4.4 percent.  That went throughout each one of those transactions.  The key point for you to look at, on the right-hand side, when there is no third party involved, Bank One's fees is a constant 1.8 percent.  What happens in the other instances where there is a third-party fee paid, the third-party fee you know in this case.  It lowered the amount that Bank One got.  So when Invested Interest invoices were made or the Bradley invoices or the Steger invoices or the Albert Edward invoice, that was Jay Gordon.  What it served to do is reduce the amount that Bank One got.

From this proof which is back up, by the way, you see Government Exhibits 2-42 and 2-43 [GX 2-43 simply reported the final payments on HOMER transactions], those numbers support these figures.  What it shows, ladies and gentlemen, quite simply is that when Bank One was paying a third-party referral, they didn't get the full 1.8 percent that they agreed with Jenkens & Gilchrist they would receive."

[Tr. 2216-2217].

This assertion by the government was simply not true.  Jenkens & Gilchrist and Bank One/Chase never agreed to Bank One/Chase receiving a two percent fee on each HOMER transaction.  Instead, Jenkens & Gilchrist simply allocated up to two percent of Jenkens & Gilchrist's legal fees on each HOMER transaction to be paid to all other service providers to complete the HOMER transactions.

Abrams failed to correct government's mischaracterization of the J&G spreadsheet.

In fact, Dye's testimony would have contradicted the government's mischaracterization of the Jenkens & Gilchrist "tracking" spreadsheet admitted into evidence, without objection from Abrams, by Daugerdas' secretary Burnside.  Abrams argued in his post-trial motion that the Jenkens & Gilchrist spreadsheet did not support the government's contentions. [see Memo in Support of New Trial under Rule 29, Case No. 1:08-cr-01109-JSR, Docket No. 118, p. 8-11].  Had Abrams produced testimony from Dye, Conrad, Kramer and Jenkens & Gilchrist unindicted attorneys, he would have disproved the government's contention related to the spreadsheet at Ohle's trial.

Contrary to the government's contention at Ohle's trial, Dye's deposition proves that Jenkens & Gilchrist's decision to pay Steger (through American Capital Financial Corp.) and Manella (through Bradley Law Firm, L.L.C.) for their role in funding the Browns' purchase of the unitrust interests in the HOMER transactions had no effect on Bank One/Chase's entitlement to HOMER fees.  It should be noted that evidence at trial clearly proved that Jenkens & Gilchrist's payment to Manella (through Invested Interest) related to Manella's introduction of Donald Wilson (and his partner Ken Brody) to Jenkens & Gilchrist [Tr. 348-349, 369].

Both Abrams and the government knew or should have known that Bank One/Chase was not entitled to two percent on each HOMER transaction from Dye's January 18, 2008 FBI statement alone.  However, Abrams' failure to investigate these matters before Ohle's trial allowed the government to create this inference during its rebuttal summation,  unduly influencing the jury.  Even when this Court specifically asked Abrams to point to evidence contrary to the government's claims

(e.g., Dye's and Kramer's FBI interviews and Jenkens & Gilchrist's IRS filings), Abrams was unable to do so because of his failure to review Ohle's discovery.  Both Abrams and the government had FBI interviews and IRS filings in their possession showing that the government's inference was not true, but neither Abrams nor the government advised the Court.  As a result, this Court allowed the government to present its chart solidifying the inference that Bank One/Chase was entitled to two percent on each HOMER transaction.

Had Abrams subpoenaed Dye, Conrad, Kramer, Cook, other non-indicted attorneys at Jenkens & Gilchrist and other representatives of Jenkens & Gilchrist (such as the attorneys who prepared the responses to IDRs in the IRS' tax shelter promoter audit and who responded to document requests in its civil litigation), Ohle's actual innocence would have been proven because Bank One/Chase had no property interest whatsoever in these third party service provider payments.

Abrams failed to produce expert at Ohle's trial.

Abrams presented other arguments in his post-trial filings that should also have been made to the jury at Ohle's trial.  For example, in his Motion for New Trial under Rule 29, Abrams argued that the government's contention that Bank One/Chase was entitled to two percent was an illegal and unethical fee splitting agreement in Illinois.  However, Abrams failed to produce an expert at Ohle's trial to provide testimony on issues that Abrams raised in his post-trial filings, including that the government's two percent theory was illegal and unethical under Illinois law. [see Memo in Support of New Trial under Rule 29, Case No. 1:08-cr-01109-JSR, Docket No. 118, p. 12-13].

## ii.  Third party service provider payments were paid out of Jenkens & Gilchrist's fees, not Bank One/Chase's fees.

The government's theory was that Ohle, Bradley and others conspired to have Jenkens & Gilchrist pay fees which the government characterized as "referral

fees" to Bradley Law Firm, L.L.C., American Capital Financial Corp. (Steger's company) and Invested Interest (Jonathon Freedman's company).  The government then theorized that Jenkens & Gilchrist deducted these amounts from fees that would otherwise have been paid to Bank One/Chase.  This theory is unsupported by the clear language in each Services Agreement. (see, e.g., DX A, para. 1-3).

In his deposition in the Ames litigation, Dye addressed the third party service provider payments by Jenkens & Gilchrist:

Q.  Go to the Exhibit 1 and go to Paragraph 49.  Do you see where it says, "When asked about referral fees being paid by Bank One, Dye responded that he did not feel that referral fees were against the code of conduct because it was Jenkens & Gilchrist paying the fee?
A.  I see that.
Q.  Okay.  Do you recall that's how you felt?
A.  I'd say it's accurate.

[Dye Dep., p. 200-201]

The question referenced "Exhibit 1, paragraph 49" was Dye's January 31, 2008 FBI interview with AUSA Okula, SAUSA Davis and Special Agent Mazzella [Dye FBI, para. 49].

Here again, Dye told the government that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers.

In addition to Dye, Abrams should have interviewed Bank One/Chase's Conrad and Kramer who were also involved in the negotiation and execution of the Services Agreements with Jenkens & Gilchrist.

Kramer stated to the FBI in his January 25, 2008 interview that he never heard that Bank One/Chase paid referral fees or third party payments [Kramer FBI, p. 12].  But despite having this evidence in hand, the government persisted in its claims that Bank One/Chase paid referral fees, which was wholly unsupported by testimonial or documentary evidence.

As a certified public accountant, Ohle knew that the IRS required the "payor" of third party fees to issue Form 1099s to each unincorporated third party service provider who received more than $600 in a calendar year.  Ohle instructed Abrams to obtain 2001 Form 1099s (i.e., 2001 Form 1099s aggregated and reported all Form 1099s from 2001 to the IRS) from Bank One/Chase and Jenkens & Gilchrist to prove that Jenkens & Gilchrist, not Bank One/Chase paid these third party service provider fees. [See 2255 Pro Se Motion Supplemental Brief, filed on April 25, 2012, Case No. 1:12-cv-01909-JSR, Docket No. UNKNOWN (Clerk failed to place on docket sheet), p. 10 (Exhibit 1-14) and p. 12-14 (Exhibits 2-1 through 2-7)].

On April 21, 2010, Abrams sent a letter to AUSA Okula which addressed various discovery issues, including Abrams' request for the government to produce all Form 1099s related to Ohle's case [see April 21, 2010 letter from Abrams to Okula, Id., Exhibit 3-4(a)].  AUSA Okula stated that "The only Form 1099 we have is the one marked by us, relating to Bradley [which was actually issued to Bradley Law Firm, L.L.C.]."[See April 30, 2010 email from Okula to Abrams/Baumgartel, Id., Exhibit 3-4(b)].  Abrams failed to subpoena 2001 Form 1096s from the IRS before Ohle's trial.

This failure by Abrams was inexcusable.  Had Abrams subpoenaed these Form 1099s, Abrams would have proved that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers consistent with the FBI interviews of Dye and Kramer.

Ohle also knew that his former employer Bank One/Chase had been examined by the IRS for its prior tax shelter activities (which was the very subject of his whistle blowing in mid-December 2001).  Accordingly, Ohle requested that Abrams obtain documents related to this tax shelter promoter audit.  But Abrams failed to obtain these documents from the government, including Bank One/Chase's Closing Agreement with the IRS where it admits its tax shelter activities, including POPS-Lite, BART, HOMER, BLISS, NIMCRUT and LILO, and pays $2,336,1163 to settle the matter. [See Exhibit 1-18, Bank One/Chase's Closing Agreement with IRS on its tax shelter promoter audit; Fatico Tr., p. 139].

At trial, the government's case against Ohle was wholly based upon third party service provider fees being paid by Bank One/Chase (which is disproved by J&G 2001 Form 1099s and J&G response to IRS' IDR) for "referral fees" (which was a label introduced by the government without any support at trial, but not relevant since the "payor" was Jenkens & Gilchrist, not Bank One/Chase) which defrauded Bank One/Chase of its property (but J&G's response to the IRS' IDR stated that third party service providers were paid out of J&G's fees, not Bank One/Chase's). [see Exhibit 1-6, J&G Response to IRS IDR (Note:  Exhibit excludes other Form 1099s)].

If the government's contention that Bank One/Chase paid the third party service providers, then Forms 1099s should exist from Bank One/Chase to Bradley Law Firm, L.L.C. and Invested Interest (both unincorporated entities). But these IRS filings by Bank One/Chase do not exist.

Instead, after trial, Ohle found IRS filings by Jenkens & Gilchrist related to these "other service provider" payments to American Capital Financial Corp., Bradley Law Firm, L.L.C. and Invested Interest in the government's post-trial production of the 116 boxes from Jenkens & Gilchrist.  Jenkens & Gilchrist filed its response to the IRS' IDR related to its tax shelter promoter audit which clearly stated that Jenkens & Gilchrist, not Bank One/Chase, paid American Capital Financial, Corp., Bradley Law Firm, L.L.C. and Invested Interest (all related to Ohle's charges) out of Jenkens & Gilchrist's fees, not Bank One/Chase's fees:

Question 3 of the IRS IDR instructed Jenkens & Gilchrist to provide:

"a worksheet showing the breakdown for the J&G payments made to so-called 'other service providers' including the name of the payee, the amount paid, the date paid, a description of the services provided and the client's name.  For purposes of the IRC section 6707 penalty computation (tax shelter promoter penalty), provide evidence if payments to these 'other service providers' were paid out of J&G fee."

The IDR continued, "If any such referral fee paid by J&G on a third party invoice which has been forwarded to J&G is not so proven, then the Service will use the gross fee figure."

Note 2 to the IDR provided, "The term, 'other service provider' was used by J&G on its own internal tax shelter participants lists."
[see Exhibit 1-6, J&G Response to IRS IDR (Note:  Exhibit excludes other Form 1099s)]

Jenkens & Gilchrist responded to IDR Question 3 with a list of "Third Party Payments - 1999-2002."  This list included 200 third party service providers paid out of Jenkens & Gilchrist's operating account in the amount of $44,077,570.94, including all three third party service provider payments at the core of Mr. Ohle's conviction.

This IRS filing proves that Jenkens & Gilchrist, not Bank One, paid American Capital Financial Corp. $81,500, Bradley Law Firm, L.L.C. $255,000, and Invested Interest $920,000 [Id.].  These payments are at the core of the wire fraud count in this case, and the resulting tax evasion counts.

This IRS filing was in the possession of the government who inexplicably claimed, despite these IRS filings and the clear language in the Services Agreements, that third party payments defrauded Bank One/Chase of its property, that Bank One/Chase was the payor of these third party service provider fees, and that these third party service provider payments were "referral fees."

The government's only support was the inference it created from its chart used in its rebuttal summation from Ferguson's hearsay testimony and its mischaracterization of the "tracking" spreadsheet introduced through Burnside.

Abrams' failure to investigate prior to trial allowed this miscarriage of justice, and Ohle has been sitting in prison for over three and a half years when Bank One/Chase was not defrauded of any property.

### iii.  Bank One/Chase not entitled to any HOMER fees beyond those amounts set forth in Services Agreements with Jenkens & Gilchrist.

In his December 2, 2013 deposition, Dye testified that Bank One/Chase received two payments on each HOMER transaction. [Dye Dep., p. 209].  First, Bank One/Chase was paid by the HOMER client for its role as trustee [Dye Dep., p. 205]. This 20 basis point trustee fee was paid on each HOMER transaction to Bank One/Chase for its role as trustee and tax return preparer.  The trustee and tax return preparer fees are uncontested and not part of Ohle's charges.

The second payment was made by Jenkens & Gilchrist to Bank One/Chase pursuant to its Services Agreement.[Dye Dep., p. 207-208].  Each Services Agreement provided that Bank One/Chase provided "financial planning, economic modeling and investment advice to J&G in connection with the structuring and implementation of the [HOMER] Strategies." [e.g., see DX A, para. 2 of Services Agreement; and GX 3-8, spreadsheet listing J&G as client of BOIA on each HOMER transaction].

Dye's deposition testimony supported the documentary evidence produced without explanation by Abrams at Ohle's trial [see Section A(i) above] and would have refuted Ferguson's statement that HOMER clients paid Bank One/Chase fees for its two roles as trustee and financial consultant. [Tr. 90].

Dye testified that Bank One/Chase was not entitled to HOMER fees beyond those amounts set forth in the Services Agreements, refuting the government's claim that Ohle defrauded Bank One/Chase of its property:

Q.  But at the end of the day, Bank One had no entitlement to the [HOMER fees] other than what was in the Services Agreement, correct?

A.  Other than the trustee fee?

Q.  Other than -- yes, exactly, just from -- between Jenkens and Bank One other than -- other than the Services Agreement, there was no other entitlement by Bank One to other funds from Jenkens?

A.  I think that is correct.

[Dye Dep., p. 213-214]

In addition to proving that Bank One/Chase was not entitled to any HOMER fees beyond those set forth in the Services Agreements, Abrams could have introduced other important evidence related to this agreement.  Kramer stated that the purpose of the Services Agreement was to clarify the roles of Jenkens & Gilchrist and Bank One/Chase; to clarify the compensation arrangements; and to address confidentiality concerns [Kramer FBI, p. 10].

The Services Agreements were drafted to clearly state that Jenkens & Gilchrist engaged Bank One/Chase to "assist J&G with certain estate and financial planning strategies [e.g., see DX A, para. 1]."  In return, Jenkens & Gilchrist agreed to pay Bank One/Chase for its services rendered including "financial planning, economic modeling and investment advice," an amount not greater than the stated, negotiated fee [Id., para. 3.  It should be noted that Bank One/Chase received that negotiated fee on each HOMER transaction. [See GX 3-8, BOIA ISG Year-end Deals showing wires received from J&G before year-end].

Ignoring the plain language of the Services Agreement, the government chose to argue at Ohle's trial that Jenkens & Gilchrist's payment to "other service providers" was relevant to determining Bank One/Chase's fees.

Again this very issue was specifically addressed in each Services Agreement, "[Bank One/Chase's] fee for services is independent of fees that may be charged by J&G or other parties, including [Bank One/Chase] and its affiliates, for services undertaken as part of the [HOMER] Strategies [e.g., see DX A, para. 3]."  In other words, Bank One/Chase's fee was independent from third party service provider fees paid by Jenkens & Gilchrist, which was completely contrary to the government's claim.

In paragraph 7 of each Services Agreement, Jenkens & Gilchrist stated that it may retain other parties (i.e., "other service providers") to serve as consultants or other roles.  Jenkens & Gilchrist then acknowledged that Bank One/Chase was not responsible for the services of any "other service provider." [Id., para. 7].

In paragraph 8 of each Services Agreement, Jenkens & Gilchrist established that Bank One/Chase was an independent contractor, and that the Services Agreement could not be construed to create any partnership, joint venture or client

solicitation arrangements.  It further stated that Bank One/Chase was not a service provider to the HOMER client. [Id., para. 8].

Notwithstanding this plain language of the Services Agreements, Bank One/Chase has claimed in its Victim Impact Statement to this Court that Bank One/Chase was entitled to two percent of each HOMER transaction, a clearly incorrect claim.

In paragraph 10 of each Services Agreement, Jenkens & Gilchrist included an integration clause to ensure that any prior oral representation or promise could not be relied upon by any party.  Bank One/Chase and the government completely ignored this paragraph and the rest of the Services Agreement in its claim that Bank One/Chase was entitled to two percent of each HOMER transaction.

Such a claim by Bank One/Chase's would have been dismissed by summary judgment in a civil proceeding, but due to the ineffective assistance of counsel at Ohle's trial, Bank One/Chase was awarded $1.2 million restitution against Ohle.

The government repeatedly asked the jury to ignore legal documents, such as the Services Agreements, which was possibly due to Abrams' failure to prepare and to present a defense case.

Here, Abrams' failure to subpoena Dye, Conrad and Kramer was unreasonable and inexcusable, resulting in his ineffective assistance of counsel.

Accordingly, Ohle's conviction should be vacated.


**D.  Bank One/Chase's continues its corporate cover up.**


During Dye's deposition, Bank One/Chase's counsel instructed Dye to not answer proper questions to conceal its misrepresentations to this Court in its Victim Impact Statement:


Ohle:  Irregardless of all of that, the service agreement was the only agreement between Bank One and Jenkens, correct?

Dye:  I think that's correct.

Ohle:  And there was never an agreement that Bank One was going to split fees with Jenkens, correct?

Dye:  I don't understand your question, John.

Ohle:  There was -- there was no fee splitting agreement.  Bank One was a service provider to Jenkens, correct?

Dye:  Based on these documents.

Ohle:  Okay.  Based on these documents, but I mean based in reality, also, were we entitled to money from the client?

Dye:  No.  We were paid by Jenkens.

Ohle:  So a statement that Bank One was entitled to 2 percent on all HOMER deals is false, correct?

Dies (Mayer Brown attorney for Bank One/Chase and Dye):  Objection.  Form.  I'm going to instruct the witness not to answer this question.  Mr. Ohle, this -- these questions -- this whole line of questioning has no bearing on the petition's allegations.  It is not --

Ohle:  It goes to the profit of Bank One.  If Bank One was entitled to 2 percent, then the total compensation to Bank One should be 2 percent or is it the amount of the service agreement?

Dies:  The witness has testified to the amounts that were invoiced by Bank One to Jenkens & Gilchrist.  The witness has testified to the amounts reflected in the services agreements.  Mr. Ohle, this is not an opportunity to develop discovery for any other purpose.  The purpose of this deposition is for discovery in this case pending in Louisiana State Court, and I'm going to instruct the witness not to answer because these questions aren't designed to elicit relevant evidence or likely to lead to the discovery of admissible evidence in this case, and on that basis I'm going to instruct the witness not to answer.

[Dye Dep., p. 214-217].

As discussed below, Ames claims in her petition that she is entitled to a portion of HOMER fees due to commissions she paid on her SocGen Warrants being subsequently loaned to fund the third party purchaser, the Browns, in the HOMER

transactions.  Accordingly, Bank One/Chase's counsel's wrongful instruction not to answer Ohle's question was a thinly disguised attempt to conceal its ongoing misrepresentations related to its claim that Bank One/Chase was entitled to two percent on each HOMER transaction.

Moreover, Bank One/Chase refused to disclose its actual knowledge based on Dye's December 2, 2013 deposition testimony that Bank One/Chase had no property interest in the subject third party service provider payments by Jenkens & Gilchrist. [See Exhibit 1-19, Letters from Eastland to Bank One/Chase on April 16, 2014 and July 28, 2014 regarding Bank One/Chase's and Mayer Brown's legal duties to correct its Victim Impact Statement].

Instead, Bank One/Chase asserted that Dye's deposition testimony was protected under a Protective Order.  In response to Bank One/Chase's repeated attempts to block Ohle from disclosing information about Bank One/Chase's illegal tax shelter activities and Bank One/Chase's misrepresentations regarding its entitlement to HOMER fees to this Court, Judge Ethel Julien on April 25, 2014 told Bank One/Chase's counsel from her bench that:

"To the extent that the federal Court in New York has a desire to receive these documents to review, then this Court is not going to in any way attempt to prevent that court from having those documents.  So the Protective Order would be modified to allow the federal Court to receive the documents.  Is that clear?"  [Exhibit 1-20, Transcript on Ames Court's ruling to modify Protective Order on April 25, 2014, Civil Action No. 11-440, CDC-Orleans Parish, Louisiana].

So, more than six months after Dye's deposition, Ohle filed a Motion for Leave to File a Supplemental Brief in support of his 2255 claims with this Court on June 30, 2014 to disclose this new evidence to this Court.  Ohle's motion was granted on July 6, 2014 resulting in his filing of this Supplemental Brief.

In addition to its instructions for Dye to not answer questions related to Bank One/Chase's entitlement to HOMER fees, Bank One/Chase repeatedly refused to produce documents related to its illegal tax shelter activities claiming such

documents are not related to Ames' claims.  However, Ames' petition specifically alleged that Ohle was knowledgeable and complicit in Bank One/Chase's illegal HOMER activities, making Bank One/Chase's actions after his whistle blowing critical evidence in the Ames litigation.

Similar to the Fatico hearing before this Court, Ohle needed to obtain documents from the period of time following his mid-December 2001 whistle blowing and departure from Bank One/Chase to prove that Bank One/Chase was culpable for its illegal tax shelter activities, not him.  In addition, Ohle sought evidence related to his whistle blowing and Jenkens & Gilchrist's orchestration of the third party purchaser, the Browns, in the HOMER transaction.  While Ohle has obtained important evidence, as shown in the background section (section A), Bank One/Chase continues its corporate cover-up, obstructing Ohle's discovery in the Ames case.

In order to obtain this evidence, Ohle has filed a Motion to Compel Deposition Testimony in the Ames proceedings which will permit him to complete his examination of Dye (including court's instruction to answer questions related to HOMER) as well as to examine Dye's supervisor Atwater who was directly involved in Bank One/Chase's illegal tax shelter activities following Ohle's departure from Bank One/Chase in mid-December 2001.

Ohle has also asked the Ames Court to order Rogoff who headed Bank One/Chase's "internal investigation" to continue his deposition which was terminated before Ohle was given the opportunity to examine him.  See Exhibit 1-21, Motion to Compel Deposition Testimony, Ames v. J.P. Morgan et al, Civil Action No. 11-440, CDC-Orleans Parish, Louisiana, filed July 11, 2014.  This motion is set for hearing before Judge Julien on October 10, 2014.

Bank One/Chase has also refused to produce documents requested by Ames and Ohle related to its illegal tax shelter activities.  As a result, Ohle was forced to file a second motion to compel with the Ames court.  See Exhibit 1-22, Motion to Compel Bank One to Comply with Its Discovery Obligations, Ames v. J.P. Morgan Chase et al, Civil Action No. 11-440, CDC-Orleans Parish, Louisiana, filed September 2, 2014.  Ohle's second motion to compel seeks an order compelling Bank

One/Chase to provide full and complete responses to discovery requests related to its illegal tax shelter activities and to designate and produce a corporate representative capable of answering questions related to its illegal tax shelter activities.  This motion is also set for hearing on October 10, 2014.

This evidence is essential to prove that Ohle was not complicit or involved in Bank One/Chase's illegal tax shelter activities once he learned of Bank One/Chase's failure to properly vet the HOMER transactions.

While the evidence provides an important defense in the Ames litigation, it is also pertinent to Ohle's Claims Five and Six in Ohle's 2255 motion, proving that Bank One/Chase's illegal tax shelter activities could not result in a legitimate property interest in the fraudulent HOMER proceeds.

The evidence that Ohle currently seeks was known and available to Abrams before both Ohle's trial and before his Fatico hearing.  In fact, much of this evidence may have been "produced" in Ohle's corrupted discovery.  However, Abrams failure to investigate the HOMER transaction resulted in Abrams failing to present evidence to this Court which would have proven that Ohle was not responsible for, nor complicit in, Bank One/Chase's illegal tax shelter activities.

Having observed Abrams' failures to prepare for his trial, Ohle pointed Abrams to specific documents from Bank One/Chase to rebut the inference that Ohle had a role in the HOMER transaction other than presenting HOMER to clients in accordance with Bank One/Chase's instructions after its approval, introducing Brown to Jenkens & Gilchrist and obtaining financing for Brown in late November at Jenkens & Gilchrist's direction.

But Abrams' efforts to obtain these documents from Bank One/Chase were thwarted when Bank One/Chase referred him to Bates-numbers from the previously produced discovery that Abrams could not access [see May 28, 2010 email from Durkin to Okula/Davis, Case No. 1:13-cv-01909-JSR, Docket No. 13, Exhibit 8].

At Ohle's Fatico hearing, Bank One/Chase continued its pattern of leaving its former employee Ohle defenseless. [See Exhibit 1-23, September 10, 2010 email from Abrams to Durkin/Rogoff/Okula/Davis/Gonzalez, stating that Abrams

expected a representative of Bank One/Chase to appear at Ohle's Fatico hearing on September 13 with the responsive documents].

Ohle was unaware of Abrams' subpoena, and has never seen any documents produced by Bank One/Chase.

Accordingly, Ohle filed a Motion to Permit Discovery with this Court [see Case No. 1:13-cv-01909-JSR, Docket Nos. 29, 31] on September 11, 2014, requesting that he be allowed to obtain and review his legal files from Frankel & Abrams.

Without reviewing any documents from Jenkens & Gilchrist, Bank One/Chase or Deutsche Bank, Abrams was subject to a fishing expedition at Ohle's Fatico hearing with a hostile witness, Bank One/Chase attorney Kramer, who should have borne more responsibility for HOMER than any other party at Bank One/Chase.

As shown above in the background section, Kramer was responsible for reviewing the legality of the HOMER transaction before Bank One/Chase began introducing clients to Jenkens & Gilchrist.  Then, Kramer drafted the Services Agreements between Bank One/Chase and Jenkens & Gilchrist [DX ZZ].  But, most importantly, he was responsible for vetting the tax shelter registration issues after Ohle's whistle blowing in mid-December 2001.

Despite having direct access to Jenkens & Gilchrist's files which included the transactional documents from the HOMER transactions (which Ohle never saw) and the option confirmation from Deutsche Bank (which Ohle never saw), Kramer allowed Bank One/Chase to accept $5.2 million in HOMER fees from Jenkens & Gilchrist (in addition to almost $1 million in trustee/tax return preparer fees) and to prepare, sign and issue tax returns reporting more than $425 million in fraudulent HOMER losses long after Ohle left his position at Bank One/Chase.

Untested by evidence, Kramer's testimony at Ohle's trial was completely disingenuous, failing to reveal Bank One/Chase's continued illegal tax shelter activities long after Ohle departed his position at Bank One/Chase in mid-December 2001.

Abrams' failure to investigate the HOMER transaction, including his failure to review the document productions of Bank One/Chase, Deutsche Bank and Jenkens &

Gilchrist or to interview witnesses based on their FBI interviews such as Dye, Atwater, Kundert and Kramer, resulted in his ineffective assistance.

Abrams should have presented evidence that Bank One/Chase instructed Ohle and other ISG members to introduce clients to Jenkens & Gilchrist's HOMER transaction; that Ohle's roles and responsibilities in the HOMER transactions were limited to: (i) introducing the Browns to Jenkens & Gilchrist as third party purchasers, (ii) soliciting funding for the Browns in late November 2001 at Jenkens & Gilchrist's instruction and (iii) introducing potential clients to Jenkens & Gilchrist at Bank One/Chase's instruction.  Abrams should have also presented evidence that Ohle was not provided any information related to Deutsche Bank's options, that Ohle was not responsible for reviewing the tax opinion letters from Jenkens & Gilchrist and that Ohle was not responsible for (and could not prevent) Bank One/Chase preparing, signing and issuing tax returns reporting more than $425 million in fraudulent HOMER losses.

As a result of Abrams' failures, the Court determined in its Finding and Conclusions Regarding "Relevant Conduct" issued October 25, 2010 that "Ohle knew the HOMER tax shelter was fraudulent and violated the tax laws and, knowing this, willfully promoted the sale of the shelter. [See Findings and Conclusions, Case No. 1:08-cr-01109-JSR, Docket No. 151 (hereafter "Fatico Findings"), p. 3]."

As a result, Ohle's guidelines were enhanced, and this Court found at Ohle's sentencing:

"So since I'm obligated to make a formal finding.  I find the offense level is 43, the criminal history is I, and the guidelines range, but for the statutory maximum, would therefore be life imprisonment.  But it is capped at 180 months by the statutory maximum [see Transcript from Sentencing on January 13, 2011, Case No. 1:08-cr-01109-JSR, Docket Nos. 180-181 (hereafter "Sentencing Tr.), p. 35]."

Notwithstanding the white collar sentencing guidelines of 180 months, this Court sentenced Ohle to 60 months in prison on each of the three counts,

concurrently, along with restitution of $5,555,680.74 and a forfeiture order of $2,954,334. [See Judgment, Case No. 1:08-cr-01109-JSR, Docket No. 176].

Incredibly, Bank One/Chase submitted a letter to this Court claiming it was due $1,256,500 as a "victim." [See Victim Impact Statement, dated January 10, 2011, where Bank One/Chase claims entitlement to two percent of each HOMER transaction and assigns financial responsibility to Ohle for its illegal tax shelter activities, Case No. 2:12-cv-013240-CJB-DEK, Docket No. 1-2, p. 53-54].

## E.  Bank One/Chase is culpable for its illegal tax shelter activities and has no legitimate property interest in fraudulent HOMER fees.

The HOMER transaction was determined to be fraudulent by this Court and two juries in United States v. Daugerdas et al, 09 CR 581 (WHP).

This Court found that, "On the basis of this evidence [presented at Ohle's Fatico hearing], it is obvious that the HOMER tax shelter was fraudulent.  Its complex design was simply intended to disguise the fact that its profit potential was infinitesimal, and its sole purpose, as even its clients understood, was to generate tax benefits. [See Fatico Findings, Case No. 1:08-cr-01109-JSR, Docket No. 151, p. 2]."

Similarly, in Daugerdas, both juries found that the HOMER tax shelter was fraudulent. [See Judgments, United States v. Daugerdas et al (09 CR 581 (WHP))].

In those trials, the government argued that the HOMER transaction was fraudulent, because Deutsche Bank's digital options lacked economic substance.

The government supported its claim that Deutsche Bank's digital options lacked economic substance in Ohle's Fatico hearing and at both Daugerdas trials with expert witness testimony from Dr. David DeRosa [Fatico Tr., p. 67, 76].

Abrams' failed to investigate the HOMER transaction and to present evidence on Ohle's lack of culpability

Abrams was alerted by counsel in the Daugerdas case of the government's failure to produce 116 boxes from Jenkens & Gilchrist.  Abrams, however, allowed

Ohle's Fatico hearing to proceed without alerting this Court to the issue.  Instead, Abrams notified the Court at the conclusion of Ohle's Fatico hearing.

Accordingly, Abrams failed to obtain critical documents, as he later argued in his Motion for New Trial, to defend Ohle from the inferences created regarding his role and responsibility at Bank One/Chase for the HOMER transaction.

In Ohle's Fatico hearing, this Court found that "[Ohle] was the head of the Chicago office of Bank One's Innovative Strategies Group (which was engaged in tax shelter promotion), and he took the lead in promoting the sale of HOMER.  This the Court infers, required him to be familiar with HOMER's structure and be in a position to explain how it worked, yet all the clients were able to understand from his presentation was that the product generated tax losses." [Fatico Findings, Case No. 1:08-cr-01109-JSR, Docket No. 151, p. 3].

Abrams' failure to investigate the HOMER transaction left Ohle defenseless once again at his Fatico hearing.  Had Abrams' presented the evidence herein, this Court would have been presented direct evidence rebutting the inference upon which the Court based its finding, namely that Ohle was responsible for Bank One/Chase's illegal tax shelter activities.

First, Abrams failed to present evidence that Dye, not Ohle, was responsible for approving tax transactions.  Further, Abrams failed to establish that Bank One/Chase's internal review process was completely inadequate, resulting in Bank One/Chase's failure to properly vet these illegal tax shelter transactions before instructing its employees to introduce them to clients.

On July 24, 2014, Michael Reed testified as a corporate representative on behalf of Bank One/Chase in a deposition taken in Ames v. J.P. Morgan Chase et al, Civil Action No. 11-440, CDC-Orleans Parish, Louisiana.  Reed explained Bank One/Chase's internal review process for its tax transactions:

Q.  How did ISG decide what solutions to offer its clients?

A.  I think there was a generally accepted set of estate and wealth transfer planning strategies that were commonly done just in the practice of that area, and that was

probably the starting point as to what those strategies were; and as other things came up, they would determine if they would add those to the list or not add those to the list.

Q.  And how did -- I guess first question, who is "they would determine"?

A.  Yeah.  Really Trey [Dye] would -- would go to different individuals in different areas of the bank and kind of vet these individual strategies.

Q.  Was anyone else involved in that vetting process within ISG?

A.  I guess hard to say because the strategies came from somewhere, but ultimately Trey [Dye] would take them to the -- whether it was somebody in the legal department or the investment side or wherever.  So I would say Trey [Dye] was the one was -- was managing the whole process.  Nobody else was managing that process.

   I mean, there would certainly be other people who would have conversations about how it worked in the process, but Trey [Dye] was ultimately going to be the one who had to get all that done and signed off on, however that happened.

Q.  Do you know how -- how things were signed off -- was there a formal process?

A.  Yes.  There was a process, but I wouldn't call it formal.  It was more Trey [Dye] would sit down with the -- with the different areas that he felt like he needed to; and if he needed somebody to help him describe what was going on, they would probably be there, too; and then he would, you know, get their, at least, verbal approval, yeah.  I would think that makes sense, and go ahead.

Q.  Was there a written approval process?

A.  Not that I'm aware of.

[Reed Dep., p. 121-123].


   Bank One/Chase's corporate decision to participate in these "tax advantaged" products was clearly stated in its Family Wealth Services marketing brochure.  Bank One/Chase stated that it provided "a strategic approach to preserving and transferring wealth for generations."  The brochure proclaimed, "The best measure of financial success is not only how much wealth you accumulate,

but how much you are able to shelter from taxes and keep working for you and your family."  Bank One/Chase cited its unwavering commitment to integrity including "Objectivity," "Professionalism," and "Confidentiality" in this marketing brochure. See Exhibit 1-24, Bank One/Chase's Family Wealth Services marketing brochure.

Based on representations by Bank One/Chase and Jenkens & Gilchrist to ISG members, Ohle and other ISG members reasonably relied on the representations by their employer Bank One/Chase in introducing HOMER to potential clients.

In fact, in his December 2, 2013 deposition, Ohle's supervisor Dye confirmed that Bank One/Chase provided "a lot of compliance and legal and trust oversight in that [HOMER] transaction [Dye Dep., p. 145]."

Dye then testified that Atwater allowed him to bypass the product review committee in vetting the tax transactions [Id., p. 146].  Instead, Dye provided the compliance attorneys with legal tax opinions from Jenkens & Gilchrist to complete Bank One/Chase's due diligence. [Id., p. 146].

Dye testified that many different groups within Bank One/Chase reviewed the HOMER transaction, including the bank attorneys in legal, compliance, trust legal and trust compliance. [Dye Dep., 145-152; Dye FBI, para. 23, 44; Little FBI, para. 19].

Q.  So Bank One ultimately approved of the HOMER and the BLISS financial -- the transactions that Mr. Ohle was offering to customers of the bank?
A.  Yes.

[Dye Dep., p. 151]

Having established the involvement of Bank One/Chase's legal department, including head BOIA attorney Kramer, compliance attorneys, trust legal attorneys and trust compliance attorneys, Dye testified to Ohle's limited role and responsibilities in the HOMER transaction at Bank One/Chase:

Q.  What is HOMER?

A. It's a strategy.

Q. Who developed the strategy.

A. Jenkens & Gilchrist.

Q. All right.  What was Mr. Ohle's involvement in HOMER based upon your knowledge of being his supervisor over at Bank One?

A. He presented to clients.

[Id., p. 142-143]

Had Abrams presented evidence from Dye, other ISG members and unindicted Jenkens & Gilchrist attorneys of Ohle's limited role and responsibility of simply introducing the HOMER transaction to Bank One/Chase clients at Bank One/Chase's instruction, this Court would not have incorrectly inferred the broad roles and responsibilities it assigned to Ohle in the HOMER transactions.

Abrams should have presented evidence that all ISG members presented the HOMER transaction from a PowerPoint presentation created by Dye and approved by Bank One/Chase, similar to the flowchart found in Dye's presentation to the R&CC. [See Exhibit 1-11, January 14, 2002 ISG PowerPoint presentation of HOMER which Dye called "Grantor Retained Remainder Trust {Funded with Options}, p. 7]. Further, Abrams should have presented evidence that the ISG members were only familiar with the GRRT "piece" of the tax shelter transaction "puzzle" which was essentially the same information as the testimony provided by the IRS' David Kirk at Ohle's Fatico hearing. [See Fatico Tr., p. 92-101].

The HOMER transactional partners - Jenkens & Gilchrist, Bank One/Chase and Deutsche Bank - prevented Ohle and other ISG members from any involvement in Deutsche Bank's options [Decl. of Ohle, para. 20].  Abrams also failed to present evidence that Ohle and other ISG members had not reviewed Jenkens & Gilchrist's tax opinion letter [Decl. of Ohle, para. 20].

As tax professionals have pointed out, a typical arrangement in these tax shelter products was to limit professionals to one "piece" of the tax shelter "puzzle," thereby hiding the fraud in the overarching scheme.  As a result, defendants who

were indicted despite their limited roles and responsibilities (but whose roles and responsibilities were still far greater than Ohle's) have been found not guilty in these tax shelter schemes. [e.g., see Denis Field and Raymond Brubaker in U.S. v. Daugerdas, 09-cr-00581 (WHP)].

Had Abrams investigated the HOMER transaction and reviewed Ohle's discovery, Abrams would have established Ohle's limited role and responsibilities. Abrams would have also proven Ohle's reasonable reliance on the representations of his employer Bank One/Chase and its HOMER transactional partners, Jenkens & Gilchrist and Deutsche Bank.

Abrams failed to investigate HOMER and present evidence of Bank One/Chase's culpability for its illegal tax shelter activities.

By mid-December 2001, Bank One/Chase was clearly on notice that the HOMER transaction was not properly vetted.  Ohle left his position at Bank One/Chase following Dye instructing him to not notify clients that problems persisted related to Bank One/Chase's due diligence of the HOMER transaction. [Tr. 1401; Decl. of Ohle, para. 22].  At this point in time, Bank One/Chase had not negotiated its Services Agreements with Jenkens & Gilchrist, Jenkens & Gilchrist had not issued its tax opinion letter to HOMER clients and Bank One/Chase had not prepared and issued, signing as trustee and tax return preparer, tax returns reporting more than $425 million in fraudulent HOMER losses.

Abrams failed to prepare for Ohle's trial including reviewing his discovery which was found to be inaccessible by his counsel Chaudhry. [See Motion to Permit Discovery, Case No. 1:13-cv-00450-JSR, Docket Nos. 29, 30].  In the government's Opposition to Ohle's 2255 Motion [see Case No. 1:13-cv-00450-JSR, Docket No. 13], FBI interviews of Groh, Kramer and Little were attached as exhibits.  These FBI interviews provided critical information related to Ohle's alleged criminal matters. (e.g., FBI interviews of Groh, Kramer and Little) which were not known to Ohle or his counsel prior to the government's filing.

As a result, the undersigned counsel requested that the government provide Ohle with copies of all FBI interviews and grand jury proceedings related to his case. Because the government had not produced these documents, Ohle requested an extension to file this Supplemental Brief which was granted by this Court.

It should be noted that although the government has recently produced these documents, Ohle has not yet completed his review of these documents prior to the filing of this Supplemental Brief. Moreover, Ohle recently discovered the government's production of these documents was incomplete and not received in time for review and use in the supplemental memorandum.

As evidenced throughout this Supplemental Brief, Abrams could not meet his professional responsibilities in his representation of Ohle without reviewing these FBI interviews and interviewing these critical witnesses.  Abrams also failed to review Ohle's discovery which led to Abrams failing to identify other leads and important exculpatory documents.

The statements in the FBI interviews along with evidence obtained in the civil litigation establishes that Bank One/Chase should be culpable for its tax shelter activities, not Ohle, who brought these issues to Bank One/Chase senior management's attention in mid-December 2001 when Bank One/Chase should have stopped its tax shelter activities.

Dye's supervisor Atwater requested that Johnanneck, a senior risk manager, and Dye, the ISG Director, meet on November 2, 2001 in Chicago with Bank One/Chase attorney Kramer regarding ISG. [See Exhibit 1-25, FBI Interview of Peter Atwater on February 27, 2008 (hereafter "Atwater FBI"), para. 30].  Atwater received no feedback from Johnanneck after the meeting, other than Kramer thought the meeting had gone well. [Id., para. 31].

Kramer told Atwater that he had some concerns he intended to share with Bank One/Chase's General Counsel Edwards, but had not had a chance to [Id., para. 33].  Nevertheless, Bank One/Chase approved the tax transactions and Dye instructed ISG members to begin introducing clients to Jenkens & Gilchrist related to HOMER and BART and Greenberg Traurig related to the partnership trade transaction.

Bank One/Chase had a second opportunity to stop its participation in the tax shelter products industry in mid-December 2001 while HOMER transactions were still being implemented with Bank One/Chase as trustee.  ISG members Ferguson and Dye solicited Bill Richels for a $100 million loan related to a BART transaction. Richels became concerned about the BART transaction and notified Kramer and R&CC of his concerns.  R&CC, the senior most risk committee at Bank One/Chase, reviewed the $100 million loan request as well as the BART structure. [Id., para. 34]. Atwater stated that Dye explained the BART transaction using a schematic which Dye collected at the end of his presentation [Id., para. 37].

Atwater stated that the principle of the BART transaction was tax avoidance, not tax deferral.  After Dye's presentation, Atwater stated that "it was like someone had taken the legs out from under him and he completely missed what the ISG was doing [Id., para. 38]."  Atwater associated risk with this transaction based on Dye's actions and the "hair on Atwater's neck went up [Id.]."  Atwater reported that R&CC members were equally concerned, if not more so, than Atwater.  Bank One/Chase senior executive Charlie Scharf, who was the head of Bank One/Chase's retail, called Atwater later after the meeting and told Atwater that "he needed to be all over it [Id.]."  Atwater told the FBI that after the December 10, 2001 R&CC meeting there were a number of "to dos" [Id.].

Only two days following this meeting without actual knowledge of these developments, Ohle demanded to ISG Director Dye, his supervisor at ANB Jon Verity and Bank One/CEO Jamie Dimon that Bank One/Chase contact HOMER clients to inform them that Bank One/Chase had not properly performed its due diligence. Dye asked Ohle to go home for the holidays and allow him to "fix" things at Bank One/Chase. [Decl. of Ohle, para. 22].  Ohle left his position at Bank One/Chase [Tr. 1401].

In late 2001 with HOMER transaction still ongoing, Kramer did not contact HOMER clients about these problems.  Instead, Kramer negotiated fee agreements with Daugerdas at Jenkens & Gilchrist, resulting in $5.2 million in HOMER fees for

Bank One/Chase in addition to the approximate $1 million in trustee/tax return preparer fees.

On January 14, 2002, Atwater and Dye were back before the R&CC, presenting more information related to the tax products approved and sold by Bank One/Chase.  Atwater stated to the FBI that his involvement was largely with Rogoff, an attorney for Bank One/Chase's litigation support and who handled the "internal investigation" of Ohle [Id., para. 49].  Following this R&CC meeting, Atwater stated that there was also the beginning of odd behavior by Ohle. [Id., para. 51].  But Ohle had left his position at Bank One/Chase a month earlier and had asked to terminate his employment after receiving his year-end bonus.

In fact, Dye and Atwater left the R&CC meeting and asked Kundert to fire Ohle.  Instead, Rogoff and Kramer advised Dye to suspend Ohle "pending investigation [Dye Dep., p. 55-57]."  Dye stated Bank One/Chase was investigating Ohle related to the purchase of SocGen Warrants by Clouatre and Rutland.  Dye recalls that Ohle "thought it was just kind of a red herring to distract from the [risk committee] meeting [Dye Dep., p. 46]."  Ohle knew that Dye and Atwater were attempting to silence his whistle blowing related to Bank One/Chase's failure to properly vet the HOMER transaction.

In fact, ISG Regional Director David Walser emailed Atwater regarding Ohle's investigation and Bank One/Chase's claims that Ohle acted improperly, "I wouldn't want to be the one explaining to the jury why John should forfeit $2.5 million over what would appear to the jury to be little more than a traffic ticket." [See Exhibit 1-26, April 1, 2002 email from Walser to Atwater then forwarded to Rogoff].

What Walser did not realize was that Kramer and Rogoff had bigger plans for Ohle than withholding his bonus - Ohle would be the scapegoat for Bank One/Chase's tax shelter activities.

Bank One/Chase had a third opportunity to extricate itself from the tax shelter industry in early 2002.  Abrams failed to present evidence, as shown herein, at Ohle's trial or at Ohle's Fatico hearing that senior management at Bank One/Chase from CEO Jamie Dimon, General Counsel Christine Edwards, CEO of Bank One/Chase's Investment Management Group David Kundert, head of R&CC, the

senior risk committee, Linda Bammann, Private Client Services CEO Peter Atwater, the entire Risk and Capital Committee including senior executives such as Paul Hennessey, Charlie Scharf, Sara McClelland, Mike Wellborn, Larry Helm, David Schabes, Steve Capouch, Sherry Daw and Mike Cavanagh down to ISG Director Dye were on notice of issues related to the HOMER transaction but chose to continue its illegal tax shelter activities including the preparation, signing and issuance of tax returns reporting more than $425 million in fraudulent HOMER losses.

Had Bank One/Chase heeded Ohle's warnings in mid-December 2001, Bank One/Chase would have avoided these problems including its tax shelter promoter penalty and Ohle's indictment for a $100 million tax fraud.

Instead of stopping its activities, Bank One/Chase hired an outside attorney Palmer of Foley & Lardner to provide an attorney-client shield for its subsequent activities. Palmer undertook a complete review of Jenkens & Gilchrist's legal files on several HOMER clients, including HOMER transactional documents and Deutsche Bank's trading confirmations. In fact, Kramer testified at Ohle's Fatico hearing that Bank One/Chase reviewed the economics of Deutsche Bank's digital options used in the HOMER transaction:

Prosecutor: You did not vet the investment transactions as part of the Homer transaction?

Kramer: No. We talked about it. I was interested in it. But that's above my expertise.

Prosecutor: You didn't review it for any profit potentials in terms of the options that were used in the transactions?

Kramer: No, we did. I didn't do that personally but our investigation considered that as part of trying to deconstruct how the strategies worked and to better understand them.

Prosecutor: Who at Bank One talked with anyone at Deutche Bank regarding the options?

Kramer: I am sorry, I don't recall.

Prosecutor:  Did you have, did you know of a person named Kenneth Brown who had a role in the Homer transaction?

Kramer:  I don't recall.

[Fatico Tr., p. 142-143]

Despite having access to Deutsche Bank's option confirmations, a complete set of transactional documents used in the HOMER transaction and Jenkens & Gilchrist's tax opinion letter, Bank One/Chase chose to continue its tax shelter activities, ignoring its third opportunity to stop its participation in the illegal HOMER tax shelter [Dye Dep., p. 141].

In Atwater's FBI interview, Atwater stated that he "did not know Bank One/Chase was in the tax shelter business until January of 2002 [Atwater FBI, para. 13]."  But Bank One/Chase continued to refuse to alert the IRS or its HOMER clients. In fact, Kramer represented to Daugerdas that Bank One/Chase would not register HOMER as a tax shelter under IRC Section 6111. [Letter from Kramer to Daugerdas stating that Bank One has been engaged in extensive due diligence of HOMER and would not register HOMER as a tax shelter, Case No. 1:08-cr-01109-JSR, Docket No. 157-3, p. 17].

Clearly, Bank One/Chase knew it was promoting tax shelters but continued to conceal this fact from its employees, clients and the IRS.

But Bank One/Chase did not stop there either.  Bank One/Chase, as trustee of each GRRT and as tax return preparer, prepared and issued tax returns reporting $425 million in fraudulent HOMER losses. [Dye Dep., p. 181-182, 194-195].

At Ohle's Fatico hearing, neither the government nor Abrams were aware that Bank One/Chase had admitted its culpability for its illegal tax shelter activities previously.  Abrams stated that, "I had asked the government for any agreements between Bank One/Chase and the IRS or the United States Attorney's Office, and I was told there were none [Fatico Tr., p. 139]."  The government then stated that, "We are not aware of a closing agreement in terms of a promoter penalty audit, but we will certainly confirm that with the IRS that none exists [Fatico Tr., p. 140]."

Ohle's Fatico hearing concluded without this critical document where Bank One/Chase admitted that it participated in promoting six different tax shelters including HOMER. [See Exhibit 1-18, Bank One/Chase's Closing Agreement with IRS related to its tax shelter activities].  Similar to the responses from Jenkens & Gilchrist to the IRS' IDR related to its tax shelter promoter audit (which proved Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers from its legal fees, not Bank One/Chase's fees), this Closing Agreement on Bank One/Chase's tax shelter audit was also in the government's possession when Ohle was indicted for $100 million tax fraud related to Bank One/Chase's tax shelter activities.

Abrams failed to challenge government's contention that fraudulent HOMER fees constituted Bank One/Chase's property.

Abrams failed to investigate the HOMER transaction and Ohle's limited role and responsibility at Bank One/Chase related to the HOMER transaction.  But Abrams also failed to challenge the government's claim that Ohle's alleged fraud deprived Bank One/Chase of certain property in the form of fees generated from the fraudulent HOMER tax shelter transaction.  The government never alleged or proved that Bank One/Chase held a legitimate property interest in these HOMER fees, a deficiency that should have rendered the prosecution and conviction of Ohle on this count legally invalid.

Abrams, compromised by health issues, failed to identify and challenge this deficiency at every stage.

Abrams could have and should have presented the evidence set forth herein to affirmatively negate the legitimacy of Bank One/Chase's property interest in these fraudulent HOMER fees.  Abrams should have presented the evidence of Bank One/Chase's senior management actively and knowingly proceeding with the preparation and issuance of fraudulent tax returns reporting $425 million of HOMER losses.  Further, Abrams should have presented evidence showing that Bank One/Chase's preparation and issuance of the tax returns occurred after its review of Deutsche Bank's digital option trading confirmations, options which were found to

be fraudulent by this Court and by two different juries in United States v. Daugerdas et al., No. 09 CR 581 (WHP).

Simply, Bank One/Chase accepted $5.2 million from Jenkens & Gilchrist and almost another million as trustee of GRRTs related to the HOMER transactions, then long after Ohle left his position at Bank One/Chase in protest of Bank One/Chase refusing to inform HOMER clients that Bank One/Chase had not properly performed its due diligence on the HOMER transaction.

Instead, Bank One/Chase orchestrated an internal investigation and corporate cover-up which resulted in Ohle's wrongful conviction and subsequent incarceration for more than three and a half years.

Bank One/Chase could not have a legitimate property interest in these fraudulent fees generated by the HOMER tax shelter transactions (and certainly did not have any property interest in Jenkens & Gilchrist's legal fees as claimed in Bank One/Chase's fraudulent Victim Impact Statement).

**F.  Abrams failed to review Jenkens & Gilchrist documents which provided exculpatory evidence, credible witnesses.**

In addition to failing to interview critical witnesses, Abrams failed to review Ohle's discovery and to subpoena other critical documents to disprove the government's claims against Ohle.  As further discussed below, Abrams failed to obtain documents that Citron Cooperman required to complete its forensic accounting report and to testify at Ohle's trial.  Similarly, Abrams failed to obtain relevant information to impeach claims by Ecetra Ames and Douglas Steger despite hiring investigators to do so. [Decl. of Ohle, para. 11-12].

Abrams' failure to review Ohle's discovery was truly inexcusable.  Chaudhry explained to this Court that she had personal knowledge that Abrams' discovery databases were not reviewable. [2255 Tr., p. 4].  Eventually, Chaudhry discovered that Ohle's discovery from the government (or its vendor CACI, Inc.) was corrupted.

To date, neither Ohle nor any of his counsel have been able to review his discovery [2255 Tr., p. 8-9].

Ohle filed his Motion to Permit Discovery on September 11, 2014, asking this Court to order the government and/or its vendor to produce an uncorrupted database of Ohle's discovery in this case.

Abrams admitted that he was unable to locate documents produced by Jenkens & Gilchrist before Ohle's trial that logically should have existed such as IRS filings and agreements between Jenkens & Gilchrist and HOMER clients. [See Abrams' letter to this Court, dated October 1, 2010, stating that documents were unavailable to him before Ohle's trial, Case No. 1:08-cr-01109-JSR, Docket No. 146, p. 3].

But Abrams blamed the government for his inability to locate the documents, claiming that the government violated its duties under Brady v. Maryland, 373 U.S. 83 (1965), and that the "government presented evidence at Ohle's trial that was false, and that the government may have known, and certainly should have known, that the evidence was false." [See Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 11-12].

On January 13, 2011, during oral argument on his Motion for New Trial, Abrams again admitted that he failed to locate  critical documents:

Abrams:  The government claims that, as to most of the material, it was produced as part of a database.  However, as we have said in our papers, we have not been able to find them using search queries on the database.  And, actually --
The Court:  Although, the government indicated that they had no difficulty using the search criteria that they employed. [Sentencing Tr., p. 3].

However, the government did not, in fact, locate these documents in its database:

Okula:  Let me be clear on a couple points.  Mr. Abrams asked directly, and I think he had a right to ask and I'll answer directly on behalf of the prosecution, that we were not aware of those specific documents that he raised for the first time in his new trial motion. [Sentencing Tr., p. 22-23].

Instead, the government based its assertion that the documents were previously produced on the Bates-stamp identifier "JGZ" which was found on the bottom of many of the thirty-three documents Abrams selected to include in his motion. [Id., p. 22-23].

This Court resolved this evidentiary dispute in favor of the government in its Memorandum Order denying Abrams' Motion for New Trial:

"Placing a higher burden on the Government to uncover such evidence would place prosecutors in the untenable position of having to prepare both sides of the case at once.  Indeed, the adversarial system presumes that the defense will be more highly motivated to uncover exculpatory evidence, so if anything, the onus is on defense counsel to conduct a more diligent search for material potentially favorable to his client.  This is especially true considering that, if exculpatory evidence exists, the defense is in the best position to know what such evidence might be and where it might be located. [See Memorandum Order Denying Abrams' Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 182, p. 9-10]."

As the Court stated, Ohle did, in fact, know what such evidence might be and where it might be located, but Abrams failed to obtain the evidence despite representations that he would. [For an example, see emails between Ohle and Abrams related to J&G Form 1096, 2255 Pro Se Motion, Case No. 1:12-cv-01909, Docket No. UNKNOWN, p. 10 and (Exhibit 1-14) and p. 12-14 (Exhibits 2-1 through 2-7)].

Based on the combination of this Court's Memorandum Order Denying Abrams' Motion for New Trial and the clear evidence that Abrams failed to review Ohle's discovery, Abrams' performance fell below an objective standard of reasonableness in light of prevailing professional norms.  Carrion v. Smith, 549 F.3d 583, 588 (2nd Cir. 2008)(citations omitted).  Accordingly, Ohle must now affirmatively prove prejudice arising from Abrams' deficient representation [Id.]

In oral argument on Ohle's 2255 Motion, the government told this Court that, "[w]e believe that as a matter of law the Court could find that even if there was ineffective assistance of counsel by Mr. Abrams, which we are by no means conceding and we've laid out our arguments as to why that is, that on the prejudice prong Mr. Ohle could never succeed and that the evidence in this matter was overwhelming, that it was clear that the fees, the bogus referral fees that were paid to Mr. Ohle and his co-conspirators were coming out of Bank One's hide, not Jenkens & Gilchrist's hide and nothing Mr. Ohle could say now could have made any sort of difference at trial [2255 Tr., p. 13-14]."

Clearly, the government should now concede that the evidence set forth herein establishes that Bank One/Chase was not entitled to a two percent fee on each HOMER transaction, that Bank One/Chase did not pay third party service providers out of its fees, Jenkens & Gilchrist did, and that Bank One/Chase did not have a property interest in the third party service provider payments by Jenkens & Gilchrist.

However, even without reviewing the other discovery produced in his case (which neither Ohle nor his counsel has ever been able to review), Ohle can point to financial statements, IRS filings, tax shelter promoter audits and discovery in civil litigation related to Jenkens & Gilchrist's tax shelters to satisfy the "prejudice" prong of the ineffective assistance of counsel inquiry, namely that the third party service provider fees were paid out of Jenkens & Gilchrist's legal fees, and not out of "Bank One's hide." Given the evidence set forth herein, there is nothing the government could say now that would contradict that irrefutable fact.

Ohle submits that the evidence set forth in this Supplemental Brief in support of his 2255 Motion provides prima facie evidence that Abrams' ineffective assistance of counsel violated Ohle's Sixth Amendment rights, thereby requiring that his judgment be vacated. See 28 U.S.C. 2255; Strickland v. Washington, 466 U.S. 668, 685 (1984).

In addition to failing to review Ohle's discovery, Abrams failed to investigate even the most basic inquires related to Ohle's charges. For example, Abrams failed to investigate any aspect of the third party service provider payments. If Bank

87

One/Chase was the "payor" of the third party service provider payments, as argued by the government, then Dye, Kramer or some other Bank One/Chase employee would have approved those payments.

But both Dye and Kramer stated in their FBI interviews that they were unaware of Bank One/Chase making third party service provider payments [Dye FBI, para. 49; Kramer FBI, para. 12].

Dye further stated that he was unconcerned about Bank One/Chase Code of Conduct issues related to the third party service provider payments because those payments were made by Jenkens & Gilchrist [Dye FBI, para. 49].

Abrams never subpoenaed Bank One/Chase to produce financial statements or IRS filings (e.g., Form 1099s).

Had Abrams inspected the financial reporting related to the HOMER transactions, Abrams could have shown that Bank One/Chase was only a third party service provider itself.  Had Bank One/Chase actually received two percent on each HOMER transaction, Bank One/Chase would have reported approximately $8,500,000 in revenue from the HOMER transactions [e.g., $450,000,000 x 2%]. Instead, Bank One/Chase reported $900,000 in trustee fees and $5,249,300 in consultant fees from Jenkens & Gilchrist.

On July 21, 2014, Reed, as the designated corporate representative of Bank One/Chase, responded to Ames' Interrogatory No. 8 as follows:

INTERROGATORY NO. 8:  Please identify any and all referral fees received by Bank One as a result of its participation in HOMER tax strategy transactions.

RESPONSE:  [Series of objections] Subject to these objections and based on documents including JPM AMES 002793-94, Bank One states that the fees received by Bank One in connection with the HOMER tax transaction totaled, at a minimum, $5,200,000.

[Exhibit 1-27, JPMorgan Chase's Second Amended Response to Plaintiff's Interrogatories and Requests for Documents, filed on July 22, 2014 in Ames v. J.P.

Morgan Chase et al, Civil Action No. 11-440, CDC-Orleans Parish, Louisiana; Statement of Verification by Michael Reed, Managing Director, on behalf of JPMorgan Chase Bank on July 21, 2014].

Bank One/Chase verified its HOMER fees referring to those amounts set forth in the spreadsheet bates-stamped JPM AMES 002793-94 [see Exhibit 1-28, Spreadsheet].  In each case, the amount listed on JPM AMES 002793-94 matches the amount set forth in the corresponding Services Agreement which was received from Jenkens & Gilchrist on each and every HOMER transaction. [See Row Nos. 52, 53, 56, 57, 62, 70, 73].

However, Bank One/Chase represented to this Court on January 11, 2011 in its Victim Impact Statement that Bank One/Chase was entitled to two percent of each HOMER transaction, a clearly fraudulent claim.

Ohle also notes that documents found in the 116 boxes of Jenkens & Gilchrist documents were substantial, cumulative and dispositive.  Abrams only presented thirty-three selected documents in his Motion for New Trial, effectively taking a mountain of exculpatory evidence and reducing it to a mole hill.  Many of the documents selected by Abrams for inclusion in his Motion for New Trial were bates-stamped with the identifier "JGZ."  Due to the government's representations and the "JGZ" identifier, this Court found that the government properly produced those documents.

During oral argument, the government stated:

"If you look carefully at our arguments with respect to these specific documents [the thirty-three documents included in Abrams' Motion for New Trial], none was a truly exculpatory document.  At most it could have provided some additional impeachment.  And because Mr. Abrams had almost all of these documents, we respectfully submit a new trial is not warranted. [Sentencing Tr., p. 24]."

But the documents do provide direct evidence that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers out of its legal fees in accordance with a standard business practice which existed since 1998.  In other

words, the "referral fees" came out of Jenkens & Gilchrist's "hide," not Bank One/Chase's "hide" as the government claimed.

In fact, the government, due to Abrams' failure to investigate, had exclusive access to a storehouse of relevant facts.  But the government steadfastly refused to acknowledge the fact that Jenkens & Gilchrist paid the HOMER third party service providers, as evidenced by the Services Agreements (which were known to the prosecutors), Jenkens & Gilchrist's Form 1099s (which were filed with the IRS), Jenkens & Gilchrist's IDR responses in the IRS' tax shelter promoter audit (which were filed with the IRS), FBI interview statements by Dye and Kramer (which were made to the FBI, IRS and the prosecutors) and other documents found by Ohle in the 116 boxes produced following Ohle's trial and Fatico hearing.

Instead, the government elicited testimony from one subordinate ISG member with no direct knowledge of the HOMER transaction which was factually incorrect and contradicted by the Director of Bank One/Chase's ISG in his FBI interview, and then mischaracterized a Jenkens & Gilchrist "tracking" spreadsheet introduced through a secretary that was contradicted by the law firm's own IRS filings to create an inference that led to Ohle's wrongful conviction.

And Abrams failed to present any of the evidence herein to defend Ohle from the government's claims.

Ohle found many additional exculpatory documents which identified numerous credible witnesses who Abrams should have interviewed and called as witnesses at trial.

However, these documents were largely not produced by the government prior to Ohle's trial and Fatico hearing.

The documents found in the 116 boxes from Jenkens & Gilchrist provided a chronological history of Jenkens & Gilchrist's tax shelter promotion activities since 1998.  As a result, the documents identified witnesses with knowledge of critical facts establishing Jenkens & Gilchrist's practice of paying third party service providers, the recruitment and representation of the Browns as third party purchasers in the HOMER transaction, and the orchestration of the funding of the

Browns in late November 2001 after White & Case made changes to the HOMER transactional documents.

For example, Abrams should have found an email which identified each party at Deutsche Bank, White & Case and Jenkens & Gilchrist responsible for the HOMER digital options. [See November 28, 2001 email from Sara Rothermel to Jenkens & Gilchrist/Deutsche Bank working group, Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 157-3, p. 6].

This document would have identified individuals to testify that ISG members, including Ohle, were not allowed to be involved in discussions regarding the Deutsche Bank digital options, rebutting the inference that led to this Court's finding that Ohle's participation in HOMER was "relevant conduct." This working group list included individuals from Deutsche Bank AG, Deutsche Banc Alex Brown, White & Case LLP and Jenkens & Gilchrist. Not a single Bank One/Chase employee is listed as part of the working group [Id.].

More importantly, Abrams should have contacted witnesses to disprove the government's theory that the Browns' participation in HOMER was fraudulent and directed by Ohle. Instead, Abrams should have called witnesses such as McLaurin Hill Files and Mitchell Portnoy, unindicted attorneys at Jenkens & Gilchrist, or any of the attorneys listed at White & Case to prove that the Browns were never required to use cash to purchase the unitrust payments.

In September 18, 2002, Portnoy, who was writing an opinion letter on securitization issues, asks Files for "Doc. 27 (partnership unitrust note)" in the HOMER document package. He further states, "Also, a reference to it seems to have been deleted from paragraph 1.4 of Doc 29 (assignment agreement) and it doesn't seem to be dealt with in Doc. 33 (liquidation agreement) . . . What's the story?" Files replies, "The [Browns'] Partnership decided to pay cash and not use a note." See September 18, 2002 email from Portnoy to Files, Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 157, p. 43.

Had Abrams investigated the participation by the Browns in the HOMER transaction, Abrams would have presented evidence that the Browns were clients of Jenkens & Gilchrist, were not required to use cash to purchase the unitrust interests,

were funded in early December at the direction of Jenkens & Gilchrist to resolve Ohle's concern that White & Case had changed the unitrust purchase note from secured to unsecured and that the Brown's entities created by Jenkens & Gilchrist were unfunded.  This evidence was critical to disproving the government's "linkage" between the alleged Bank One/Chase fraud and the Browns' funding by Douglas Steger and Dalton Ventures LLC.

Having failed to reviewed Ohle's discovery prior to trial, Abrams chose one particular document from Mike Cook to establish that Bank One/Chase was only entitled to one percent, not two percent, on the HOMER transaction.  See Abrams' statements that Cook's notes would have made a difference at Ohle's trial, Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 15-16; and Reply Memorandum, Docket No. 166, p. 5-6.

Had the government produced these documents to Abrams prior to Ohle's trial, Abrams would have found interview notes of Mike Cook related to Jenkens & Gilchrist's tax shelter civil litigation and the IRS' investigation where referral fees were discussed. [See Exhibit 1-29, Interview notes of Mike Cook].

Other interview notes would have identified two more unindicted Jenkens & Gilchrist attorneys with knowledge of the understanding and practice of Jenkens & Gilchrist related to its payment of third party service provider payments. [See Exhibits 1-30 and 1-31, Interview notes of Patrick O'Daniel and Brian Lee, respectively].  All three Jenkens & Gilchrist attorneys could have rebutted the government's unsupported contention that, "Pursuant to the understanding and practice of J&G and Bank One, these referral fees were subtracted from the total fees that Bank One - as opposed to J&G - would otherwise be paid for a HOMER tax shelter in the absence of a third-party referral. [See Gov't Opposition to Ohle's 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket No. 13, p. 10].

The documents in the 116 boxes from Jenkens & Gilchrist also included a roadmap to Jenkens & Gilchrist's tax shelter activities.  For example, there were memoranda detailing the history of Jenkens & Gilchrist's tax shelter activities. [See Exhibit 1-32, July 17, 2003 Memorandum detailing a meeting between Rod Phelan and Tyler Murray, Tom Borders and Joe Ginsburg of McDermott, Will & Emery and

Marshall Simmons, Mike Cook and John Gilliam of Jenkens & Gilchrist].  These attorneys identified in this Memorandum responded to discovery requests in civil litigation and governmental investigations.  None of these documents were produced to Ohle prior to his trial or his Fatico hearing.  [Note: documents are not bates-stamped with "JGZ" prefix].

Jenkens & Gilchrist production to plaintiff attorneys in civil litigation.

Attorneys Phelan of Baker Botts, Murray, Border and Ginsburg of McDermott, Will & Emery and Simmons, Cook and Gilliam of Jenkens & Gilchrist created a document production chart which identified exculpatory documents clearing Ohle of the defrauding Bank One/Chase [see Exhibit 1-33, Chart of discovery production to class counsel by Jenkens & Gilchrist in civil litigation].  This document production chart provided a clear roadmap to locate critical, exculpatory documents.

Item 2 related to documents concerning fees paid to third parties (either by J&G or by the client).  It identified Joe Ginsburg of McDermott, Will & Emery and Douglas Whitney as the responsible persons.  The chart would have directed Abrams to Disc B.

Item 3 related to invoices from third parties.  The chart would have again directed Abrams to Disc B.

Item 9 related to "All sharing or service agreements between J&G or any of its attorneys/shareholders with the other firms involved in the tax shelters covered by the Denney Stipulation of Settlement (such as Deutsche Bank, Wachovia, Bank One, Ernst & Young, KPMG, BDO Seidman, Diversified Group, Inc., Sidley Austin Brown & Wood) or similar agreements among those firms, not involving J&G."  The note states, "anything besides the Bank One agreements?"  Once again, the chart would have directed Abrams to Discs A and B.

Item 16 related to a description of how fees were divided between the various entities involved in the tax strategies.  Here, both Ginsburg and Whitney could have explained that fees were not divided.  Through these witnesses, Abrams

could have introduced the faxes and charts on Disc A and the third party invoices on Disc B referenced in Item 16.

When Ohle went to New York to review the 116 boxes of Jenkens & Gilchrist documents that the government had failed to produce prior to Ohle's trial and Fatico hearing, Ohle discovered 15 discs in the boxes. [See Motion for New Trial, Case No. 1:08-01109-JSR, Docket No. 159, p. 6].

These discs contained Jenkens & Gilchrist's document production to the plaintiffs' attorneys in civil litigation and to the government in its investigations by the IRS and DOJ.  For example, one disc would have provided Ohle with critical evidence that Jenkens & Gilchrist paid third party service providers in the HOMER transaction for services rendered contradicting a central premise in the government's case.  The government refused to permit Ohle to copy the discs on that trip.

Had the government allowed Ohle to copy the discs, Ohle would have been able to locate source documents proving that Bank One/Chase had no property interest in the third party service provider payments made by Jenkens & Gilchrist [see Exhibit 1-33].

Furthermore, as evidenced from the documents below, Ohle would also have found Jenkens & Gilchrist's responses to the IRS' IDR related to its tax shelter promoter audit which provided direct, exculpatory evidence that third party service provider payments were paid by Jenkens & Gilchrist out of its legal fees.  Also, Ohle would have had Jenkens & Gilchrist's Form 1099s providing further proof that Jenkens & Gilchrist, not Bank One/Chase, paid these third party service providers. See Exhibit 1-35 and Exhibit 1-36 below.

Instead, the government provided Ohle with a database of approximately 1.7 million files, comprising roughly sixth gigabytes of data.  The documents were not indexed and were not searchable.  As a result, Ohle could not complete his review before he was sentenced and sent to prison.  See Motion for New Trial, p. 6, 10.

Jenkens & Gilchrist production to DOJ.

If the government had produced the 116 boxes of Jenkens & Gilchrist documents before Ohle's trial, Abrams could have found the letter from Thomas Borders of McDermott Will & Emery to John Lindquist of the U.S. Department of Justice transmitting 1,950 pages of Jenkens & Gilchrist attorney notes identified by Bates Range JG-N000001-JG-N001950 [see Exhibit 1-34, June 15, 2004 letter from Borders to DOJ attaching J&G attorney notes].  Abrams referred to the Jenkens & Gilchrist attorney notes "as the best thing," prompting Abrams to his first realization that the actual facts in Ohle's case were the exact opposite of the government's theory at Ohle's trial [see October 27, 2010 email from Abrams to Ohle, 2255 Pro Se Motion, Exhibit 2-7].

These notes showed that Daugerdas only agreed to pay Bank One/Chase one percent on certain HOMER transactions. [For two examples, see Reply Memo, Case No. 1:08-cr-01109-JSR, Docket No. 166, p. 21-22].  Also, the notes prove that Daugerdas knew that Manella had transferred his $920,000 related to Donald Wilson to Bank of America [Invested Interest] and that an affidavit of adverse claim was being filed to obtain those monies back from Jonathon Freedman [Id., p. 31].

Borders sent his letter to the three Jenkens & Gilchrist attorneys who were indicted before Ohle's trial, Daugerdas, Guerin and Mayer, but also identified other potential witnesses for Ohle including Gilliam, Cook, and Marshall Simmons of Jenkens & Gilchrist, Rod Phelan of Baker Botts and Joe Ginsburg of McDermott, Will & Emery.  Other pertinent Jenkens & Gilchrist attorneys' notes were provided to Abrams but not presented to this Court as part of Abrams' limited thirty-three document production.

Jenkens & Gilchrist responses to IRS' tax shelter promoter audit.

If the government had produced the 116 boxes of Jenkens & Gilchrist documents before Ohle's trial, Abrams would have had a letter from Charles B. Lewis at Jenkens & Gilchrist to Rick Halper at Davis Polk & Wardell. [See Exhibit 1-35, September 27, 2004 letter from Lewis to Halper copying Gilliam].  This letter enclosed the critical IRS filings by Jenkens & Gilchrist  that proved that Jenkens &

Gilchrist, as a standard business practice, paid third party service providers out of its legal fees, not out of Bank One/Chase's fees, including those at issue in Ohle's case, out of its legal fees.  Once again, Jenkens & Gilchrist provided discs (which Ohle, inexplicitly, was not allowed to copy by the government)  that included, among many other documents, the following documents which provided direct, exculpatory evidence:

- 22 IRS summonses to Jenkens & Gilchrist,
- Responses to the 22 IRS summonses,
- 12 IDR from IRS,
- Responses to IDR and many other documents.

As discussed above, Jenkens & Gilchrist's response to the IRS' IDR in its tax shelter promoter audit provided direct, exculpatory evidence that Jenkens & Gilchrist paid third party service providers in the HOMER transaction, not Bank One/Chase.  These exculpatory documents were not produced by the government to Ohle before his trial or Fatico hearing.

Had Abrams understood the history of Jenkens & Gilchrist's payments to third party service providers and obtained these documents, Abrams would have affirmatively established Ohle's actual innocence because there could be no way for the government to prove that Bank One/Chase was defrauded of any property whatsoever.

Also in the these unproduced documents from Jenkens & Gilchrist's 116 boxes of documents was an email from Lewis to Gilliam and Phelan attaching Jenkens & Gilchrist's Form 1099s to third party service providers. [See Exhibit 1-36, November 3, 2004 email from Lewis to plaintiff attorney Cory, copying Gilliam and Phelan].  At Ohle's trial, Gilliam testified that he found no services agreement with Bradley in Jenkens & Gilchrist's legal files.  Had Abrams investigated Jenkens & Gilchrist's payment of third party providers, Gilliam's testimony would have been completely discredited since Jenkens & Gilchrist's only executed services agreements with Bank One/Chase (due to Bank One/Chase's insistence) and that its

common practice was to split legal fees with attorneys without services being rendered (unlike its practice with non-attorney service providers). [See Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 157, p. 45].  Jenkens & Gilchrist's Form 1099s issued to its third party service providers were included on Disc C which the government refused to allow Ohle to copy.

Finally, an email which was not produced before Ohle's trial or Fatico hearing (which does not have the "JGZ" bates-stamp identifier) would have identified key witnesses to testify at Ohle's trial regarding Jenkens & Gilchrist's payments to third party service providers including Rod Phelan of Baker Botts and Charles Lewis of Jenkens & Gilchrist. [See Exhibit 1-37, November 3, 2004 email from Congilio to Phelan, Gilliam and Lewis].  This email discussed the production of Jenkens & Gilchrist's Form 1099s to the plaintiffs' attorneys.

Had Abrams simply called these attorneys or Jenkens & Gilchrist's accountants Ernst & Young as witnesses at Ohle's trial, Abrams would have presented direct evidence that Jenkens & Gilchrist paid third party service providers out of its fees and that such payments had absolutely no effect whatsoever on the payments due to Bank One/Chase.

Abrams failed to present any of this evidence in his Motion for New Trial. Instead, Abrams selected thirty-three documents which the government claimed were previously produced and this Court found were not material.


Evidentiary hearing related to government's production.


Since Ohle's sentencing, facts surrounding Abrams' health issues and resulting failure to investigate the government's claims against Ohle have been established, as set forth in Ohle's Motion to Permit Discovery, filed herein on September 11, 2014 see Docket Nos. 29, 31, including:


  -  Abrams failed to review Ohle's discovery prior to trial [2255 Pro Se Motion, Exhibit 2-8];

   - Chaudhry determined that Abrams' discovery was in a format that was not reviewable. [2255 Tr., p. 4];

   - Chaudhry learned that Ohle's discovery was corrupted which also prevented her from searching Ohle's discovery. [2255 Tr., p. 4];

   - Neither Ohle nor any of his counsel have been able to review his discovery. [2255 Tr., p. 8-9];

   - Ohle learned of witness statements from important witnesses such as Groh, Kramer and Little only when the government attached these FBI statements to its Opposition to Ohle's 2255 Motion. [For example, Case No. 1:13-cr-00450-JSR, Docket No. 13, Exhibits 3, 5 and 9].  The government produced witness statements pursuant to this Court's order on or about September 3, 2014.  Eastland delivered the government's production to Ohle at FPC Pensacola on September 9, 2014; and,

   - Ohle has not found witness statements by Gordon, Manella or Steger in the government's September 3, 2014 production despite the government's statement in the cover letter that it was including the "3500 previously turned over in connection with the Ohle trail (to trial counsel Stuart Abrams)."  The government's production was alphabetical but ends after Mark Love's 3500 materials with one exception, John Wogan's 3500, which was also included in the production.

        Also, subsequent evidence has shed light on the government's refusal to allow Ohle to copy discs contained in the 116 boxes from Jenkens & Gilchrist produced to Ohle after his trial and Fatico hearing:

   - Documents produced to Ohle after his trial referenced discs which Ohle was not allowed to copy [see Exhibits 3-33, 3-35 and 3-36, and Motion for New Trial, p. 6]; and,

   - Those discs contained Jenkens & Gilchrist's Form 1099s, responses to IRS' IDRs related to its tax shelter promoter audit and other important documents establishing that Jenkens & Gilchrist, not Bank One/Chase, paid third party service providers.

        On October 22, 2010, Ohle emailed Abrams stating that the government sent the two boxes of discs to CACI for copying.  As a result, the government could not

produce the balance of the withheld evidence prior to Ohle's new trial motion deadline.  He also stated, "Christine [Mazzella] stated that you should discuss the timing of the disk production with [AUSA] Okula, they seem extremely reluctant to get involved in the problem."  See Exhibit 1-38, October 22, 2010 email from Ohle to Abrams regarding 15 J&G discs].

Four days later, Abrams emailed Okula, "As I told you on the phone, we understand that there are 2 boxes of computer disks that were not available when Ohle was inspecting documents last week.  We would like to get copies of the disks rather than print-outs of hard copies as we understand that the disks are not formatted for Concordance and Ohle will be able to go through them on his own computer."  See Exhibit 1-39, October 26, 2010 email from Abrams to Okula.

On December 10, 2010, Ohle's wife alerted Abrams that the government's statement that the Jenkens & Gilchrist statements had not been scanned into Concordance was contradicted by notes found on discs in Box 401 of the Jenkens & Gilchrist production following Ohle's trial and Fatico hearing.  She stated to Abrams, "This seems fishy to me."  The email pointed out that the government represented that "contrary to our long-held understanding, approximately 110 of the 535 boxes of Jenkens & Gilchrist documents . . . were not scanned into the J&G Concordance database.  However, Ohle found discs in Box 401 which contained the same exculpatory documents (i.e., Jenkens & Gilchrist's tax filings and tax shelter promoter audit) labeled as previously scanned into Concordance.  See Exhibit 1-40, December 10, 2010 email from Patty Ohle to Abrams.

Abrams never reviewed the government's production of Jenkens & Gilchrist documents - either prior to trial or its production after Ohle's Fatico hearing.  It is inexcusable that the government allowed Ohle's Fatico hearing to proceed without providing notice of these unproduced documents.  Abrams only became aware of the issue due to defense counsel in Daugerdas providing him a copy of the government's letter.

In his Motion for New Trial, Abrams requested an evidentiary hearing to address the problems associated with Ohle's discovery, including the government's refusal to allow Ohle to copy the discs in the 116 boxes from Jenkens & Gilchrist.

[See Abrams' discussion of government refusing to allow Ohle copy discs and providing a database of 1.7 million files, comprising roughly sixty gigabytes of date which Ohle was unable to review before being sentenced to prison, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 6-7].

Whether the discovery failures were related to Abrams' ineffective assistance, the government's failures, or some combination thereof, Ohle is entitled to relief since the documents provided direct exculpatory evidence defeating the government's contention that Bank One/Chase was defrauded of its property.

In light of the foregoing, Ohle renews the previous requests of both Abrams and Chaudhry for an evidentiary hearing.  In addition to the other evidentiary matters previously discussed, Ohle respectfully submits that this Court should conduct an evidentiary hearing to address the following issues:

-  Whether Ohle's discovery was corrupted preventing Abrams and Chaudhry from reviewing his discovery.

   -  What caused the government to fail to find IRS filings from Jenkens & Gilchrist which disproved its theory that Bank One/Chase paid third party service providers.

   -  What caused the government to fail to find responses by Jenkens & Gilchrist to the IRS in conjunction with its tax shelter promoter audit that definitively stated that payments to American Capital Financial Corp., Bradley Law Firm, LLC, and Invested Interest were paid by Jenkens & Gilchrist out of its legal fees.

   -  Why the government ignored FBI statements from senior management at Bank One/Chase and chose to create an inference contrary to these statements through the factually incorrect testimony of a subordinate employee without direct knowledge of Bank One/Chase's agreement with Jenkens & Gilchrist.

   -  Why the government failed to produce to Ohle the 120,000 images received by the IRS from Jenkens & Gilchrist in response to civil summons enforcements which included its statement that American Capital Financial Corp., Bradley Law Firm, LLC and Invested Interest were paid by Jenkens & Gilchrist out of its legal fees.

Government witnesses regarding Ohle's discovery would include AUSA Okula, AUSA Davis, Christine Mazzela, Shawn Chandler, Rosemarie Schellas, Sarah Tate, Maria Stabile and all technical litigation advisers involved in Ohle's case.

Since Ohle's trial, Ohle has persistently attempted to obtain access to the government's discovery so that he could personally review such discovery in light of Abrams' previous failures to do so.  Ohle's efforts has led to the record now before the Court.  The history related to Ohle's attempts to obtain his discovery is as follows:

  - May-June 2010:  Abrams failed to present exculpatory evidence and call witnesses at Ohle's trial (as set forth herein).

  - 9/16/10:  Government tells counsel in Daugerdas that it failed to produce 116 boxes of documents from Jenkens & Gilchrist [see letter from Okula to counsel in U.S. v. Daugerdas, S3 09-581 (WHP), attached as an exhibit in Motion to Continue Sentencing Date, Case No. 1:08-cr-01109-JSR, Docket No. 146, p. 4-22].

  - 10/1/10:  Abrams advises Court that government failed to turn over boxes from Jenkens & Gilchrist prior to Ohle's trial and his Fatico hearing [Id.].

  - Oct.-Dec. 2010:  Ohle personally reviewed 116 boxes from Jenkens & Gilchrist [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159, p. 6].

  - Oct.-Dec. 2010:  Ohle was not allowed to copy 15 discs from in 116 boxes from Jenkens & Gilchrist [Id.].

  - Oct.-Dec. 2010:  Abrams failed to review Concordance database of 116 boxes from Jenkens & Gilchrist [see 2255 Pro Se Motion, Case No. 1:12-cr-01909-JSR, Docket No. UNKNOWN, Exhibit 2-8].

  - 10/22/10:  Ohle provided Abrams with six banker boxes of relevant and/or exculpatory documents from his review of 116 boxes from Jenkens & Gilchrist [see Exhibit 1-38].

  - 11/11/10:  Abrams revealed that he failed to review Ohle's discovery before trial in an email to Ohle [see 2255 Pro Se Motion, Case No. 1:12-cr-01909-JSR, Docket No. UNKNOWN, Exhibit 2-8].

- December 2010:  Abrams' health issues prevented him from meeting with Ohle during this critical period.  Abrams had Michael Hammer draft Ohle's Motion for New Trial which was not presented to Ohle until the filing deadline.  Abrams failed to disclose to Ohle his health issues or Hammer's involvement in his case.

- 12/17/10 :  Abrams selected thirty-three documents to include in his Motion for New Trial from over six banker boxes of relevant and exculpatory documents which were delivered to Frankel & Abrams by Ohle [see Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 157].

- 12/17/10:  Abrams failed to disclose his own culpability in failing to review Ohle's discovery in his Motion for New Trial [Id.].

- 1/13/11:  This Court denied Abrams' Motion for New Trial based on its finding that documents were previously produced to Abrams and that the documents were not material [see Order, Case No. 1:08-cr-01109-JSR, Docket No. 182].

- Mar.-Oct. 2011:  Following Ohle's incarceration at FPC Pensacola, Abrams represented that he would investigate the Form 1099s issued to Invested Interest as well as review the six banker boxes of documents provided by Ohle to Abrams. Abrams represented that he would obtain the IRS filings from Jenkens & Gilchrist to dispute the government's contention that the Invested Interest Form 1099 was a "draft."  This Court accepted the government's claim.  Abrams' health issues resulted in hospitalization and limited contact with Ohle.  Abrams never investigated the issue. See 2255 Pro Se Motion, Case No. 1:12-cv-01909-JSR, Docket No. UNKNOWN, p. 12-13.

- 10/3/11:  Cancer-stricken Abrams argued Ohle's appeal before the Second Circuit Court of Appeals.

- 10/13/11:  Abrams died.

- 03/14/12:  Ohle filed his pro se 2255 motion. [See Case No. 1:12-cv-01909-JSR, Docket Nos. 1 and UNKNOWN][Ohle's Memo in Support is not shown on docket sheet].

- 08/13/12:  Ohle filed a motion requesting that this Court allow him to obtain and review his discovery at FPC Pensacola [Case No. 1:08-cv-01109-JSR, Docket No. 242].

- 09/24/12:  This Court denied Ohle's motion to obtain and review his discovery as premature [Case No. 1:08-cv-01109-JSR, Docket No. 253].

- Oct. 2012:  Ohle hired Chaudhry to obtain his discovery for Ohle's review and for Chaudhry's review and to re-file Ohle's 2255 Motion.

- Jan. 2013:  Chaudhry determined that Abrams' discovery was not in a format that was reviewable [2255 Tr., p. 4].

- Jan. 2013:  Government refused to provide Chaudhry copy of Ohle's discovery based on its previous production to Abrams [see Motion to Permit Discovery, Case No. 1:13-cr-00450-JSR, Docket Nos. 30 and 31, Exhibit B].

- Jan. 2013:  This Court ordered the government to produce a copy of Ohle's discovery to Chaudhry [Id.].

- 02/26/13:  Chaudhry determined that Ohle's discovery was corrupted and not searchable [Id.].

- 03/29/13:  Chaudhry petitioned this Court to pay expenses related to corrupted discovery [Case No. 1:13-00450-JSR, Docket No. UNKNOWN][Chaudhry's petition for expenses is not docketed].

- April 2013:  This Court denied Chaudhry's petition for expenses [Case No. 1:13-00450-JSR, Docket No. UNKNOWN][Court's order is not docketed].

- July 2013:  Ohle hired Eastland to obtain his discovery and to represent him in this 2255 Motion.

- 8/9/13:  Chaudhry at oral argument on Ohle's 2255 stated that neither she nor Abrams have ever been able to review Ohle's discovery [2255 Tr., p. 2-4].

- August 2014:  Government agrees to provide Eastland with copy of all 3500 materials in Ohle's case.

- 09/03/14:  Government produced 3500 materials pursuant to order by this Court (3500 materials are missing, see above).

- 09/17/14:  Ohle filed his Motion to Permit Discovery to obtain his complete, uncorrupted discovery [Case No. 1:13-00450-JSR, Docket Nos. 30-31].


Chaudhry explained to this Court during oral argument on Ohle's 2255 motion:

"For these reasons there's a man who is sitting in prison serving a sentence who had an entire trial with a lawyer who was compromised and never actually reviewed the discovery, and who has a lawyer who is standing before you who is not compromised but also never had the chance to review the discovery but we know at least a few leads [which was before the evidence obtained herein] without my having to go through it all to say there would have been a different outcome and at least enough to get a hearing here so that we can know for sure that the man sitting there serving the sentence is serving a sentence on the correct outcome, that we can all feel the outcome was sound and it wouldn't have changed had his lawyer actually reviewed all the discovery and presented what he found as part of his defense." [2255 Tr., p. 8-9]."

Based on prima facie evidence set forth herein and in his Motion to Permit Discovery, Ohle respectfully requests an order from this Court vacating Ohle's sentence and judgment of conviction and sentence.

Should the Court require additional evidence necessary on his claims for habeas relief, Ohle asks that an evidentiary hearing be granted for this purpose.

## II.  SECTION II Regarding Ohle's § 2255 Claim Two.  Trial counsel's failure to investigate legitimate loans made by Ames Trust was ineffective assistance of counsel.

The government's case against Ohle rested upon the premise that Ohle had orchestrated a fraudulent scheme to obtain monies from his employer, Bank One/Chase, related to fees generated by the HOMER transaction.  As set forth above, had Abrams investigated these HOMER fee issues prior to Ohle's trial, Abrams would have affirmatively established that Bank One/Chase was not defrauded of its property, and that Jenkens & Gilchrist paid these third party service provider fees.

This issue was critical.  And Abrams failed to recognize this core issue until after Ohle's trial when he reviewed documents found by Ohle in the 116 boxes that the government failed to produce to Ohle before his trial.   Upon reviewing Ohle's discovery for the first time, Abrams emailed Ohle that Jenkens & Gilchrist attorney

notes confirmed that Bank One/Chase was only promised one percent by Jenkens & Gilchrist on HOMER transactions, not two percent, but its fee could be increased on specific deals.  Abrams concluded his email, "This [fee arrangement] is the opposite of what the government argued, namely that [Bank One/Chase's] fee would be 1.8% unless reduced by the payment of third-party fees."  See October 27, 2010 email from Abrams to Ohle, Case No. 1:12-cv-01909-JSR, Docket No. UNKNOWN, Exhibit 2-7.

But, in addition to not presenting any of the abundant evidence that Jenkens & Gilchrist paid third party service providers in the HOMER transaction, Abrams also failed to investigate the government's claims that Kenneth Brown's participation as third party purchaser in Jenkens & Gilchrist's HOMER transaction was predicated on his ability to pay cash to purchase the unitrust interests of the grantor retained remainder trusts ("GRRT").  Based on that assertion, the government further claimed that two transfers which provided funding to the Browns were also fraudulent - a transfer of $300,000 from American Capital Financial Corp. [GX 72-2-A2] and a transfer of $347,834.04 from the Ames CRUT [GX 71-2-G3].

Had Abrams investigated these issues prior to Ohle's trial, Abrams could have presented evidence that Steger and Manella provided services to Jenkens & Gilchrist related to (a) the introduction of HOMER clients Donald Wilson and Ken Brody and (b) the funding of the Browns in early December 2001; and that those services resulted in the payments by Jenkens & Gilchrist to Manella (through his nominees Invested Interest and Bradley Law Firm, LLC) and Steger (through his company American Capital Financial Corp.).

Instead, at trial, Abrams failed to object to the government's unsupported labeling of the third party service provider fees as "referral fees."  The government's unchallenged contention that the third party service provider payments were "referral fees" compounded this prejudice to Ohle's case and resulted in the jury hearing irrelevant testimony from HOMER clients that Steger and Bradley had not referred them to Jenkens & Gilchrist [Tr. 207-208, 324, 1773-74; GX 101-102].

On March 8, 2011 during the trial of United States v. Daugerdas et al., S3 09 CR 581 (WHP), Ohle's prosecutors again used Daugerdas' secretary to introduce Jenkens & Gilchrist documents and spreadsheets into evidence.  When the government attempted to label these documents as "referral fee exhibits," defense counsel objected to the mischaracterization of these third party service provider fees as referral fees.  Judge Pauley stated:

"Here is my problem.  Generally, when an exhibit comes into evidence, it's somehow connected to a witness' testimony.  My recollection of the testimony this morning was that in the second group of exhibits Ms. Davis simply stated what the government believe the exhibits purport to be and offered them.  Nobody objected to that characterization, but that characterization is not evidence.  So let's get back to what a trial is.  Ask Ms. Burnside, here is the pile of exhibits, Ms. Burnside, take a look at them.  What are they?  Then offer them." [Daugerdas Tr., p. 593-594].

At Ohle's trial, Abrams allowed the government to mischaracterize Jenkens & Gilchrist's third party service provider payments as "referral fees."  Abrams admitted that he failed to obtain emails that identified witnesses that showed that Jenkens & Gilchrist's third party service provider payments were not "referral" fees. See Motion for New Trial, Case No. 1:08-cr-01109-JSR, Docket No. 159 (hereafter "Motion for New Trial"), p. 20 and Exhibits 9 and 10.

Even worse, Abrams allowed the government to introduce into evidence, without objection, a preliminary Jenkens & Gilchrist spreadsheet used by Burnside to "track" clients [GZ 2-42] for the purpose of offering this spreadsheet as proof, contradicting the Services Agreements, that Bank One/Chase was entitled to two percent on each HOMER transaction.  So, without a single witness or any document stating that Bank One/Chase was entitled to two percent, due to Abrams' ineffective assistance, the government created the inference that Bank One/Chase paid "referral fees" which reduced the amount Bank One/Chase received on the HOMER transactions as a result of Ohle's fraudulent conduct.

But, in fact, Jenkens & Gilchrist paid third party service providers out of its legal fees for services rendered to Jenkens & Gilchrist in the HOMER transactions. In this regard, Burnside testified at Ohle's trial that Daugerdas approved all third party service provider payments [Tr. 175, 179, 180, 186]. Once again, Abrams admitted that he had failed to obtain prior to Ohle's trial an important email from Jenkens & Gilchrist where senior partner Donna Guerin stated that she, Daugerdas and Irwin Mayer had full "knowledge" of the relationships with all the third party service providers who received payments in Jenkens & Gilchrist's transactions [Motion for New Trial, p. 21 and Exhibit 16].

Abrams was obviously unprepared for Ohle's trial. But after only the government's first two witnesses - low level ISG member Paul Ferguson and Daugerdas' secretary Sandra Burnside - the government had created an inference that Bank One/Chase paid third party service providers "referral" fees out of its fees. Not until after Ohle's trial did Abrams admit his failures to obtain relevant documents and investigate these critical matters.

Abrams was not the only confused party though. After Ferguson's testimony, this Court stated, "I think it's clear that the jury isn't following anything that is being said by [Ferguson][Tr. 106]." Then again, this Court asked counsel whether they were observing the jury because it is clear they do not have the foggiest idea of what was being testified to [Tr. 128]. In fact, after Burnside's testimony, Juror No. 10 told this Court that Ohle's case was confusing which was of concern to the Court [Tr. 173].

After Ohle produced documents from the 116 boxes from Jenkens & Gilchrist which the government failed to produce until after Ohle's trial, Abrams admitted that he had failed to obtain documents that "undermine confidence in the correctness of the jury's verdict, cutting across all aspects of the government's case." See Motion for New Trial, p. 12.

Abrams should have presented evidence at Ohle's trial establishing that Jenkens & Gilchrist was responsible for all aspects of the HOMER transaction, including, but not limited to:

1)  the payment of third party service providers in the HOMER transactions which included American Capital Financial Corp., Bradley Law Firm, LLC and Invested Interest;

2)  the recruitment and subsequent representation of the third party purchasers of GRRT interests in the HOMER transactions and that those third party purchasers in 2001 were the Browns who were clients of Jenkens & Gilchrist (and would have been Invested Interest in 2002);

3)  the drafting and execution of the HOMER transaction documents which did not require the Browns to use cash to purchase the GRRT interests; and

4)  the recruitment of Ohle to solicit funding for the Browns in late November 2001 to solve Ohle's concerns about White & Case's last minute change of the unitrust purchase note from secured to unsecured.

As set forth in detail above, Jenkens & Gilchrist, pursuant to its standard business practices, paid third party service providers in its tax shelter transactions out of its legal fees [Exhibit 1-6, J&G Response to IRS IDR].  This fact alone would have defeated the government's claim that Ohle defrauded Bank One/Chase of its property.

Abrams failed to rebut Brown's contention that he was "puppet" of Ohle and to establish that the Browns were clients of J&G.

In addition to failing to establish that Jenkens & Gilchrist paid third party service providers, Abrams also failed to present evidence that Jenkens & Gilchrist controlled all aspects of the Browns' participation in the HOMER transactions as third party purchasers.  Again, Abrams admitted that he failed to obtain documents from Jenkens & Gilchrist's document production that would have rebutted the government's theme that Brown was a puppet of Ohle who acted solely at his direction. [Id., p. 25].

Abrams stated that documents that he failed to obtain prior to Ohle's trial proved the following facts regarding the Browns role as third party purchasers in Jenkens & Gilchrist's HOMER transaction:

  - Kenneth A. Brown and Denise Davila Brown were clients of Jenkens & Gilchrist in their capacity as third party purchasers in the HOMER transaction;
  - In July 2001, Jenkens & Gilchrist formed partnerships and corporations for the Browns to use in carrying out their role as third party purchasers in the HOMER transaction;
  - In August 2001, Jenkens & Gilchrist assisted the Browns in establishing brokerage accounts with Deutsche Bank to use in carrying out their role as third party purchasers in the HOMER transaction;
  - Jenkens & Gilchrist was aware that Brown worked for IKON Services as a manager, earning less than $100,000 annually, but instructed the Browns to falsely represent to Deutsche Bank that their annual income was $1.2 million and that their net worth was approximately $9 million, excluding their residence;
  - Jenkens & Gilchrist referred the Browns to American Express Tax & Business Services, Inc. ("Amex") for the preparation of tax returns for both the Browns individually as well as the partnerships and corporations used by the Browns in carrying out their role as third party purchasers in the HOMER transaction; and,
  - Jenkens & Gilchrist provided tax information and instruction to Kurt Anderson at Amex regarding the preparation of the Browns' tax returns.

[Id., p. 25-27]

As previously discussed, Jenkens & Gilchrist originally planned to use Bolton Capital Planning ("BCP") as third party purchasers [see Exhibit 1-5, Agenda for May 17, 2001 meeting between BCP, J&G and Bank One].  Later in May 2001, Belle Six pointed out that BCP should not act as third party purchasers, since under the partnership attribution rules, BCP may be deemed to be a "related party" under IRC

Section 267. [See Exhibit 1-5, string of emails between the parties in May 2001 regarding BCP not acting as third party purchaser due to IRC section 267 concerns].

Shortly thereafter, Daugerdas recruited Ohle to identify someone, anyone, who was able to sign their name, to act as third party purchasers at the direction of, and pursuant to the legal representation of, Jenkens & Gilchrist.  Ohle introduced his childhood friend Ken Brown to Daugerdas [Tr. 530-32].

Once Jenkens & Gilchrist accepted the Browns as clients in June 2001, Jenkens & Gilchrist had completed filling the various roles in its HOMER transaction: Bank One/Chase as trustee of the GRRTs, Deutsche Bank as option writer and the Browns as third party purchasers.

Bank One/Chase, as trustee, signed HOMER transactional documents transferring more than $850 million in assets with the Browns [GX 2-43].  The government contended that Ohle secretly inserted the Browns into the HOMER transactions to obtain a secret profits interest from the Browns.  This claim was implausible in light of Jenkens & Gilchrist's representation of the Browns.  Neither Daugerdas nor Bank One/Chase was "fooled" by Ohle.  Instead, Ohle acted at their direction.

Recently in a deposition in the Ames v. J.P. Morgan Chase & Co. litigation, Bank One/Chase admitted that it did not perform any due diligence on the Browns as third party purchasers in the HOMER transactions [see Reed Dep., p. 327]. Instead, Bank One/Chase relied upon its HOMER transactional partner Jenkens & Gilchrist to vet the Browns as third party purchasers.

Since the Browns were clients of Jenkens & Gilchrist, Bank One/Chase, in its dual role as both trustee and tax return preparer, was satisfied that the Browns' participation as third party purchasers was appropriate.  And, in fact, there were no legal issues related to the Browns' participation as third party purchasers.

Had Abrams proved that Ohle simply, at Daugerdas' direction, introduced the Browns to Jenkens & Gilchrist as potential third party purchasers in June 2001, the government's theme that Ohle used Brown as a puppet to obtain a secret profits interest in the HOMER transaction would have been defeated.

110

Abrams failed to rebut Brown's contention that funding was required by J&G for his participation as third party purchaser.

The Browns' participation as third party purchasers in the HOMER transaction was neither improper nor fraudulent. But an issue arose in mid-November 2001 that caused Ohle concern due to the fact that the entities created by Jenkens & Gilchrist to be used by the Browns in the purchase of the GRRT interests were unfunded. Originally, the HOMER transactional documents called for the Browns' entities to acquire the remainder interest and the unitrust interest of the GRRT for two separate, secured promissory notes [see Motion for New Trial, p. 18 and Exhibit 4, secured promissory note for purchase of unitrust interest dated October 18, 2001].

But in mid-November 2001, Ohle learned from his fellow ISG member Jeff Conrad that White & Case, which represented Deutsche Bank regarding the securitization of its digital option contracts, had determined that the Browns' note to purchase the unitrust interests in the HOMER transactions could not be secured. Jenkens & Gilchrist and White & Case simply changed the note from secured to unsecured. [Id., p. 18 and Exhibit 5, unsecured promissory note for purchase of unitrust interest dated November 15, 2001].

Ohle was aware that the Browns had not funded the entities created by Jenkens & Gilchrist to be used in acquiring the GRRT interests in the HOMER transactions. Accordingly, Ohle raised his concern with Daugerdas that the HOMER transaction could lack economic substance upon IRS' review since these unfunded entities were using an unsecured promissory note to acquire the unitrust interests of the GRRTs. See Decl. of Ohle, para. 21.

Daugerdas suggested that Ohle obtain $500,000 financing to be used by the Browns to purchase the unitrust interests to solve Ohle's concerns, and that Jenkens & Gilchrist would pay $130,000 to the party providing the short-term financing for the Browns [see GX 20-15; Decl. of Ohle, para. 21]. Ohle contacted several different persons to solicit this short-term financing. Steger through his company American

Capital Financial Corp. agreed to provide $500,000 to the Browns for 60 days in return for the $130,000 fee from Jenkens & Gilchrist.

Daugerdas provided Ohle with invoice details to be delivered to Steger regarding the $130,000 payment [Id.].  Around the same time, John Manella, who originally introduced Steger to Ohle, requested that he receive his third party service provider payments related to his introduction of Donald Wilson and his partner Ken Brody through an entity [Tr. 391, 423].  Manella stated that he did not want his former employer Bank One/Chase or his potential future business partner Wilson to learn that he was receiving the fee [Tr. 394, 416, 420].

After discussions with Jenkens & Gilchrist, Manella decided to direct his third party service provider fees from Wilson and Brody to Invested Interest where the monies would be used in 2002 to finance Invested Interest's participation as third party service provider in the HOMER transactions.  Manella, Steger and Freedman would be equal partners in Invested Interest which would be the third party purchaser in 2002 HOMER transactions [Tr. 431, 453-54, 1113, 1136, 1260-61, 1290-93; GX  9-1 thru 9-5, GX 9-7, GX 20-2 and 20-3, DX UU].

In fact, Steger explained to Cetie Ames' attorney John Wogan that "'Invested Interests' was a vehicle that he personally was using to invest funds, and that the payment to that company would shelter the funds until the investment was ready to be made."  See Exhibit 2-1, March 11, 2003 Report from Wogan to Cetie Ames (hereafter "Wogan Report"), p. 7.

It was further agreed that the Browns and Invested Interest would split their profits since the HOMER transactions were being introduced to clients so late in 2001.  So, the Browns would pay 50% of their 2001 HOMER income to Invested Interest, in exchange for 50% of Invested Interest's 2002 HOMER income.

Steger, however, failed to fully fund the Browns.  Instead, Steger only sent $300,000 to Invested Interest instead of the full $500,000. [GX 72-2-A2].  As a result, Ohle, as trustee, of the Ames CRUT covered the shortfall through Dalton Ventures which was party to a tripartite loan arrangement. [GX 72-2-B4].

However, in December 2001, yet another problem arose with HOMER. Ohle learned that Bank One/Chase had not properly performed due diligence on the HOMER transaction. Ohle demanded that Dye and Kramer allow him to contact HOMER clients notifying them of the issue. Dye refused. Ohle left his position at Bank One/Chase in mid-December 2001 and never returned [Decl. of Ohle, para. 22; Tr. 1401].

Following Ohle's departure from Bank One/Chase, in late December 2001, Jenkens & Gilchrist paid three third party service providers that the government claimed at Ohle's trial were fraudulent:

First, Jenkens & Gilchrist wired Invested Interest $920,000 related to the services rendered by Manella to Jenkens & Gilchrist which included his introduction of Wilson and Brody [Tr. 124, 391, 423]. However, pursuant to the agreement to allow Invested Interest use those funds as third party purchaser in 2002, Manella's accountant raised a problem - namely, how would Manella pay his income taxes on those fees?

Second, in response to Manella's income tax problem, Jenkens & Gilchrist paid $255,000 to Bradley Law Firm, LLC (who was not required by Jenkens & Gilchrist to render any services) [Tr. 1967-68]. Manella negotiated with Bradley the subsequent payment to Manella's company, JDC Company, of $184,000 [Tr. 377]. The government presented no evidence at trial that Ohle was involved in these negotiations or payments.

Third, Jenkens & Gilchrist reduced its payment to American Capital Financial Corp. from $130,000 to $81,500 as a result of Steger's failure to fund the entire $500,000 loan to the Browns. Steger testified at Ohle's trial that this third party service provider payment came out of Daugerdas' hide. [Tr. 1244].

Notwithstanding the evidence that Manella introduced Wilson and Brody to Invested Interest and Steger's testimony that his third party service provider payment came of Jenkens & Gilchrist's legal fees, the government claimed that these payments by Jenkens & Gilchrist were part of Ohle's fraudulent scheme to defraud Bank One/Chase of its property.

Had Abrams presented the evidence which he failed to obtain prior to Ohle's trial, Abrams would have established that Jenkens & Gilchrist paid third party service providers and that those payments related to services rendered in the introduction of HOMER clients Wilson and Brody and related to the funding of the Browns as third party purchasers of the unitrust interests in the HOMER transactions.

However, Abrams admitted that he failed to obtain evidence that proved that the Browns' participation in the HOMER transaction was never conditioned upon the Browns obtaining financing. The government's theory of a single conspiracy in Ohle's case was predicated on the Browns having to be funded in order to purchase the unitrust interest. This claim was simply not true.

Had Abrams reviewed Ohle's discovery before his trial, Abrams would have presented to the jury the evidence that he set forth in his Motion for New Trial, namely that the funding of Brown was irrelevant to the implementation of the HOMER transactions. Abrams pointed out that he failed to understand prior to Ohle's trial that Jenkens & Gilchrist and White & Case had designed the HOMER transaction so that the Browns would purchase the unitrust interest through an unsecured promissory note, not cash. See Motion for New Trial, p. 18.

Abrams also stated that a chart prepared by Jenkens & Gilchrist found by Ohle after his trial in the 116 boxes from Jenkens & Gilchrist proved this important point, namely that the Browns did not require funding to participate as third party purchasers in the HOMER transactions [Id.].

In addition to the HOMER transactional document package (negotiated and drafted by Jenkens & Gilchrist and White & Case, and approved by Bank One/Chase) and the corresponding HOMER transactional chart (described above), Abrams also failed to obtain an email, dated September 18, 2002, between Jenkens & Gilchrist attorneys McLaurin Hill Files and Mitchell Portnoy before Ohle's trial. Portnoy, who was writing an opinion letter on HOMER securitization issues, asks Files for "Doc. 27 (partnership unitrust note)" in the HOMER document package. He further states, "Also, a reference to it seems to have been deleted from paragraph 1.4 of Doc 29

(assignment agreement) and it doesn't seem to be dealt with in Dec. 33 (liquidation agreement) . . . What's the story?"  Files replies, "The [Browns'] Partnership decided to pay cash and not use a note."  See September 18, 2002 email from Portnoy to Files, Motion for New Trial, p. 43.

Clearly, Abrams should have subpoenaed Files and Portnoy to rebut the government's contention that Ohle's fraudulent scheme required the funding of the Browns.  Additionally, Abrams could have called any witness from the extensive list of attorneys and investment professionals on the Jenkens & Gilchrist/Deutsche Bank working group list to testify that the Browns never required funding in the HOMER transactions. [See Motion for New Trial, p. 6].  Had Abrams investigated this core issue, Abrams would have proved that the government's fraud claims were not a single conspiracy, an argument that Abrams made repeatedly after trial but failed to present to the jury at Ohle's trial.

Abrams failed to investigate the Ames-related allegations.

Perhaps Abrams most notorious failures occurred when Abrams failed to defend the two transfers that funded the Browns - a transfer of $300,000 by Steger and a transfer of $347,834.04 by Ohle.

Based upon the false premise that Ohle secretly inserted the Browns into the HOMER transaction as third party purchasers which required financing, the government claimed that Ohle had fraudulently obtained the monies that funded the Browns.

Certain individuals recognized the opportunity presented to them by the government's aggressive prosecution of tax shelters.  By the end of Ohle's trial, Abrams recognized that Brown, Uhalt and Steger made material misrepresentations and created false inferences in order to advance their personal agendas.

Abrams told the jury in his closing argument, "I think this case really is a tripod.  There are three legs to it.  The three legs are Douglas Steger, Brown, and the sort of Ames Trust.  And I would submit that none of those legs can bear the weight that the government wants to put on it, but in fact each one of them fails . . . But

those three legs, actually you can think of them as three people who are really what is really underlying this case, again, Doug Steger, Kenneth Brown, and instead of saying the Ames Trust I would say Hugh Uhalt [Tr. 2084-85]."

While Abrams understood that these witnesses had provided false, misleading and self-serving testimony, Abrams failed to present evidence contradicting their testimony.  Had Abrams investigated the Jenkens & Gilchrist documents described above, Abrams would have proved that Brown's testimony that he was required to obtain financing and lied to Daugerdas regarding his ability to pay cash for the unitrust interest was false.

Had Abrams investigated critical documents related to the Consent Judgment approving Ohle's final accounting of the Ames CRUT, the loan documentation between the Ames CRUT and Gamma Trading and the legal files from Baldwin & Haspel and Liskow & Lewis related to the resignation and full release of Ohle as trustee of the Ames CRUT and the subsequent turnover to Wogan, Abrams would have presented evidence which proved that transfers from the Ames CRUT were bona fide loans, not embezzled funds, and that Ohle did not receive commissions related to Cetie Ames' purchase of SocGen Warrants.

But without Abrams having investigated these issues prior to trial, Uhalt recognized an opportunity to gain control of his mother's fortune through false and perjured testimony concerning Ohle's role and actions in his mother's financial affairs.  This false testimony resulted in a $1.7 million forfeiture together with an award of restitution to his mother in direct contravention of the Louisiana court's final judgment and his mother's separate settlement agreement which forever released Ohle from any and all claims or liability.

Similarly, had Abrams investigated the purchase of SocGen Warrants, Abrams would have presented evidence that Ohle did not receive any commissions from the SocGen Warrants and that Cetie Ames relied on three other investment advisors, and not Ohle, in deciding to purchase the SocGen Warrants.  But without Abrams having investigated these issues prior to trial, Abrams had to rely upon cross-examination of Steger without critical documents which would have contradicted Steger's testimony at Ohle's trial.

## A. Background

Ohle first met Ecetra N. Ames ("Cetie Ames") in the mid-1990s when he was the accountant for her mother's estate.  In 1998, Ohle transferred from New Orleans to KPMG's Washington National Tax office.  Ohle no longer had direct client responsibilities but maintained his friendship with Cetie Ames and her husband Anthony Ames ("Tony Ames").  Ohle also knew Cetie Ames' son from her first marriage, Hugh Uhalt, both socially and professionally in New Orleans.  See Wogan Report, p. 2-3; Tr. 672-73.

In December 1999, Ohle was considering a number of different job opportunities, including an offer from Bank One/Chase.  Around the same time, Cetie Ames decided to establish a charitable remainder trust to diversify a portion of her Proctor & Gamble ("P&G") stock.  On December 28, 1999, Cetie Ames transferred approximately $5 million in P&G stock from her Whitney National Bank account to fund the Ames CRUT.  Cetie Ames named Ohle as initial trustee of the Ames CRUT, reserving a beneficial unitrust interest (i.e., 8.062% of the Ames CRUT fair market value paid quarterly) for herself and her husband, and gifting the remainder to several different charities.  See GX 24-1, Ames CRUT instrument; Tr. 673-76.

Ohle decided to accept the position of Regional Director of the family wealth services group at Bank One/Chase in Chicago in December 1999.  Bank One/Chase's Code of Conduct permitted Ohle to serve as trustee of the Ames CRUT [see Exhibit 1-1, January 17, 2002 letter from Hutchinson to Rogoff, p. 1-3; Dye Dep., p. 25-26 and 217-19; Dye FBI, para. 9].

As trustee of the Ames CRUT, Ohle hired Jonathon Freedman as the investment advisor to the Ames CRUT which was invested primarily in "dot-com" technology stocks due to the Cetie Ames' concentrated P&G holdings.  Following the downturn in technology stocks, the Ames CRUT suffered losses but those losses were less than the comparative index.  Nevertheless, Cetie Ames, as beneficiary of the Ames CRUT, became concerned.  At Cetie Ames' insistence, Ohle liquidated the

Ames CRUT's stock portfolio to cash.  Ohle and the Ameses met in person quarterly to discuss the reinvestment of the Ames CRUT cash.  See Exhibit 2-2, Videotaped deposition of Anthony Ames, taken in Ames v. J.P. Morgan Chase et al., Civil Action No. 11-440, CDC-Orleans Parish, Louisiana, on June 3, 2014 (hereafter "Ames Dep."), p. 199-216; Tr. 678].

As trustee, Ohle loaned a portion of the uninvested cash in the Ames CRUT pursuant to a tripartite loan arrangement between the Ames CRUT, Gamma Trading and Dalton Ventures.  This loan provided the Ames CRUT with an above-market interest rate fully secured by Gamma Trading while Ohle and the Ameses explored alternative investments.  See GX 31-14, Ames CRUT accounting; Gov't Opposition to Ohle's 2255 Motion, Case No. 1:13-cv-00450-JSR, Docket No. 13, Exhibit 1].

During these meetings discussing alternative investments for the Ames CRUT, Cetie Ames decided to transfer an additional 38,000 shares of P&G into the Ames CRUT to increase the quarterly distributions to meet the cash flow needs of her and her husband Tony Ames and satisfy her charitable giving goals.  On November 3, 2000, Cetie Ames signed instructions and sent them to Blair Ferguson at Whitney National Bank, instructing Ferguson to transfer 38,000 shares of P&G into the Ames CRUT.  On November 16, 2000, Whitney National Bank transferred approximately $2.8 million of P&G stock into the Ames CRUT on Cetie Ames' instructions. [See Exhibit 2-3, Attorney notes produced by Wogan regarding Ames matters, notes from May 15, 2003 regarding additional 38,000 shares contribution; Exhibit 2-4, May 29, 2003 letter from Wogan to Cetie Ames summarizing contributions to Ames CRUT with backup documentation from Whitney National Bank].

Meanwhile, Bank One/Chase investment advisor John Manella introduced Ohle to his long-time business associate Doug Steger.  In July 2001, Steger introduced Ohle and ISG Director Trey Dye to Societe Generale's leveraged hedge fund structure ("SocGen Warrants"). [Tr. 1065].  Shortly thereafter, Manella left Bank One/Chase to take a position with a small private asset management company in Chicago [Tr. 384-85].

As a potential investment option for the Ames CRUT, Ohle provided the Cetie and Tony Ames with the SocGen Warrants prospectus which identified Carpe Diem Dynamic Fund as the asset allocators [see GX 4-4, SocGen Warrants prospectus]. Cetie Ames asked three investment professionals to perform due diligence on the SocGen Warrant product, including Blair Ferguson, Peyton Bronze and her son Uhalt. Ohle only acted as trustee for the Ames CRUT, never offering investment advice to the Ames CRUT [see Wogan Report, p. 3-4; Ames Dep., p. 147-164].

Following the review of the SocGen Warrants by Ferguson, Bronze and Uhalt, Cetie Ames agreed that the SocGen Warrants were a suitable investment for the Ames CRUT.  In fact, Cetie Ames also decided to purchase $5 million of SocGen Warrants individually.  Ohle purchased $2 million in SocGen Warrants on behalf of the Ames CRUT.  See Wogan Report, p. 4-5; Ames Dep., p. 147-164; GX 71-2-G2, Ames CRUT $2m investment; GX 28-2 and 28-3, Cetie Ames $5m investment; Tr. 680.

In conjunction with the purchase of the SocGen Warrants, a five-percent up-front load was charged by Carpe Diem as a marketing fee.  Steger, who was a hedge fund salesperson for Carpe Diem, sought investments below the $20 million threshold that Societe Generale typically required to invest in its leverage hedge fund structure.

On March 7, 2003, Steger sent a facsimile to Wogan attaching his purported authorizations for payment of his sales commissions.  Steger enclosed a Subscription Form signed by Cetie Ames purchasing 190 warrants with a net value of $4,750,000 while attaching a "Note To Completion of Subscription Document" purporting to authorize his commission on the Ames CRUT.  See Exhibit 2-5, March 7, 2003 Confidential facsimile sent by Steger to Wogan showing Carpe Diem's authorization for 5% commission on SocGen Warrants and Steger's Marketing Agreement with Carpe Diem; Wogan Report, p. 5-7.

The SocGen Warrants performed poorly.  Despite the prospectus' claims of downside protection, both the Ames CRUT and Cetie Ames suffered losses in the SocGen Warrants for several straight months.  Ohle liquidated the Ames CRUT's SocGen Warrants.  Subsequently, Cetie Ames also liquidated her SocGen Warrants and transferred the cash proceeds into the Ames CRUT.  See Wogan Report, p. 5, 7-8;

Exhibit 2-4, May 29, 2003 letter from Wogan to Cetie Ames with chart showing contribution of $4,100,549 to the Ames CRUT; Ames Dep., 199-201; Tr. 683.

Uhalt used the poor performance of the SocGen Warrants to insert himself in his mother's financial affairs.  Uhalt claimed that Ohle had acted improperly as trustee of the Ames CRUT [Tr. 720].  As a result, Cetie Ames hired John Wogan of Liskow & Lewis to investigate Uhalt's claims that improprieties existed in Ohle's handling of the Ames CRUT [Tr. 684].

To fully cooperate and ultimately resign as trustee of the Ames CRUT, Ohle hired, at Wogan's suggestion Jerry Reso of Baldwin & Haspel LLC to file a final accounting for the Ames CRUT and to obtain a full and final release of claims as trustee of the Ames CRUT so that Ohle could resign and turn over the Ames CRUT to a successor trustee.  [See Exhibit 2-3, Attorney notes produced by Wogan, note on April 12, 2002 where Wogan referred Ohle to Ken Weiss, Jerry Reso or Max Nathan to handle his final accounting and release; GX 30-25, 30-36].

Ohle, however, was familiar with Cetie Ames' repeated claims that her past advisors had "screwed her."  For example, in 2001, Cetie Ames attempted to collect additional monies from PNC Bank despite a prior final accounting and release [see Exhibit 2-12, December 4, 2001 letter from PNC Bank to Cetie Ames responding to Cetie Ames' attempt to seek additional monies following a final accounting and a release].  Accordingly, Ohle also instructed Reso (who was replaced by John Rouchell at Baldwin & Haspel due to Reso's health issues) to also obtain a full and final settlement agreement with Cetie Ames, Tony Ames and the Ames CRUT for any and all possible cause of actions. [GX 30-22, 30-27].

Before accepting the position of trustee of the Ames CRUT himself, Wogan thoroughly investigated a litany of baseless allegations by Uhalt and Cetie Ames for more than six months.  Those allegations included claims that transfers of P&G stock were forged [see Exhibit 2-3, Attorney notes produced by Wogan, notes from May 15, 2003 regarding forgery allegations; see Exhibit 2-4, May 29, 2003 letter from Wogan to Cetie Ames summarizing contributions to Ames CRUT with backup documentation from Whitney National Bank], that certain transfers were not authorized [Id.], that Ohle and Tony Ames were colluding against Cetie Ames, that

Ohle received the commissions on Cetie Ames' purchase of SocGen Warrants and that Cetie Ames' transfer of her SocGen Warrants to the Ames CRUT was improper. [See findings, Wogan Report]

To investigate these matters and review the final accounting, Wogan also employed the services of Murphy & North, an accounting firm, to review Ohle's final accounting of all financial transactions in the Ames CRUT.  Upon the conclusion of Wogan's investigation and Murphy & North's review of Ohle's final accounting, Wogan and John Rouchell from Baldwin & Haspel drafted a final agreement resolving "any and all claims, known or unknown" between the Ameses, the Ames CRUT and Ohle. See GX 30-22 and 30-27.

However, before the final accounting was approved and the settlement agreement between the Ameses, the Ames CRUT and Ohle was signed, Cetie Ames' son Uhalt sought to review all relevant documents.  Uhalt had previously sought documents from Ohle in December 2002 without authorization.  But now, for the first time, Cetie Ames authorized Wogan to release certain financial information to her son Uhalt.  See Exhibit 2-6, August 5, 2003 letter from Wogan to Ames asking Cetie Ames to authorize releasing information to Uhalt, and August 5, 2003 letter from Cetie Ames to Wogan authorizing Hugh Uhalt to receive certain information regarding the Ames CRUT and Cetie Ames' financial information.

On September 4, 2003 following Uhalt's review, Wogan proposed a settlement releasing Ohle of "all liability that he may have resulting from his service as Trustee of the 1999 Trust, as Advisor to Mr. and Mrs. Ames, and otherwise" in exchange for Ohle returning his 2003 trustee fee, refunding $7,196.15 related to his 2001 trustee fee and paying $6,000 to cover the filing costs related to Cetie Ames' IRS ruling to remove $4.1 million from the Ames CRUT.  See Exhibit 2-6, September 4, 2003 letter from Wogan to Rouchell, para. 2-4.

Cetie Ames decided she wanted to remove $4.1 million from the Ames CRUT which had been previously donated following the liquidation of her SocGen Warrants.  As a result, Wogan and Joe Murphy from Murphy & North devised a plan to obtain a private letter ruling from the IRS allowing Cetie Ames to remove the monies from the CRUT.

As a result of this plan, Wogan included a "parade of horribles" in the settlement agreement which Wogan would provide to the IRS to bolster his arguments.  Ohle rejected signing the agreement with those allegations.  However, Rouchell added paragraph (6) on page 13 of the Agreement which provided strict confidentiality provisions.  In fact, Cetie Ames was only allowed to disclose this agreement to the IRS pursuant to her private letter ruling.  In the letter, Wogan advised Cetie Ames that, "We have also talked about the fact that this settlement is final, and it does not leave open any opportunity for anyone to pursue John Ohle at a later date for damages as a result of his actions prior to the Settlement Agreement." See Exhibit 2-6, November 18, 2003 letter from Wogan to Cetie Ames.

Similar to the Services Agreements between Jenkens & Gilchrist and Bank One/Chase, the Settlement Agreement and attached final accounting was not investigated by Abrams, and Abrams failed to file motion in limine and subpoena witnesses such as Rouchell, Gary Stern and others to defend the agreement.  In fact, Abrams allowed the Settlement Agreement (with the baseless allegations inserted by Wogan to obtain the IRS ruling) to be introduced into evidence at Ohle's trial despite the clear confidentiality provisions.

Around October 14, 2003, Cetie Ames, Tony Ames, the Ames CRUT and Ohle entered into the Settlement Agreement and Mutual Release, whereby the Ameses and the Ames CRUT released Ohle "of and from any and all liability and all claims and demands of any nature or kind, whether in law or in equity, whether or not now known, whether growing out of tort, contract or otherwise, including without limitation all obligations and liability resulting in any manner from (i) the administration of the [Ames CRUT] by [Ohle] as trustee and fully release, discharge and acquit [Ohle] of any further responsibility in connection with the [Ames CRUT] subject to his delivery to the duly appointed successor trustee [Wogan] . . . and (ii) professional and/or personal services of [Ohle] rendered to [Cetie Ames and Tony Ames] or either one of them, at any time up to and including the date of the Agreement."  See GX 30-27.

Ohle also petitioned the Civil District Court for the Parish of Orleans to approve his final accounting of the Ames CRUT.  On January 12, 2004, a Consent Judgment was entered, having been approved by Wogan.  The final judgment stated that the accounting "is hereby approved in accordance with LSA R.S. 9:2088, and such accounting shall be conclusive against a beneficiary of the trust with respect to all matters disclosed in such accounting."  See Exhibit 2-7, January 12, 2004 Petition to Approve Accounting by Trustee and January 12, 2004 Consent Judgment.

On August 17, 2007, Cetie Ames replaced Wogan as trustee of the Ames CRUT with Steven O. Medo, Jr. who is the father of her son Uhalt's business partner [see Exhibit 2-8, August 17, 2007 letter from Wogan to the Ameses resigning as trustee of the Ames CRUT and agreeing to turn over the assets to Steven O. Medo, Jr. as successor trustee of the Ames CRUT].

Despite all of Ohle's precautions in dealing with Cetie Ames and her son Uhalt including full disclosures through Baldwin & Haspel, resigning and turning over the assets of the Ames CRUT pursuant to a final accounting, approved by the State of Louisiana and obtaining a full release through a settlement agreement with strong confidentiality provisions, Uhalt directed his mother Cetie Ames to file a lawsuit against Ohle in derogation to the express terms of the Settlement Agreement, the Consent Judgment and the restitution award of this Court in the Eastern District of Louisiana alleging substantially the same allegations resolved previously in the Settlement Agreement, and rendered final under state law in the Consent Judgment, cloaked in the assertion that Ohle's criminal trial brought these claims to Cetie Ames' attention [see Ames v. J.P. Morgan Chase et al., Civil Action No. 09-7058-C3, U.S.D.C.-E.D.LA].

Cetie Ames' federal complaint was dismissed in December 2010 by Judge Helen G. Berrigan, holding that Cetie Ames' claim of violation of the Racketeer Influenced and Corruption Act ("RICO") was untimely under its four-year statute of limitations which began at the time of the Settlement Agreement and declining to exercise jurisdiction over Cetie Ames' state-law claims. [see Ames v. J.P. Morgan Chase et al., Civil Action No. 09-7058-C3, 2010 U.S.Dist. LEXIS 126662 (E.D.LA - December 1, 2010)].

Cetie Ames then re-filed her lawsuit in the Civil District Court for the Parish of Orleans, State of Louisiana (Civil Action No. 11-440, CDC-Orleans Parish, Louisiana) on January 14, 2011, alleging substantially similar claims raised in the Settlement Agreement.

In this civil litigation, Ohle discovered substantial new evidence which Abrams failed to obtain prior to Ohle's trial.  For example, Abrams failed to subpoena and review the Ames CRUT investigation files of Liskow & Lewis, Murphy & North and Baldwin & Haspel prior to Ohle's trial.  As noted above, Abrams went to New Orleans to investigate these matters and interview these witnesses but failed to meet with any witnesses.

Abrams' failure to investigate and obtain documents relating to the Ames CRUT's loans to Gamma Trading became apparent when Abrams filed a motion during Ohle's trial seeking permission to introduce documents evidencing the tripartite loan arrangement between the Ames CRUT, Gamma Trading and Dalton Ventures that were produced to the government pursuant to a subpoena.  The Court denied Abrams' motion.

Furthermore, deposition testimony from Uhalt and Tony Ames and documents produced in the litigation reveal that Cetie Ames and Uhalt sought to recover market losses and associated fees that were the result of freely and voluntarily made investments decisions by Cetie Ames based on the advice of trusted investment advisors, and not based on investment advice from Ohle.  The deposition of Tony Ames revealed that Cetie Ames' claims regarding Ohle were designed to obtain a favorable tax ruling from the IRS, allowing Cetie Ames to remove monies that she had previously irrevocably donated to the Ames CRUT on the false premise that she did not understand that she was making the donation.  Documentary evidence was also obtained showing that Cetie Ames and Hugh Uhalt both had actual knowledge that the SocGen Warrants had a five percent commission which was paid to Steger.  However, Cetie Ames allowed Uhalt to testify at Ohle's trial claiming that she was defrauded by Ohle of these commissions.

In response to discovering Cetie Ames' and Uhalt's fraud, Ohle filed a Reconventional Demand against Cetie Ames, also naming Uhalt as a defendant, for Cetie Ames' claimed false victim status in these proceedings and based on Uhalt's fraudulent scheme to unlawfully gain control of his mother's affairs through false and perjured testimony concerning Ohle's role and actions in Cetie Ames' financial affairs [see Exhibit 2-10, Reconventional Demand filed July 18, 2014 by John B. Ohle, III against Cetie Ames and her son Hugh Uhalt].

**B.  Ohle's conviction based upon testimony from Uhalt, Steger and Brown.**

The government's theory at Ohle's trial was that Ohle fraudulently obtained monies to fund the Browns' participation as third party purchasers in the HOMER transaction in a scheme to defraud his employer Bank One/Chase of its property.

Accordingly, the government called Uhalt to testify on behalf of his mother Cetie Ames that Ohle had embezzled monies from the Ames CRUT and fraudulently obtained commissions from her purchase of the SocGen Warrants.  Uhalt testified at Ohle's trial that he was acting pursuant to a power of attorney from his mother when he discovered Ohle's fraudulent conduct related to the Ames CRUT.

Uhalt testified that he had questions about the Ames CRUT and Cetie Ames' investment in the SocGen Warrants, and therefore he called Ohle in the later part of 2002 to demand financial information on behalf of his mother:

Q.  Did you see statements, Mr. Uhalt, from the Carpe Diem investment?

A.  Not at that time.

Q.  Did you ask for a meeting with Mr. Ohle?

A.  Yes, I did.

Q.  Did you have that meeting?

A.  Yes, we did.

Q.  Where was that meeting?

A.  At my office in New Orleans.

Q.  When was that meeting?

A.  The latter part of 2002.

Q.  Tell us what happened at that meeting.

A.  I called John in and I said I have the power of attorney of my mother, I want to see every single statement, every transaction, everything to do with that account from day one.

Q.  Did you observe Mr. Ohle's reaction?

A.  His face turned white.

[Tr. 728-29]

Uhalt specifically testified that he was acting in place of his mother under a power of attorney.  Of course, without a power of attorney from his mother, Uhalt would have had no right to the financial information from his mother or the Ames CRUT.  Uhalt then continued his testimony based on his claimed power of attorney from his mother by stating that he was going to hire a lawyer because he thought that there was a problem with Ohle's actions as trustee of the Ames CRUT:

Q.  Did you advise Mr. Ohle about what your actions would be if you did not get the information?

A.  Yes, I did tell him I was going to hire a lawyer.

Q.  Do you know whether a lawyer was hired?

A.  I was in the process of either getting the documents, I was going to do it regardless because I think we had a problem.

Q.  Was a lawyer hired?

A.  Yes.

Q.  Who was that lawyer?

A.  John Wogan.

[Tr. 730]

Due to the significance of Uhalt's claim that he was authorized to act on behalf of his mother under a power of attorney, Abrams immediately questioned Uhalt on cross-examination about his claims:

Q.  I am Stuart Abrams; I represent John Ohle.  You didn't have power of attorney over your mother's accounts, did you?

A.  Yes, I did.

Q.  In 2001 and 2002?

A.  Thereabouts, we got one in that timeframe, yes.

Q.  You did?

A.  Yes.

Q.  Do you have it with you?

A.  No, I don't

Q.  Did you ever give it to the government?

A.  There is a lot of files; I am sure it's in there.

Q.  You are just making that up, Mr. Uhalt?

A.  You would like to think that but no.

Q.  Mr. Uhalt, in fact, I think you said today that you control everything, right?

A.  At this point, I manage the assets.

Q.  At some point in time you are aware that there was a final accounting that was approved by the court in Louisiana regarding Mr. Ohle as trustee?

A.  You mean the settlement?

Q.  Yes.

A.  Yes, I am aware of that.

Q.  It was filed with the court in Louisiana and approved, right?

A.  We had no choice but to sign that.

Q.  The court in Louisiana approved of the settlement, correct, yes or no?

A.  Yes, that is true.

Q.  Mr. Wogan became trustee of your mother's trust, correct?

A.  At that point, yes.

Q.  Mr. Wogan today is no longer trustee?

A.  No, he is not.

Q.  Are you?

A.  Yes, I am.

Q.  So now you are the trustee of your mother's trust, correct?

A.  That's correct.

[Tr. 731-732]

 This Court, also recognizing the importance of Uhalt's claim that he was acting under a power of attorney on behalf of his mother Cetie Ames, immediately called a sidebar conference upon the conclusion of Uhalt's testimony:

Court:  I assume the government has been instructing their witnesses just to answer the question put.  If we have another witness who does what the last witness did, the court will take very affirmative action that the government will not be very happy about.

Davis:  Your Honor, I can assure you we had numerous conversations with Mr. Uhalt about his decorum on the stand.  I apologize.

Court:  He claimed by the way that he could determine when someone's face turned white.  I assure you that if he had continued much longer in the way he was continuing, it would have been his face that would have been turning red.  Now, did the government ever receive a power of attorney.

Davis:  I don't recall seeing one, your Honor.

Court:  I assume from questions raised that defense counsel may be making an argument on summation that he lied about that, and given the present state of the record, I think that would be permissible argument.

[Tr. 739]

 Through Uhalt's testimony, the government established that Uhalt had a power of attorney from his mother Cetie Ames and that based on that power of

attorney, he conducted a thorough investigation of his mother's affairs and ultimately gained control of his mother's assets, uncovered Ohle's fraud, and replaced Ohle as trustee.

Had Abrams investigated the Ames CRUT matters and Cetie Ames' investment in the SocGen Warrants, Abrams would have known that Uhalt did not have a power of attorney, that Uhalt was never trustee of the Ames CRUT, that Cetie Ames had attempted to circumvent other final accountings with PNC Bank in the past, and that Ohle had provided a final accounting for the Ames CRUT to Cetie Ames' attorney Wogan which resulted in a full and final release of any and all liability for Ohle as trustee.

Instead, Uhalt's testimony resulted in a $1.7 million forfeiture together with an award of restitution to his mother Cetie Ames.  This restitution award was in direct contravention of a final Louisiana state court order, releasing Ohle as trustee of any and all liability related to the Ames CRUT.  Instead of presenting critical exculpatory documents to contradict Uhalt, Abrams was reduced to cross examining Uhalt with no ability to demonstrate that Uhalt was perjuring himself, all of which resulted in a restitution award for his mother in her individual capacity.  As a threshold matter, Cetie Ames (as opposed to the trustee of the Ames CRUT) had no legal right or standing to recover from Ohle as a beneficiary of the Ames CRUT. Abrams' failures to investigate the final accounting and the loan documents between the Ames CRUT and Gamma Trading, file motions in limine regarding these matters and present evidence rebutting Uhalt's false claims allowed Uhalt to wrongfully obtain a restitution award for his mother based on his perjured testimony.

In addition to Uhalt's testimony that Ohle acted improperly as trustee, Doug Steger testified pursuant to a plea bargain that Ohle received commissions from Cetie Ames' purchase of SocGen Warrants:

Q.  Do you know whether the Ameses were charged the 5 percent upfront fee on their investment?

A.  Yes, they were.

Q.  How do you know that?

A.  Because 5 percent was deducted off the original investment and the remainder was invested into the Carpe Diem dynamic fund.

Q.  The 5 percent equaled what amount of dollars?

A.  $350,000.

Q.  Did you receive any instructions from John Ohle about how the $350,000 should be paid?

A.  Yes.

Q.  What were those instructions?

A.  $300,000 was to be sent to an account at Invested Interest, and I had asked to get paid some money out of that and he agreed that I could make $50,000.

[Tr. 1090-91]

I        In other words, Steger's testimony was that he only received $50,000 of the sales commissions from his sale of SocGen Warrants to Cetie Ames and the Ames CRUT.  The remaining $300,000 was sent to Invested Interest for the benefit of Ohle.

Q.  Had you otherwise any entitlement to the 5 percent fee under the fee structure that had been reached between you and Mr. Ohle and Mr. Slade?

A.  It was my understanding this was a non Bank One client according to John, so I had done a lot of work, spadework, and tried to sell this product for a year, and I though I deserved some of the fee.

Q.  Under the fee structure that was reflected in the October 16, 2001 memo, the 5 percent upfront fee was to be paid to whom?

A.  To Bank One.

Q.  Did you have any affiliation with Bank One?

A.  No.

Q.  What was John Ohle's response when you asked for a portion of the upfront fee?

A.  He was initially reluctant to let me have any.

Q.  What happened after that with respect to whether or not you were going to be paid anything out of the upfront fee?

A.  I persisted and asked and I said I think I deserve it for all the work and time I put in and he said OK, you can get $50,000.

[Tr. 1091-1092]

So, Steger testified that Ohle was in control of the $350,000 commission and that Steger was forced to grovel with Ohle even though Steger was entitled to be paid this commission under his marketing agreement with Carpe Diem.  Had Abrams subpoenaed Ohle's supervisor Dye as a witness at trial, Abrams would also have established that Bank One/Chase never entered into any agreement with Carpe Diem, discounting the misleading statements by Steger regarding the agreement Carpe Diem proposed to Bank One/Chase  which was never effectuated. As Steger testified, neither Cetie Ames nor the Ames CRUT were Bank One/Chase's clients, and accordingly Bank One/Chase had nothing to do with Steger's commissions.

Because Steger claimed that $300,000 wired to Invested Interest did not belong to him, he then testified that the Jenkens & Gilchrist third party service provider payments were "referral fees" to which he also claimed he was not entitled:

Q.  The invoices were supposed to be for what services to your knowledge?

A.  For introducing those clients to Bank One for the tax trade.

Q.  Did he provide you with the clients' names?

A.  Yes, he did.

Q.  Did you have anything to do with those clients getting involved in the HOMER tax strategy?

A.  I did not.

[Tr. 1098]

The sum and substance of Steger's testimony at Ohle's trial was that he only received $50,000 from the commissions on the sale of the SocGen Warrants, that the other $300,000 was sent to Invested Interest, that Invested Interest was a company for Ohle's benefit and that Jenkens & Gilchrist paid American Capital Financial Corp. based upon false invoices for "referral fees."

Had Abrams established that Steger received, pursuant to his marketing agreement with Carpe Diem, all $350,000 from the sale of the SocGen Warrants and that Steger himself used $300,000 to fund Invested Interest, Abrams would have shown that Jenkens & Gilchrist's payment of $81,500 to American Capital Financial Corp. was not related to "referral fees," but to Steger's financing of the Browns.

The government claimed that these fraudulently obtained monies from the Ames CRUT and Ohle's fraudulent receipt of commissions on Cetie Ames' purchase of the SocGen Warrants were needed for the Browns' participation as third party purchasers in the HOMER transaction.  Accordingly, the government elicited testimony from Brown to establish that Ohle was required to obtain funding for the Browns (including making fraudulent statements to Daugerdas regarding the Browns' ability to use their own cash) to complete his fraudulent scheme to defraud his employer Bank One/Chase of its property.

Brown testified that Ohle demanded a secret profits interest from Brown before inserting the Browns into the HOMER transactions and that Ohle agreed to fund the Browns:

Q.  This sum of money what Mr. Ohle referred to as hitting the lottery, did you have a discussion with him about whether you were going to keep all of that money?

A.  Yes, sir.  John said that we were going to share the money 50-50, all the proceeds from transactions.

Q.  Did you understand that was a condition?

A.  Yes, sir.

Q.  Did you discuss with Mr. Ohle at all about whether you were going to have to put up any money?

A.  At a point in time we had that conversation.  Initially I believe it was supposed to be just promissory notes that we were going to use to do the transactions and at some point leading up to the transactions it was decided there would be a cash component of that also.

Q.  Where was that cash going to come from according to your conversations with Mr. Ohle?

A.  From Mr. Ohle.

[Tr. 532]

Brown then testified that Daugerdas met with Brown to determine whether the Browns had the necessary cash to purchase the unitrust interests before Jenkens & Gilchrist allowed the Browns to participate in the HOMER transactions as third party purchasers:

Q.  Prior to actually meeting with Mr. Daugerdas at the restaurant, did you have a discussion with Mr. Ohle about what was going to take place?

A.  My understanding was that Paul wanted to meet the person who was acting as the third party investor and Mr. Ohle had told me that.  And he also said that he was probably going to ask about the money, whether or not I had the funds to partake or participate in the transactions, that I should tell him that it wasn't a problem.

Q.  Did you in fact personally have the money to do the transaction?

A.  No, sir, I did not.

Q.  Where was it going to come from?

A.  It was coming from Mr. Ohle.

[Tr. 536]

Brown testified that he intentionally misled Daugerdas into thinking that he and his wife had the available to cash to fund the purchaser of the unitrust interests in the HOMER transactions:

Q.  [Did there come a time you participated in the conversation between Ohle and Daugerdas?] About any other topic?

A.  Mr. Daugerdas asked me if I had the funds to do the transactions.

Q.  What did you say?

A.  I told him that I did.

Q.  Was that true?

A.  No, sir, it was not.

Q.  Why did you not tell Mr. Daugerdas the truth?

A.  At Mr. Ohle's request.

[Tr. 537-38]

Based on Brown's testimony, the government created the inference that Ohle had deceived Daugerdas at Jenkens & Gilchrist regarding the Browns' financial wherewithal to use cash in purchasing the unitrust interests in the HOMER transactions.  But the underlying foundation of Brown's testimony was that he and his wife required funding to participate as third party purchasers in Jenkens & Gilchrist's HOMER transaction.

Had Abrams, as he admitted in post-trial filings, obtained HOMER transactional documents from Jenkens & Gilchrist, White & Case and Deutsche Bank, as well as email correspondence, Abrams would have definitively established that Brown's testimony was false because funding was never required for the Browns' participation as third party purchasers.

## C.  Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate.

Similar to Abrams' failure to investigate the HOMER transaction including the payment by Jenkens & Gilchrist of third party service provider fees and Ohle's limited role and responsibility regarding the HOMER transaction, Abrams failed to

134

investigate the Ames-related allegations. Ohle provided Abrams with information regarding the tripartite loan arrangement entered into by Ohle as trustee of the Ames CRUT with Gamma Trading and Dalton Ventures. [Decl. of Ohle, para. 14].

Ohle also directed Abrams to evidence regarding Steger and Cetie Ames that would have impeached testimony regarding Cetie Ames' investment in SocGen Warrants. Abrams, in fact, hired investigators to obtain this evidence but due to his health issues failed to follow-up, and as a result, proceeded to trial without the critical documents and information necessary to impeach Steger and Uhalt. [Decl. of Ohle, para. 12].

### i. Uhalt obtained restitution order for his mother Ecetra Ames through perjured testimony.

At trial, Uhalt testified that he demanded financial information from Ohle in connection with his investigation of Ohle's conduct as trustee of the Ames CRUT. Uhalt's investigation was based upon his assertion that he held a power of attorney from his mother and had the right to the confidential financial information regarding his mother's financial affairs and the Ames CRUT. Without this power of attorney, Uhalt would have not had access to this financial information, and his testimony at Ohle's trial would have been meaningless. Uhalt also testified that he was appointed trustee of the Ames CRUT creating the inference that he had direct access and knowledge of Ohle's actions as prior trustee.

These statements by Uhalt at trial were false. In his civil deposition, Uhalt admitted that he did not have a power of attorney from his mother until 2009 and that such power of attorney was for the limited purpose of pursuing the civil action against J.P. Morgan Chase et al. [see Exhibit 2-9, Video deposition of Hugh Uhalt, taken in Ames v. J.P. Morgan Chase et al., Civil Action No. 11-440, CDC-Orleans Parish, Louisiana, on May 29, 2014 (hereafter, "Uhalt Dep.")]. Uhalt only obtained a general power of attorney from his mother on March 11, 2014, some twelve years after he claimed to hold such power of attorney [see Uhalt Dep., p. 68-69].

Q.  --did you have a written power of attorney with respect to your mother's affairs?

A.  You know, looking back, no, probably not, but we did have -- there were times when my mom would ask me for things, I would go to Wogan and I know -- and, look, I can't remember everything, so if I have to  -- if you have to press me on it, I'd have to say I don't remember.  But there were times that I had a power of attorney over my grandmother, so there were, you know, it was kind of involved but not involved. There were certain periods of time that I may have been more involved than others. During this particular --

Q. Let me --

A.  Just let me finish.  During this particular time --

Q. I apologize.

A.  That's okay.  I just don't want to talk over each other.  So, during this particular time I don't remember exactly what, you know, time.

Q.  I want to be clear, though.  During that period of time when Mr. Wogan had certain responsibilities with respect to your mother's affairs, you didn't have a written power of attorney, correct?

A.  Let's just assume that I did not in your case, but I don't remember exactly if I did or did not.  And the reason being, because there were times that I had had power of attorney dating back to my grandmother where, you know, I was involved in trying to clean up her estate before she passed away, then I may not have had one for a period of time with my mother, then I may have been more involved with John Wogan dealing with the stuff related to John Ohle.  So, did I have something that may have been in writing?  I mean, what -- I'm not a hundred percent sure.  That's my answer.  My mom may have picked up the phone and said, "Tell Huey the information.  Give Huey the information."

Q. I understand.

A.  So, a written -- is that a written document?  No.

Q. All right.  And, again, my question is whether a written document existed during the time period that Mr. Wogan was advising your mother, a written document that gave you power of attorney, and the answer to that question is no; correct?

A.  I would assume if it's not in that file, then the answer is no.

[Uhalt Dep., p. 53-55]

Due to Uhalt's rambling response to Bank One/Chase's attorney, Uhalt is once again asked about his testimony at Ohle's trial:

Q.  Well, first off, do you recall testifying to this under oath during the trial of Mr. Ohle?

A.  Yeah, I have a recollection of this, yeah.

Q.  All right.  And just generally speaking, what are you testifying to here, what was the subject matter of your testimony here?

A.  Just -- I'm sorry.  I was just -- just wanted to meet with Ohle because my mom had expressed some concern, and she had asked me, and I was setting up a meeting with John to discuss it.

Q.  All right.  And do you recall having given this testimony regarding the meeting with Mr. Ohle during the criminal trial of John Ohle?

A.  Yeah, to some -- to some extent, yeah.

Q.  All right.  And if you focus on 728, Lines 20 through 23, question, "Tell us what happened at the meeting."  Answer, "I called John in and said I have power of attorney of my mother, I want to see every single statement, every transaction, everything to do with that account from day one."

A.  Yes.

Q.  Do you see that?

A.  Yeah.

Q.  Is that what you told Mr. Ohle, that you had power of attorney?

A.  Apparently I did, I did say that, yeah.

Q.  All right.  And that wasn't true, was it?

A.  Once again --

Q.  Yes or no.

A.  It's very vague again.

Q.  Is it very vague?

A.  I think it's pretty vague.

Q.  Did you tell Mr. Ohle that you had power of attorney, yes or no?

A.  I think I did say that.

Q.  All right.  Was that true?

A.  You know, my mom had asked me to get the information, very clearly.  Go talk to Mr. Ohle, get the information.  So, you know -- you know, I mean, it was very clear what her directive was to me, okay.  And, so, you know -- you know, you can say whatever you want but, I mean, we had -- I don't remember exactly what had taken place.  I had had powers of attorney from time to time over my grandmother and for various family members.  Sometimes they've come in the form of like these little one-off things.

Q.  So, now are you changing your testimony from earlier today when you testified that you had no recollection of having a power of attorney?

A.  I really don't have a recollection -- of having a hard power of attorney.  I don't remember if I had one or didn't have one.

[Uhalt Dep., p. 201-204]

However, it was clear that Uhalt did not have a power of attorney from his mother in December 2001, despite his testimony under oath at Ohle's trial that he had such a power of attorney.  Documents produced in the Ames litigation revealed that Cetie Ames only gave Uhalt a limited authorization on August 5, 2003 to receive documents and financial information related to Ohle's final accounting and settlement agreement.  See Exhibit 2-6, Letters from August 5, 2003 authorizing Uhalt to receive certain information regarding the Ames CRUT and Cetie Ames' financial information].  Accordingly, even Uhalt's deposition testimony in the civil litigation is false.

Bank One/Chase's attorney also realized that Uhalt's testimony was problematic:

Q. The document marked as Uhalt Exhibit 17 [Exhibit 2-6, August 5, 2003 letter from Cetie Ames to Wogan], this document authorizes Mr. Wogan to release certain financial information --

A. Yeah.

Q. -- to you; correct?

A. Yeah.

Q. Certain financial information of your mother; correct?

A. Yes.

Q. It doesn't authorize you to engage in any financial transactions on her behalf?

A. No, it does not.

Q. All right. If you had power of attorney at this point in time, would there be a need for your mother to authorize Mr. Wogan to release financial information to you?

A. No, I guess not.

Q. All right.

A. Okay.

Q. All right. So -- all right. Again -- and, again, we're back in this time period, 2003, you don't have power of attorney with respect to your mother; right?

A. Maybe I -- if I -- you know what? I don't remember.


[Uhalt Dep., p. 193-194]


In fact, the only powers of attorney that Cetie Ames gave to Uhalt were the 2009 limited power of attorney to prosecute the civil claims against J.P. Morgan Chase et al. and the 2014 general power of attorney [Uhalt Dep., p. 68-69].

The other basis of Uhalt's alleged personal knowledge regarding Ohle's actions as trustee of the Ames CRUT was also false: Uhalt was never trustee of the Ames CRUT even though he testified at Ohle's trial that he was successor trustee of the Ames CRUT. In his deposition, Uhalt recanted this claim:

Q.  Question, "Mr. Wogan today is no longer trustee?"  Answer, "No, he is not."
Question, "Are you?"  Answer, "Yes, I am."

A.  Well, it's clearly mistaken.  I mean, the trustee is Mr. Medo, not me.  And then I
just probably was, you know, either nervous on the stand or just answered the
question incorrectly.

Q.  But that answer was inaccurate?

A.  I would say that answer probably is inaccurate.

Q.  It was false?  Is it true?

A.  It's not true.

Q.  It's not true.  So, it was false?

A.  It's not true.  Okay, it's a false answer, but it wasn't intentionally.

Q.  All right.  Let's go the next one.

A.  Okay.

Q.  So, you answer it, "Yes, I am."  Then you're asked the same question again.

A.  I'm sorry, where --

Q.  732, Line 11 through 12, "So now you are the trustee of your mother's trust,
correct?"  Answer, "That's correct."  Do you see that?

A.  Yeah, I mean, I hear you.

Q.  I said do you see it?

A.  Yes.  Yes, I see it.

Q.  All right.  And, again, that's false?

A.  That is false.


[Uhalt Dep., p. 205-207]


    Later, Uhalt's stepfather Tony Ames was deposed in the same civil litigation
on June 3, 2014.  Tony Ames testified that Uhalt did not have a power of attorney
and had never been trustee of the Ames CRUT:


Q.  All right.  During the time period that Mr. Ohle was trustee of the 1999 Charitable
Remainder Trust, did Mr. Uhalt have a power of attorney with respect to your wife?

A.  No.  [Ames Dep., p. 173]

Q.  All right.  Has Hugh Uhalt ever been trustee of the 1999 Charitable Remainder Trust?

A.  Not to my knowledge.  [Ames Dep., p. 175]

Abrams should have also obtained documents prior to Ohle's trial confirming that Uhalt did not possess a power of attorney in the relevant time period and that Uhalt was never trustee of the Ames CRUT.  However, if Ohle had been able to confront his real accuser Cetie Ames, Ohle could have established that Cetie Ames' agenda was removing $4.1 million from the Ames CRUT under the false pretense that she did not understand that she was making an irrevocable donation.  In order to remove the $4.1 million from the Ames CRUT, Cetie Ames and Wogan submitted a request for a private letter ruling to the IRS claiming that Cetie Ames' transfer of those funds were by mistake.

In Tony Ames' deposition, he stated that Cetie Ames did not transfer the proceeds from the SocGen Warrants to the Ames CRUT by mistake, "I know she was in all of the meetings.  I think she knew about it.  I don't know how she could not know about it." [Ames Dep., p. 209-210].  Because Abrams did not conduct the requisite investigation, Ohle was denied his Sixth Amendment right to confront his real accuser Cetie Ames.

 **ii.  Steger obtained probationary sentence through perjured testimony.**

Judge Pauley stated in the Daugerdas trial, "Cross examination is the engine that searches for the truth [Daugerdas Tr., p. 712]."  However, Abrams was unable to obtain the truth in Ohle's trial through cross examination alone.  Steger's testimony was proof that cross examination without investigation of critical documents and witnesses could not defeat a witness who was prepared to offer repeated false testimony.

Steger testified that he only received $50,000 of the $350,000 in sales commissions on his sales of SocGen Warrants to Cetie Ames and the Ames CRUT, that Invested Interest was Ohle's company (or, at least, for Ohle's benefit) and that Jenkens & Gilchrist paid his company American Capital Financial Corp. for bogus "referral fees."

Ohle told Abrams that he resigned as trustee of the Ames CRUT following an extensive final accounting which resulted in a final judgment by the Civil District Court for the Parish of Orleans in Louisiana.  Abrams also knew that John Rouchell and Jerry Reso from Baldwin & Haspel represented Ohle in the matter.  But Abrams failed to obtain the files from Liskow & Lewis, Murphy & North and Baldwin & Haspel.  In fact, Abrams flew to New Orleans to interview witnesses but failed to meet with a single witness.  [Decl. of Ohle, para. 12]

Had Abrams obtained the investigation files of Wogan, Abrams would have obtained a report from Wogan which would have provided the following statements reported by Wogan regarding Ohle's limited role as trustee of the Ames CRUT in the SocGen Warrants investment and Steger's receipt of the commissions from his sale of the SocGen Warrants to Cetie Ames and the Ames CRUT:

  - John [Ohle] states that he has never served as your "investment advisor," but only brought investments, such as the Carpe Diem Investment, to you for your decision whether to invest or not [Wogan Report, p. 3].

  - In [Ohle's] view, you entered into the Carpe Diem Investment based on your own assessment of the investment and on advice from Huey and Blair.  [This assertion by Ohle was confirmed by Tony Ames in his deposition where he testified that Ferguson, Bronze and Uhalt provided investment due diligence on the SocGen Warrants, not Ohle. [see Ames Dep., p. 147-164] [Wogan Report, p. 3].

  - I understand that the investment was also discussed in a phone call with Mr. Ohle, yourself, Mr. Ames, Hugh Uhalt and Blair Ferguson. [Wogan Report, p. 4].

- The best explanation is that sometime in 2001, Douglas M. Steger, a Chicago broker then associated with Chicago Investment Group, had developed an idea to sell smaller blocks of the Carpe Diem Investment.  The investment vehicle had typically been marketed directly by Carpe Diem Capital in blocks of $20 million or more . . . there is little doubt from the beginning, Mr. Steger contemplated getting a 5% commission on anything purchased through Mr. Ohle for your account or for the Trust's account. [Wogan Report, p. 4].

- [Doherty of Carpe Diem] said that they will permit a "gatekeeper" to charge a fee for securing the investment, but that the fee charged is between the client and the sales broker, in this case, Mr. Steger. [Wogan Report, p. 6].

- Mr. Steger stated in our conversation that he had his license with Chicago Investment Group in 2001 and that is the reason why $50,000 of the funds went to that company.  Mr. Steger says he is no longer affiliated with Chicago Investment Group. [Wogan Report, p. 7].

- Mr. Steger said that "Invested Interests" was a vehicle that he personally was using to invest funds, and that the payment to that company would shelter the funds until the investment was ready to be made. [Wogan Report, p. 7].

- Mr. Steger categorically denied that the 5% fee was shared with Mr. Ohle or any affiliate of Mr. Ohle's [Wogan Report, p. 7].

- Mr. Steger did not sound like the type of individual who is interested in sharing anything with anyone. [Wogan Report, p. 7].

Abrams' failure to investigate any aspect of these government's charges resulted once again in Abrams' failure to obtain these documents prior to Ohle's trial.  As a result, Abrams cross examination was limited and ultimately ineffective because of his failure to use other witnesses and documents to impeach Steger.  Ohle

had explained the relevant issues to Abrams but Abrams was not prepared for a witness such as Steger.  Abrams' failure to investigate Ohle's case and present affirmative evidence disproving Steger's testimony resulted in the jury being left in the dark as evidence by this exchange between Abrams and Steger:

Q.  Do you recall speaking with a lawyer by the name of John Wogan in roughly March 2003?

A.  Possibly.  I am not that familiar with Mr. Wogan.

Q.  Do you recall speaking with a lawyer in New Orleans who was asking some questions about the Ames trust?

A.  I remember talking with someone in New Orleans regarding the Ames investment in Carpe Diem, and I recall those questions around the investment and someone calling and asking about details of the Carpe Diem investment?

Q.  Do you recall a couple of years after the investment that a lawyer from New Orleans named John Wogan called you and asked you who got the fees on the Carpe Diem investment?

A.  I don't recall.

Q.  Do you recall telling a lawyer in New Orleans that you directed fees to be paid to Invested Interest?

A.  I don't recall.

Q.  Do you recall telling a lawyer in New Orleans that you parked money at Invested Interest for tax reasons?

A.  I don't recall.

Q.  Isn't it a fact that you were the one who did not want the Carpe Diem fees to be in your name; isn't that true, Mr. Steger?

A.  Absolutely not.

Q.  Isn't it a fact that you knew that any money that was in your name could possibly be grabbed by the IRS for all the money you owed them?

A.  No.

Q.  You have no recollection of telling this lawyer in New Orleans that in fact that was the reason why you were parking money at Invested Interest?

A.  No.

[Tr. 1235-36]

But Steger had told Wogan that Invested Interest was a vehicle that he personally was using to invest funds, not an entity for Ohle's benefit as testified during Ohle's trial.  In fact, Abrams' failure, as more fully discussed below, to obtain a forensic accounting report and have an expert testify at Ohle's trial allowed Steger's claim that he only received $50,000 from his sale of the SocGen Warrants to go unchallenged before the jury.

Had Abrams obtained a forensic accounting report and called the expert to testify, Abrams could have proved that Steger obtained $920,000 from Invested Interest [GX 73-1-D1] of which he transferred $600,000 to Dalton Ventures [GX 73-1-E6].  The difference of $320,000 plus the original $50,000 that Steger sent to his broker-dealer Chicago Investment Group [Tr. 1091] represented the entire $350,000 commission on his sale of the SocGen Warrants.  Abrams failure to obtain this forensic accounting report and the expert's testimony at Ohle's trial was another instance of Abrams' ineffective assistance.

Steger's testimony at Ohle's trial that Jenkens & Gilchrist paid his company American Capital Financial Corp. pursuant to false "referral fees" is no longer credible in light of Steger, not Ohle, financing the Browns.  Simply, Steger's company American Capital Financial Corp. received $81,500 from Jenkens & Gilchrist, not Bank One/Chase as the government alleged, and that third party service provider fee was not obtained by fraudulent means.  Simply, it was Steger's income.

Steger, however, resolved his past income tax issues (which were completely unrelated to Ohle), and entered a guilty plea for "over reporting" his income, then provided this blatantly false testimony at Ohle's trial.  Steger was sentenced to probation.

Ohle also gave Abrams other information regarding Steger's past conduct to impeach his testimony, including allegations of forgery by his former business partner Doug O'Brien and instances where Steger repeatedly avoided receiving

monies in his name.  To investigate these matters and obtain evidence, Abrams

hired an investigator to obtain this evidence and to testify at Ohle's trial.  [Decl. of

Ohle, para. 12].  However, due to Abrams' illness, no evidence was obtained and no

one was called to testify at Ohle's trial.  So, Abrams relied on cross-examination to

Ohle's detriment:

Q.  Have you ever told the government anything about having committed forgery?

A.  I don't know what you are talking about.

Q.  Have you ever forged someone's signature on a check?

A.  Forge, not that I recall.

Q.  Have you ever written someone else's name on a check without that person's

authorization?

A.  At this time I don't recall.

Q.  Do you know a person by the name Douglas O'Brien?

A.  Yes.

Q.  Isn't it a fact you wrote a $15,000 check to yourself on an account that Mr.

O'Brien had sole signatory authority over?

A.  I don't really recall that.

Q.  Do you recall telling the government that you had, that Mr. O'Brien was

somebody your were involved in a business relationship with?

A.  Yes.

Q.  That was actually one of the, connected to one of these later deals you testified

had something to do with Mr. Ohle?

A.  Yes.

Q.  You told the government that you had a falling-out with Mr. O'Brien?

A.  A falling-out.  I said we were not communicating.

Q.  Isn't it a fact that the reason for that is because Mr. O'Brien discovered that you

had taken a check from a checkbook that he had authority over and written it for

$15,000 to yourself?

A.  No.

[Tr. 1221-22]

Ohle placed one phone call following his trial and obtained the checks from O'Brien.  See Exhibit 2-11, December 7, 2010 email from McKenzie to Abrams, transmitting three checks that Steger instructed O'Brien to make payable to his wife Sharon Steger and a check that O'Brien stated Steger forged in the amount of $15,000.

Q.  After this point in time, is it correct that you also tried to make sure that any of your assets that your family had were held in your wife's name?
A.  Did I try and do that, I can't say that that's the case.

[Tr. 1275]

Once again, Steger's testimony was false, evidenced by, as one example, the checks that Steger instructed O'Brien to write in the name of his wife Sharon Steger. Had Abrams obtained these checks before Ohle's trial, Abrams would have impeached Steger through documents (and other witnesses).  Instead, the jury was left in the dark about Steger's continued false testimony at Ohle's trial.

Abrams acknowledged to the Court that he failed to obtain documents that would have rebutted Steger's testimony at Ohle's trial [Motion for New Trial, p. 22-23].  Abrams addressed the issues related to O'Brien's checks in footnote 6, "Separate and apart from the evidence derived from [the Jenkens & Gilchrist boxes], we have recently obtained evidence contradicting another aspect of Steger's trial testimony.  Steger testified that he did not forge the signature of a man named Douglas O'Brien on a $15,000 check (Tr. 1221).  We have since obtained a copy of the check that Steger apparently forged.  There are also checks showing that Steger directed payments to be made to his wife, contradicting Steger's trial testimony that he was not trying to put assets in his wife's name to hide them from the IRS. (Tr. 1275)[Id., p. 22].

Clearly, Abrams felt these issues were important but had failed to obtain this evidence and present it when it mattered, namely to the jury at Ohle's trial.

In addition to the documents discussed above, Abrams also failed to obtain and investigate documents related to Steger's direct dealings with Jenkens & Gilchrist.

For example, Abrams concluded from the documents that "Steger's testimony was false" involving Steger's claims that he issued invoices for fees to Jenkens & Gilchrist solely on the basis of Ohle's instructions, that he had no dealings with Jenkens & Gilchrist that would have warranted the payment of these fees and that he had never met Daugerdas [Id.]. Abrams cited, as an example, the Confidentiality Agreement between Jenkens & Gilchrist and Steger personally dated November 26, 2001. Abrams concluded that evidence from the Jenkens & Gilchrist boxes would have thoroughly contradicted Steger's testimony [Id.].

Abrams failure to investigate these matters before Ohle's trial and to present a defense case was ineffective assistance which should result in this Court vacating Ohle's conviction and sentence.

 iii. **Brown's testimony regarding his participation as third party purchaser under Ohle's control is refuted through evidence obtained in Jenkens & Gilchrist's 116 boxes produced after trial.**

Abrams admitted that he had failed to obtain critical documents from Jenkens & Gilchrist prior to Ohle's trial which would have undermined the correctness of the jury's verdict, cutting across all aspects of the government case. [Motion for New Trial, p. 11]. But Abrams' failure to present evidence defeating Brown's contention that his participation as third party purchaser in the HOMER transaction occurred under Ohle's control and allowed witnesses such as Uhalt, Steger and Brown through false pretenses to make unchallenged statements which were prejudicial and harmful to Ohle and which were directly contradicted by documents that Abrams failed to obtain.

As discussed above, Ohle had to defend against claims that he had fraudulently obtained monies from Bank One/Chase that were, in fact, the property of Jenkens & Gilchrist.  In other words, Ohle was not confronting his true "accuser," the payor of the third party service provider fees Jenkens & Gilchrist who did not claim that their payments were fraudulent.  Likewise, Uhalt's false testimony resulted in Ohle not confronting Cetie Ames.  Instead, the government was able to elicit testimony from witnesses such as Uhalt, Steger and Brown resulting in inferences, innuendos and false statements which directly resulted in Ohle's wrongful conviction.

Specifically, Abrams failed to present evidence that Jenkens & Gilchrist paid, pursuant to its long-standing business practices, third party service providers in its tax shelter transactions.  But Abrams failed to present this evidence at Ohle's trial, resulting in Ohle having to disprove a negative without confronting the true "payor" of the third party service provider fees, namely the indicted Jenkens & Gilchrist attorneys Daugerdas, Guerin and Mayer.

Similarly, Abrams failed to investigate the Ames-related allegations which allowed Uhalt to falsely testify that he was authorized to investigate Ohle's conduct as trustee of the Ames CRUT.  Had Abrams established that Uhalt had no standing or legal right to this financial information, but was simply creating false inferences and innuendos through his testimony, Ohle could have confronted his real accuser Cetie Ames.  It should be noted that the party with standing and legal right to pursue these claims was the trustee of the Ames CRUT, but neither of the successor trustees, Wogan or Steven Medo, Jr., claimed that Ohle defrauded the Ames CRUT.

Brown was the witness who provided the "glue" for the government's case.  Through Brown's testimony, the government connected two separate and distinct "conspiracies."

Had Abrams investigated the files of Jenkens & Gilchrist, Abrams would have proved through witness testimony at Ohle's trial what Abrams spent two years arguing in his motions, namely that Ohle's case was not a single conspiracy.  In other words, had Abrams presented evidence that the Browns' participation as third party purchasers in the HOMER transaction was not contingent of their ability to use cash

to purchase the unitrust interests, the government's case would have been split into two distinct pieces, no longer constituting the broad, overarching fraud scheme painted by the government.

Instead, Abrams could have recast the government's theory into two bite-size pieces which would have been defeated through the presentation of a defense case:

First, Jenkens & Gilchrist directed all aspects of the HOMER transaction including the payment of third party service provider fees and the participation of the third party purchasers.  The Browns, as clients of Jenkens & Gilchrist, purchased the GRRT interests in the 2001 HOMER transactions.  As shown above, Jenkens & Gilchrist, not Ohle, proposed obtaining financing for the Browns to resolve Ohle's concerns created when White & Case changed the unitrust purchase promissory note from secured to unsecured.  Finally, Jenkens & Gilchrist, not Ohle, arranged for Invested Interest (with Freedman, Manella and Steger as members) to participate as third party purchaser in the HOMER transactions for 2002.

Second, Uhalt prompted his mother Cetie Ames to challenge Ohle's actions as trustee of the Ames CRUT in order to obtain a more prominent role in his mother's financial affairs.  As a result, Ohle hired a law firm who prepared a final accounting setting forth all financial transactions, including the tripartite loan arrangement between the Ames CRUT, Gamma Trading and Dalton Ventures, which was approved by a final judgment of the Louisiana state court.  Further, Cetie Ames' attorney Wogan investigated a litany of claims, including the payment of commissions on the SocGen Warrants.  After investigating these issues for more than six months, the Ameses, the Ames CRUT and Ohle entered into a final settlement agreement.

To properly defend Ohle's case, Abrams should have presented evidence and testimony based on three documents obtained by Ohle in the Jenkens & Gilchrist files after his trial.  If Abrams would have presented this evidence, Abrams would have shown that the Browns were never required by Daugerdas (or Jenkens & Gilchrist, White & Case and Deutsche Bank) to use cash to purchase the unitrust interests in the HOMER transactions.  Abrams admitted that he failed to obtain these three following critical documents:  (1) the HOMER transactional document

package; (2) an email between Jenkens & Gilchrist attorneys McLaurin Hill Files to Mitchell Portnoy demonstrating that the Browns were not required to purchase the unitrust interest with cash; and, (3) an email which identified each party at Deutsche Bank, White & Case and Jenkens & Gilchrist responsible for the HOMER transactional documents [see Section One(F) above].

Abrams should have also interviewed and subpoenaed Laura Lightholder, John Beery and McLaurin Hill Files from Jenkens & Gilchrist. These unindicted Jenkens & Gilchrist attorneys were personally involved in the formation of the Browns' entities used as third party purchasers, the execution of the purchases and the reporting of income related to their activities as third party purchasers. Abrams would have established that the Browns' participation as third party purchasers was pursuant to the advice and counsel of Jenkens & Gilchrist, not pursuant to Ohle's instruction or control.

Other documents found in Jenkens & Gilchrist's document production also demonstrated that Daugerdas was fully aware that Brown was an office manager for IKON Services, not a wealthy investor. In fact, as Abrams pointed out after trial, documents found in the 116 boxes from Jenkens & Gilchrist establish that the Browns and Jenkens & Gilchrist submitted false account opening forms to Deutsche Bank, grossly misrepresenting the Browns income as $1.2 million and their net worth as approximately $9 million, excluding their residence. See Motion for New Trial, p. 25-26.

Had Abrams presented these false account opening forms presented by the Browns to Deutsche Bank, Abrams, as he admitted in his post-trial filings, he could have impeached Brown and shown that he was acting upon the instruction of Jenkens & Gilchrist and not Ohle. However, because Abrams failed to investigate and to properly prepare and present Ohle's defense, the government was able to use Brown to link the false testimony of Steger and Uhalt into a single overarching conspiracy.

 **iv.  Abrams failed to interview attorneys involved in certain transactions and to obtain forensic accountant's report which would have refuted government's "tracing" theory.**

Under the false premise that Ohle had constructed a fraudulent scheme to insert the Browns into the HOMER transaction and, as a condition of their participation, fraudulently funded the Browns, in order to steal monies from his employer Bank One/Chase, the government then claimed that Ohle's subsequent business transactions and personal financial dealings were designed to conceal his illicit activities.

Abrams was told by Ohle, in each instance, which attorneys were involved in transactions to defeat the government's "tracing" theory.  As a result, Abrams stated to Ohle that he would interview the following attorneys:

  - Lee Hutchinson of Freeborn & Peters - Hutchinson responded to Bank One/Chase's allegations in its "internal investigation," which resulted in a settlement agreement and a substantial bonus payment for Ohle [Decl. of Ohle, para. 17];

  - David Lukinovich - Lukinovich handled a proposed real estate transaction between Steger and Ohle's father, drafted Ohle's estate planning documents including Dalton Ventures, drafted similar estate planning documents for Steger, drafted organization documents for Bil Bradley and represented clients related to both HOMER and 1256 transactions. [Decl. of Ohle, para. 16];

  - Jerry Reso and John Rouchell of Baldwin & Haspel, LLC - Rouchell represented Ohle in connection with his resignation as trustee of the Ames CRUT, following an extensive final accounting which resulted in a final judgment by the Civil District Court for the Parish of Orleans, Louisiana.  Rouchell also settled any and all other claims related to Ohle's involvement with the Ameses.  [Decl. of Ohle, para. 13];

  - Tom Fitzgerald of Winston & Strawn - Fitzgerald represented Dumaine Group LLC and his firm had reviewed and approved the 1256 transaction structure for its clients, including Daniel O. Conwill [Decl. of Ohle, para. 16]; and,

- Gary Stern of Chuhak and Tescon - Stern handled the drafting and execution of Ohle's business and estate planning transactions, including Museum of Sports History, LLC, and had actual knowledge of Steger's involvement and MOSH's business activities [Decl. of Ohle, para. 16].

Abrams stated that he would interview these witnesses on trips to Chicago and New Orleans.  But, as noted above, Abrams failed to interview any of these witnesses on these trips.  Abrams reported to Ohle that he would return later to interview the witnesses, but never did.  Finally, Abrams assured Ohle even while the trial was ongoing that these witnesses would be called at trial, but they never were.

Ohle, Abrams and Abrams' co-counsel Steven Blanc decided that a forensic accountant would be required to rebut the government's "tracing" theory.  Blanc, who had previously represented Ohle in his IRS civil income tax examination, created a spreadsheet analysis matching transactions on bank statements to transactions with back-up documentation.  On February 18, 2010, Ohle asked Abrams and Blanc whether the accounting/tracing had been completed.   In anticipation of hiring a forensic accountant expert, Abrams requested that Blanc send him his spreadsheet analysis and back-up documentation.

Abrams then hired Citron Cooperman to produce Ohle's forensic account report for use at his trial but was never able to complete its report.  Abrams failed to obtain necessary statements for Citron Cooperman, and Ohle learned after trial that Bank One/Chase had refused to pay its half of Citron Cooperman's fees.  So, Citron Cooperman failed to produce the forensic accounting report or testify at Ohle's trial. See Decl. of Ohle, para. 11; Exhibit 2-13, emails related to Abrams obtaining a forensic accounting of transactions.

**III.  SECTION III Regarding Ohle's § 2255 Claim Three**:  **Trial counsel's failure to investigate Ohle's good faith claim of a 1256 transaction deduction was ineffective assistance of counsel.**

As part of the tax evasion allegations in Count Three Ohle stood accused of reporting nearly a $4 million loss on his 2002 income tax return based on an allegedly "fraudulent tax shelter" known as the "1256 transaction." The 1256 transaction was also part of the allegations of a conspiracy to defraud the IRS in Count One.

The willfulness of Ohle's conduct and the actual structure of the transaction were critical issues in determining his culpability. [Tr. 2240-42, providing jury instruction as to tax evasion counts]. The transaction at issue in Count Three was a series of sixteen separate contracts between the 2002 JBO Trust No. 1 and Montgomery Global Advisors V ("Montgomery Global"). [Tr. 1557].

Along with other information important to defeating these charges, Ohle told Abrams that investment advisor Roger Groh of Montgomery Global had acted as the counterparty to his father's investment on behalf of the 2002 JBO Trust No. 1, and that Groh had represented in a critical representation letter given in connection with the 1256 transaction that the sixteen underlying contracts were "separate and independent" [Decl. of Ohle 2255, para. 10; Decl. of Chaudhry, para. 15d].

Abrams failed to investigate this information, and did not subpoena Groh or produce crucial documents at trial. Abrams also failed to obtain Ohle's files from Greenberg Traurig which contained this critical representation letter from Montgomery Global in which Montgomery Global specifically represents, as the counterparty in the 1256 transaction, that the sixteen contracts were separate and independent from each other.

Ohle's legal files at Greenberg Traurig were not obtained until April 9, 2014. [See Exhibit 3-1, April 9, 2014 letter from Greenberg Traurig to Eastland, transferring Ohle's legal files].

The documents referred to throughout this Section Three were included in Greenberg Traurig's production, including Montgomery Global's representation letters, and should have been obtained by Abrams prior to Ohle's trial. Because of the indisputable materiality of the documents and information, it is clear that Abrams' illness had a serious adverse effect on his preparation for Ohle's trial because there could be no reasonable trial strategy in not offering them.

The effects of Abrams' illness are demonstrated in his trip to New Orleans to interview important witnesses related to the 1256 transaction, including Ohle's father, Dumaine clients Daniel O. Conwill, IV and Stephen Hansel and their tax counsel, David Lukinovich who drafted documents for Conwill, Hansel and Ohle, and witnesses related to other aspects of Ohle's charges.  Despite flying to New Orleans in April 2011 to investigate these matters, Abrams failed to contact a single witness while billing Ohle for his travel and explained to Ohle that he did not feel up to the meetings [Exhibit C, Frankel & Abrams Cash Disbursement Schedule showing March 30, 2010 trip to Chicago and April 2, 2010 trip to New Orleans; Decl. of Ohle, para. 15].  This is another example of how Abrams' health problems plagued his preparation for Ohle's criminal trial.  Abrams told Ohle that he would return at a later date, but he never returned, failing to interview a single witness [Decl. of Ohle, para. 15].

Just as Abrams failed to obtain the loan documents related to the Ames CRUT described in Claim Two above, Abrams failed to obtain Ohle's legal files from tax opinion writer Greenberg Traurig.  These files included representation letters directly and irrefutably contradicting the government's argument created through John Kruse's false testimony at trial (a) that Montgomery Global had an understanding with its counterparties that the 1256 transactions would not be unbundled and (b) that Ohle further knew that this "understanding" resulted in a fraudulent tax shelter transaction, satisfying the "willfulness" element of tax evasion.

As shown below, Montgomery Global had no such understanding with its counterparties and, in fact, represented in its formal representation letter that the sixteen separate contracts could be transferred independently.  In deposition testimony following Ohle's trial, Kruse admitted that he actually had no knowledge of Montgomery Global's representations to its counterparties.  Kruse further testified that he was unaware of any fraudulent or illegal aspect of the 1256 transaction, refuting the government's contention of Ohle's "willful" conduct [see Exhibit 3-2, Videotaped Deposition of John Kruse, taken in Conwill v. Greenberg Traurig et al, Civil Action No. 11-0938, U.S.D.C-E.D.LA, on September 10, 2012

(hereafter "Kr. Dep."), p. 197-98].  Had Abrams obtained and reviewed these legal files from Greenberg Traurig, he would have subpoenaed counterparty Roger Groh of Montgomery Global to testify at trial, and Groh's testimony would have defeated the 1256 transaction charges against Ohle.

Abrams also failed to produce an expert at trial to testify to the legality of the 1256 transaction and Ohle's reasonable reliance on Greenberg Traurig's tax opinion letter.  Instead, having failed to prepare a defense including the presentation of critical witnesses and documentary evidence as well as expert testimony for Ohle's trial, Abrams resorted to his only available option - cross-examination.  The hiring of an expert to testify to the legality of the 1256 transaction was a critical aspect to Ohle's defense and was discussed extensively with co-counsel Steven Blanc before he withdrew from the Ohle's defense team in March 2010. [Decl. of Blanc, para. 10-11].  Abrams' failures to present critical fact and expert witnesses and critical documents was not reasonable trial strategy but rather the result of progressive illness.

## A.  Background

Ohle was introduced to the "1256 transaction" by Greenberg Traurig attorney Jay I. Gordon who stated that this transaction offered genuine economic returns and allowed tax losses through tax provisions in 26 U.S.C. 1256.  Gordon referred Ohle and other members of the Dumaine Group ("Dumaine") to John Napoli at Seyfarth Shaw. [Tr. 1510, 1548, 1566-67].  Napoli explained the transaction and offered a tax memorandum analyzing the 1256 transaction for their review.  Eventually, Napoli introduced Dumaine to John Kruse at Royal Bank of Canada.  Kruse explained the economics of the 1256 transaction to Dumaine [Kr. Dep., p. 86-87].  Ohle introduced the "1256 transaction" to three clients at Dumaine, including Conwill.  Each client engaged independent counsel to review the Seyfarth Shaw/Royal Bank of Canada transaction.  Independently, tax counsel for all three clients approved the purported tax consequences of the 1256 transaction [Decl. of

Ohle, para. 16]. Montgomery Global Advisors V was the counter-party for each of the sixteen separate contracts with each of these clients [Tr. 1511; Kr. Dep., p. 104].

With confidence in the recommendation by Greenberg Traurig, the tax memorandum from Seyfarth Shaw analyzing and approving the tax consequences in the 1256 transaction and the independent review of the 1256 transaction by counsel of three Dumaine clients, Ohle referred his father, as trustee of the 2002 JBO Trust No. 1, to the 1256 transaction [Tr. 1557].

As trustee of the 2002 JBO Trust No. 1, Ohle's father entered into sixteen separate contracts with Montgomery Global as counter-party. Groh told the FBI in his interview on March 2, 2010 that Montgomery Global did trades for Ohle's father at cost. Additionally, Groh stated that he extended this offer to "friends and family" of individuals who Montgomery Global identified as possible future sources of business [see FBI Notes from Interview of Roger Groh on February 2, 2010 (hereafter "FBI Groh"), Case No. 1:13-cv-00450-JSR, Docket No. 13, Exhibit 9, p. 5]. Ohle also introduced several other friends and business associates to Montgomery Global, including Brown and Steger [Tr. 1506-1509].

Nine months later, Ohle provided the three Dumaine clients with contact information for three law firms who had analyzed the tax consequences of the 1256 transaction. Each client independently contacted the three law firms to choose an attorney to opine on the tax consequences of the 1256 transaction. Two clients, including Conwill, chose Gordon at Greenberg Traurig. [See Exhibit 3-3, Deposition of John B. Ohle, III, taken in Conwill v. Greenberg Traurig et al, Civil Action No. 11-0938, U.S.D.C.-E.D.LA, taken on March 16, 2012, (hereafter "Ohle Dep."), p. 41-46].

Due to the terms of the 2002 JBO Trust No. 1, Ohle was responsible for reporting all gains or losses from that trust. [Tr. 1557]. Accordingly, Ohle requested that Vicky Little contact Gordon on his behalf regarding the costs associated with him obtaining an opinion letter from Greenberg Traurig. Greenberg Traurig estimated $25,000, agreeing to only charge Ohle direct time and costs. [see Exhibit 3-4, September 17, 2003 facsimile from Little to Gordon; Tr. 1552]. Ohle engaged Greenberg Traurig who opined that the 1256 transaction was not a tax shelter and resulted in properly deductible losses. [Tr. 1552; see Exhibit 3-5, October 15, 2003

Greenberg Traurig Opinion Letter, p. 10-13].  Ohle provided his accountants, American Express Tax & Business Services, with documents from his father's 1256 investments, a copy of the trust, and Greenberg Traurig's tax opinion letter.  His accountants prepared and signed his tax return reporting the losses from the 1256 transaction. [Tr. 1676-77].

## B.  Ohle's 1256 transaction convictions based on fraudulent representation to Gordon.

The government offered three different theories on Ohle's culpability for tax evasion related to his reporting the 1256 transaction losses on his 2002 tax return. None of these theories - violation of the "at-risk" rules, the "primarily for profit" test, and the "economic substance" doctrine - were sustainable, let alone could defeat Ohle's "advice of counsel" defense, but for the government's contention that Ohle provided Gordon with a false representation in order to procure a tax opinion letter from Greenberg Traurig.

In fact, Abrams argued on appeal that trial evidence was insufficient to permit any reasonable jury to find Ohle guilty of attempted tax evasion.  Abrams further argued that Ohle did not have fair notice that his conduct in entering in to the complex 1256 transaction could constitute a willful attempt to evade federal income taxes.  The Second Circuit pointed to Ohle's alleged false statements to Gordon in denying Abrams' arguments (see Opinion in Ohle's Appeal, 2011 U.S. App. LEXIS 21275, 2nd Cir., Oct. 20, 2011, p. 4-5).

Like Abrams' other failures, Abrams' failure to investigate the 1256 transaction's legitimacy was neither reasonable nor strategic, and rather served to undermine the strategy that he did pursue.  Abrams' failure to investigate Ohle's good-faith claim of a deduction resulted in Abrams attempting to rebut testimony or inferences through his cross-examination of witnesses who were testifying under plea agreements (such as Gordon) or under non-prosecution agreements (such as Kruse and his co-promoter Mark Love).  Abrams sought through cross examination of adverse witnesses to suggest that the 1256 transaction, certainly to Ohle's

knowledge, had been properly structured and vetted as sound.  Yet Abrams' failure to obtain existing corroborating documents and witnesses who were not testifying under plea or non-prosecution agreements prevented him from refuting the government's claim that his representation to Greenberg Traurig was false.

**C.  Evidence obtained post-trial demonstrates prejudice from Abrams' failure to investigate.**

Abrams' failure to investigate the 1256 transactions' legitimacy and specifically the role of Groh and Montgomery Global which refuted the government's claim that Ohle's representation to Greenberg Traurig was false clearly prejudiced Ohle's defense.  At trial, the government produced only one witness, Kruse, to testify about the structure of the 1256 transaction.  Had Abrams secured Groh's testimony and the documents for trial, Groh's own direct knowledge about the structure of the 1256 transaction and evidence of his assurances to Ohle and representations to Greenberg Traurig would have countered the inferences created by Kruse's testimony.  If Groh's testimony and supporting documents which constitute direct, material evidence as opposed to the inferences created by Kruse's testimony had been presented to the jury at trial, the jury's conclusion on the 1256 transaction allegations in Count One and Count Three would have been different.

Former Dumaine client Daniel O. Conwill, IV filed a lawsuit based upon allegations set forth in Ohle's criminal trial (see Conwill v. Greenberg Traurig et al, Civil Action No. 11-0938, U.S.D.C.-E.D.LA), naming Greenberg Traurig, Gordon and Ohle as defendants.  While the litigation was settled with no liability on behalf of Ohle, significant deposition deposition testimony was taken, revealing critical facts that Abrams should have discovered in his investigation prior to Ohle's criminal trial.

These facts, as discussed below, include (1) Kruse admitting that he was unaware of Montgomery Global's representations to Ohle: (2) Kruse stating that the "separate and independent" issue was not fraudulent (contrary to the inferences Kruse's testimony created during Ohle's trial); and (3) Ohle's good-faith belief in the

proper deductibility of losses attributable to the 1256 transaction based upon the tax opinion letter from Greenberg Traurig.

### i. Kruse's trial testimony that government based its claim that Ohle provided Gordon with false representation.

The government contended that Kruse's testimony at Ohle's trial proved that Montgomery Global had an agreement with its counterparties that the sixteen separate contracts could not be transferred separately, that Ohle knowingly misrepresented to Greenberg Traurig that the investment contracts were separate and independent in order to fraudulently induce Greenberg Traurig to issue Ohle a tax opinion letter, and that this false representation reflected Ohle's knowledge that the 1256 transaction was fraudulent.

At Ohle's criminal trial, Gordon testified that (1) he ran the tax department of Greenberg Traurig firm wide which included 70-90 tax attorneys [Tr. 1534, 1566]; (2) tax opinions are formal legal advice based on facts represented by clients which the law firm then applies the law to form a legal conclusion [Tr. 1534-35]; (3) tax opinions also demonstrated to the IRS that taxpayer's tax positions are within the bounds of legal possibility [Tr. 1554]; (4) clients sought tax opinions from reputable law firms like Greenberg Traurig to avoid legal prosecution and/or penalties that could be assessed by the IRS if the client's tax position was disallowed [Tr. 1535, 1554]; (5) Greenberg Traurig prepared representation letters for Ohle and his father to sign [Tr. 1553]; (6) Gordon did not discuss the tax import of these representations with Ohle [Tr. 1555]; and (7) Greenberg Traurig provided a tax opinion letter to Ohle and his father related to his 1256 transaction. [Tr. 1552].

It is important to note that Gordon, who admittedly drafted the representation letters for Ohle and his father to sign and pled to fraud in regard to the issuance of his tax opinion letter to Ohle, did not testify that Ohle had made any false statements or misrepresentations to him. Instead, the government offered testimony from John Kruse, a foreign currency trader at Royal Bank of Canada, who was personally responsible for the design of the 1256 transaction investment

contracts.  He and his co-promoter Mark Love defrauded their employers of their honest services by secretly accepting payments from counterparty Montgomery Global. [Tr. 1491, 1500].

Despite the fact that Kruse and Love designed, promoted and implemented the 1256 transaction and unlawfully received fees from the 1256 transactions that should have gone to their employers, the government offered Kruse and Love non-prosecution agreements for their testimony in Ohle's trial. [Tr. 1467-68, 1487-88]. Pursuant to the non-prosecution agreement, Kruse testified as follows at Ohle's criminal trial:

Okula:  Could these contracts be pulled apart to expose the taxpayers to risk?

Kruse:  They were as a group of transactions that were not allowed to be separated.

Okula:  Not allowed by whom?

Kruse:  By Montgomery Global or anyone that would have been a counterparty to the transaction.

Okula:  Did you discuss that with Mr. Ohle?

Kruse:  Yes.

Okula:  And you mentioned the phrase Montgomery Global.  Who is Montgomery Global?

Kruse:  Montgomery Global was the counterparty to the transaction and the trust was the opposite side of the transaction.

Okula:  The trust being Ohle?

Kruse:  Yes.

[Tr. 1499-1500]

In other words, Kruse testified that Montgomery Global would not allow the group of 16 separate contracts to be separated.  The government argued that Kruse's testimony established that Ohle and the other sixty-four counterparties [see Tr. 1505, where Kruse states that Groh's company served as counterparty in sixty-five 1256 transactions] were aware that Montgomery Global required the contracts

to remain "bundled," and, accordingly, Ohle knew that his representation letter to Greenberg Traurig was false.  Therefore, the government argued that Ohle had willfully evaded his income taxes for tax year 2002 (Count Three) and similarly conspired to defraud the U.S. government (Count One).

Had Abrams introduced readily available evidence that Montgomery Global did not have this "understanding" with Ohle's father or its sixty-four other counterparties, Kruse's testimony would have been completely discredited, eliminating all notions that Ohle willfully evaded his income taxes.

Kruse's testimony that Ohle was the counterparty was also false and was presented to blur the legal distinction between Ohle and the actual counterparty. Ohle was not "the trust."  The JBO 2002 Trust No. 1 was a grantor trust for income tax purposes.  Accordingly, Ohle, as grantor, was required to report items of income and loss from the trust on his income tax return.  However, Ohle was not the counterparty to Montgomery Global in the sixteen separate contracts which comprised the 1256 transaction.  2002 JBO Trust No. 1 was the counterparty.  As explained below, this legal distinction is important in light of the government's alternative theories related to business purpose.

Kruse acknowledged that the legal relationship between Montgomery Global and its 65 counterparties was established through the sixteen, separate written contracts and any other agreements between Groh and its counterparties.  Kruse's testimony was nothing more than hearsay as to the understandings of the counterparties to the transaction which he was not a party.  Had Abrams called Groh as a witness with direct knowledge of the understandings of the counterparties instead of simply attempting to cross-examine Kruse without having access to the underlying transaction documents, Kruse's gratuitous and self-serving testimony would have been refuted.

On cross examination, Kruse continued to testify "on behalf" of Groh as to the "understandings" of all of the counterparties in 65 separate transactions:

Abrams:  So is it fair to say that the transaction -- we are calling it the transaction but it actually involves numerous separate transactions, correct?

Kruse:  As a group executed at the same time, yes.

Abrams:  Is it 16 separate transactions?

Kruse:  14 transactions on the first 2 days and then there are at the time of contributing to the charity there is an additional hedge that is placed at that point.

Abrams:  So is this an additional 2 at the end?

Kruse:  Yes.

Abrams:  So in total it comes to 16 separate transactions?

Kruse:  Yes.

Abrams:  And you said that it was essentially an understanding with Montgomery Global that the transactions would not be unbundled, correct?

Kruse:  That is the understanding of all counterparties.

Abrams:  Which in this case is Montgomery Global?

Kruse:  And John Ohle.

[Tr. 1511-1512]

Here, Kruse claimed that Montgomery Global and its sixty-five counterparties understood that the 16 separate contracts that comprised the 1256 transaction could not be "unbundled." Ohle was not a counterparty to Montgomery Global; the 2002 JBO Trust No. 1 was.  But, more significantly, as shown below, that the transaction could not be unbundled was not the understanding between Montgomery Global and its sixty-five counterparties.

In fact, Ohle told Abrams that his representations to Greenberg Traurig were based upon Groh's representations to Greenberg Traurig that the transactions were separate and independent and therefore could be unbundled related to its investment contracts with 2002 JBO Trust No. 1.

Having failed to investigate the Section 1256 transaction before trial or obtain an expert witness, Abrams was left with eliciting this testimony through adverse witnesses on cross-examination.  [Tr. 1569-1570].

The government argued that Kruse's testimony proved: (1) the contracts were not separate and independent, and (2) Ohle willfully violated the tax law by signing Greenberg Traurig's representation letter.

As will be shown below, had Abrams subpoenaed Groh as a witness, Kruse's testimony would have been refuted.  More importantly, Abrams would have proved that the contracts were, in fact, separate and independent and Ohle had a good faith belief of the same.

**ii.  New evidence including Ohle's Greenberg Traurig legal files, civil deposition testimony and other investigations demonstrate Abrams' failure to investigate the 1256 transaction and resulted in ineffective assistance of counsel.**

Continuing his pattern of failing to investigate matters related legal instruments which provide direct evidence to disprove the government's contentions, Abrams once again failed to obtain Greenberg Traurig's legal files associated with the 1256 transaction at issue in Counts One and Three.

Abrams' failure to obtain these critical files underscores the effects of Abrams' health conditions on his preparation and investigation prior to Mr. Ohle's trial.

Had Abrams obtained Ohle's legal files from Greenberg Traurig, he would have subpoenaed Groh as the counterparty to the 2002 JBO Trust No. 1 to testify that the 16 contracts in the 1256 transaction were allowed to be transferred, sold, exchanged or otherwise disposed of independently of each other by Montgomery Global, that this fact was represented to Greenberg Traurig by Montgomery Global and that Montgomery Global did not have any other "understanding" with the 2002 JBO Trust No. 1 or any of the other sixty-five counterparties.

Abrams could also have introduced into evidence Montgomery Global's representation letter which provided that, "The Options and the Forward Contracts [the 16 separate contracts that comprised the 1256 transaction] can be transferred, sold, exchanged or otherwise disposed of independently of each other." [See Exhibit

3-6, October 2003 Montgomery Global Advisors V LLC representation letter to Greenberg Traurig regarding foreign currency transactions with JBO 2002 Trust No. 1].  This critical representation letter from Montgomery Global would have refuted Kruse's testimony at Ohle's trial and the resulting inferences that the government used to support its charges in Count One and Count Three.

Abrams would have also found the transmittal letter dated October 20, 2003 [see Exhibit 3-7, October 20, 2003 letter from Greenberg Traurig to Groh, transmitting replacement representation letter for Montgomery Global on Conwill and Ohle transactions] from Marc A. Zametto to Groh on behalf of Montgomery Global Advisors V LLC, which also copied Gordon, enclosing replacement representation letters for Montgomery Global Advisors V LLC to sign in connection with the income tax opinions rendered by Greenberg Traurig to Conwill and Ohle. Earlier that day, Groh requested that Zametto remove references to Groh Asset Management in these representation letters.

This conversation led to the actual representation letter Groh provided to Greenberg Traurig (see Exhibit 3-6, October 2003 Montgomery Global representation letter to Greenberg Traurig), and on which Ohle based his representation letter.

From Ohle's legal files Abrams would have also established that Montgomery Global provided identical representations to its counterparties in sixty-four other 1256 transactions, thereby further discrediting and disproving Kruse's testimony at Ohle's trial.  Groh sent a facsimile to Zametto at Greenberg Traurig with identical representation letters for both Conwill's and Ohle's 1256 transactions. [See Exhibit 3-8, November 18, 2003 facsimile from Montgomery Global to Greenberg Traurig with signed representation letters on foreign currency transactions with JBO 2002 Trust No. 1 and DOC 2002 Trust No. 1].

These documents alone identified, in addition to Groh himself, an additional three witnesses - Zametto, Conwill and his trustee - who could have been subpoenaed to testify that the contracts were "separate and independent."

Abrams' failures to produce this representation letter from Montgomery Global Advisors V LLC, and to subpoena Groh and other witnesses such as Zametto,

Conwill, the trustee of the DOC Trust and Ohle's father as trustee of the 2002 JBO
Trust No. 1, are more more glaring when viewed in the light of Kruse's deposition
testimony in the Conwill litigation on September 10, 2012:

Lund:  And was Montgomery Global or RBC the counterparty [in Ohle's transaction]?
Kruse:  Montgomery Global.
Lund:  And [Ohle] has made the statement that all representations -- now, do you
know what the representations are in connection with the RBC transaction or the
Ohle modified RBC transaction.
Kruse:  I -- I couldn't tell you.
Lund:  I don't mean specifically but, in general, do you know what the
representations accomplish?
Kruse:  If it's referring to the risk and reward of the transaction, yes.
Lund:  All right.  In other words, the person who made the investment was supposed
to make certain factual statements and attest to their truthfulness; is that right?
Kruse:  Yes.

[Kr. Dep., p 122]

Rinck:  Did you know that Montgomery Global represented that all these
investments were independent of each other?
Kruse:  (Pause).  I'm not sure what the question is.
Rinck:  Do you know that Montgomery Global made representations to Mr. Ohle in
this case -- in this [1256] transaction?
Kruse:  I'm not aware of the representations that Ohle -- that Groh made.

[Kr. Dep., p. 185]

     This exchange demonstrated that Kruse's testimony at Ohle's trial was
deliberately misleading because he made definitive statements (such as,
Montgomery Global and its sixty-five counterparties understood that the 16

separate contracts in the 1256 transaction could not be unbundled), which are directly refuted by his deposition testimony in this civil litigation.

Even worse, due to his failure to investigate Abrams allowed Kruse's testimony to remain unchallenged.

In his deposition in the Conwill litigation Kruse does not testify that Ohle's representation to Greenberg Traurig was false or that the 1256 transaction was illegal.

In fact, in 2011, Kruse testified that he believed the 1256 transaction was neither fraudulent nor illegal:

Rinck:  My question is:  It's somewhat my understanding -- and I could be wrong and that's part of the reason I'm asking the question is for my own knowledge -- is that if the transaction were considered bundled transactions and if they could not be settled independently that that end result would create a fraudulent transaction or illegal transaction, if you will?

Kruse:  No.

Rinck:  So that's not true?

Kruse's attorney:  Asked and answered.

[Kr. Dep., p. 184-85]

In other words, Kruse testified in the civil litigation that, even if the 16 separate contracts were a bundled transaction where the individuals contracts could not be settled independently, the 1256 transaction was not fraudulent or illegal.  This testimony is in direct conflict with the government's inference from Kruse's testimony during Ohle's trial.

Kruse's testimony demonstrated that Ohle did not have the required mens rea to meet the requirements for income tax evasion (Count Three) or conspiracy to defraud the U.S. government (Count One).

Had Abrams investigated the 1256 transaction, obtained Ohle's legal files from Greenberg Traurig, subpoenaed witnesses and produced an expert at trial, he

would have put on direct proof establishing that Ohle lacked the requisite criminal intent, that Ohle did not sign a false representation letter, and that Ohle could not be guilty since he reasonably relied on the advice of his counsel in their tax opinion letter, all of which would have removed any element of criminal responsibility from Ohle's actions.

Kruse's knowledge of Ohle's willful conduct was further explored in this deposition:

Rinck:  Was there any -- to your knowledge and in your opinion, was there any fraud in the transactions done by Ohle?

Kupperman:  Objection.

Lasky:  Object to the form.

Rinck:  Do you know of any part of these transactions that were fraudulent?

Kupperman:  Objection.

Kruse:  I do not.

Rinck:  Okay.  Do you know if any parts of these transactions are, in your opinion, illegal?

Kruse:  I do not.

[Kr. Dep., p. 197-98]

Here, Kruse's deposition testimony directly disputed and contradicted the government's contention that Ohle possessed the required criminal intent, namely that Ohle willfully evaded his income taxes.

In other words, Kruse stated that he was unaware of any fraudulent or illegal element in the 1256 transaction, despite his prior testimony at Ohle's trial.

Where a taxpayer acts under a good faith belief that his conduct is not prohibited by the tax law, even if that belief is objectively unreasonable, then as a matter of law the element of willfulness is not established.  Cheek v. United States, 498 U.S. 192, 200-201, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).

Had Abrams investigated the 1256 transaction, entered documentary evidence into the record, subpoenaed witnesses to testify at Ohle's trial and produced expert testimony on the 1256 transaction, Ohle could not have been found to possess the required mens rea to support a criminal conviction for income tax evasion or conspiracy to defraud the U.S. government.

On October 15, 2003, Greenberg Traurig provided Ohle and his father with its tax opinion letter which concluded that, "It is more likely than not that the [1256] Transactions will have the requisite economic substance and business purpose to be respected under the authorities discussed above." [Exhibit 3-5, October 15, 2003 Greenberg Traurig tax opinion letter to Ohle, p. 87].

Had Abrams investigated the 1256 transaction by obtaining Ohle's legal files from Greenberg Traurig, subpoenaing witnesses and producing an expert at trial, he would have put direct proof into evidence of Groh's representations, refuting any inferences created by Kruse's testimony, as well as established that Kruse was unaware of any illegal aspect of fraud related to the 1256 transaction.

Further, Abrams could have successfully defended Ohle from these claims in Count One and Three through an "advice of counsel" defense.  Simply, as Abrams argued belatedly in post-trial papers but without proper evidentiary support in the record, Abrams could have proved that Ohle should not have been indicted related to the 1256 transaction.

### iii.  Abrams failed to produce an expert at trial, interview witnesses, investigate Ohle's civil income tax audit and similar audits of other 1256 transaction participants, and the IRS' civil tax shelter promoter audit of Dumaine.

In December 2003, the Internal Revenue Service issued Notice 2003-81 which required 1256 transaction taxpayers to disclose their participation in the 1256 transaction.  Ohle was notified of this Notice by Greenberg Traurig on April 7, 2004. [See Exhibit 3-9, April 7, 2004 letter from Greenberg Traurig to Ohle regarding Notice 2003-81 and Qualified Amended Returns].

The letter from Gordon stated that "listed transactions" invokes procedural matters but does not address the merits of the transaction from a tax standpoint.  It stated, "The outcome of any such challenge is impossible to predict at this time [Id.]."

Ohle disclosed to the IRS that his 2002 income tax return reported losses from the 1256 transaction in accordance with Notice 2003-81.  Consequently, the IRS audited Ohle's 2002 income tax return related to the 1256 transaction.  Ohle dutifully complied with the IRS audit. [Tr. 1676-77].

Contrary to the government's assertions in Ohle's criminal trial and its post-trial filings, the one-percent economic exposure did not dictate that the taxpayers did not have at-risk basis under IRC Section 465, as shown below.

In fact, the transaction was presumably created and arranged by Ed Sedacca, Seyfarth Shaw and Royal Bank of Canada due to this anomaly. [Little FBI, para. 52].

Abrams should have called an expert to explain the at-risk issue to the jury.

In addition to the IRS individual audit, the IRS opened a tax shelter promoter audit on Dumaine based upon its members formerly being employees of Bank One's Innovative Strategies Group.  Ohle hired Tom Fitzgerald of Winston & Strawn to assist Dumaine in complying with all requests in its tax shelter promoter audit [Ohle Dep., p. 45-46].  Dumaine produced the entirety of its records to Winston & Strawn which provided all requested information to the IRS.  Ultimately, the IRS concluded that neither Dumaine nor any of its employees, including Ohle, had engaged in any criminal conduct.

Abrams should have called Fitzgerald to put direct evidence into the record that the IRS found no criminal liability by Ohle or other Dumaine members related to their limited involvement in the 1256 transaction.  Fitzgerald's testimony could also have established that Dumaine's role in the 1256 transaction was limited to introducing clients to Seyfarth Shaw and Royal Bank of Canada and the transfer of certain contracts to charities.

Once again, Abrams' failure to present a defense case allowed broad roles and responsibilities to be wrongfully assigned to Ohle and his involvement in these transactions.

Kruse, Love and Groh participated in sixty-five 1256 transactions together. Kruse stated that Dumaine was involved in 15-20.  [Kr. Dep., p. 103].  Ohle was involved in three of those.  Kruse further stated that he was not aware of anyone else that was indicted, charged or convicted of any criminal conduct related to the 1256 transactions. [Kr. Dep., p. 199-200].

Only Ohle was indicted and prosecuted for the 1256 transaction out of all of the organizers Kruse, Love, Sedacca, Napoli, Groh, counterparty Montgomery Global or the sixty-five other counterparties to Montgomery Global.  While Abrams knew about these civil audits and investigations, as well as the issues related to the IRS' civil challenges to the 1256 transaction, he failed to review the relevant documents, commission an expert report or produce an expert at Ohle's trial.

Had Abrams presented a defense to these charges, Ohle could not have been convicted despite being the sole person indicted and prosecuted for reporting losses from the 1256 transaction on their income tax return.

### iv.  Government would not prevail on any of its three alternate "theories" related to Ohle's willful evasion of taxes.

As previously discussed, the government put forth three different theories relating to Ohle's criminal intent in deducting the losses associated with 2002 JBO Trust No. 1's 16 separate contracts in the 1256 transaction on his 2002 income tax return in violation of 26 U.S.C. 7201 (Count Three) and conspiring to defraud the Internal Revenue Service in violation of 18 U.S.C. 371 (Count One).

Had Abrams presented the direct evidence discussed above and produced an expert to testify at Ohle's trial, Ohle should not have been convicted on any of the government's alternate theories.

Abrams also failed to present an advice of counsel defense which would have also absolved Ohle from all criminal liability related to the 1256 transaction.

**1.  The government argued that Ohle willfully evaded the tax law because the 1256 transaction did not possess "economic substance."**

This contention by the government is unsupported by even its own witness Kruse at Ohle's trial.  Kruse testified as follows:

Abrams:  In fact, that was one of the things that Mr. Ohle was interested in, the transaction was structured in a way that it had the potential of making a profit, correct?

Kruse:  Yes.

[Tr. 1520]

Kruse's testimony established that the 1256 transaction had economic substance and that Ohle required that the 1256 transaction have economic substance.

Accordingly, Ohle could not be found criminally liable on this government theory.

Moreover, Ohle reasonably relied upon his tax opinion letter from Greenberg Traurig which addressed "economic substance" (see Exhibit 3-5, Greenberg Traurig tax opinion letter, p. 82-87; Tr. 1520) when reporting losses from the 1256 transaction on his 2002 income tax return, thereby defeating this contention by the government.

**2. The government argued that Ohle willfully evaded his taxes because he failed to have a proper "business purpose" for investing in the 1256 transaction.**

Here, the government argued that Ohle was required to be primarily motivated by the investment, not obtaining a tax loss, to properly deduct the losses from the 1256 transaction.

But the law, as Greenberg Traurig cited in its tax opinion letter, is that there must be a business or commercial reason for the taxpayer to engage in the transaction without regard to tax benefits.  Friedman v. Commissioner, 869 F.2d 785, 792 (4th Cir. 1989); Rice's Toyota World Inc. v. Commissioner, 752 F.2d 89 (4th Cir. 1985) (see Exhibit 3-5, Greenberg Traurig tax opinion letter, p. 75).

Further, the tax opinion provided that in "its common application, the courts use business purpose (in combination with economic substance . . . ) as part of a two-prong test for determining legality:  (1) whether the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering into the transaction, and (2) the transaction lacks economic substance (Id., p. 74)."

The Second Circuit Court of Appeals also failed to adopt the government's position (see Opinion in Ohle's Appeal, 2011 U.S. App. LEXIS 21275, 2nd Cir., Oct. 20, 2011, p. 4-5).

The facts are also not in accord with the government's argument.  The government failed to consider the proper party in applying the "business purpose" test.  The motivations of Ohle's father, as trustee of the 2002 JBO Trust No. 1, should have been considered, not Ohle's.  At trial, the government offered no proof related to the motivations of Ohle's father in entering the 1256 transaction.  In any event, Kruse's testimony at trial should have defeated the government's contentions.

Having reasonably relied on the tax opinion letter from Greenberg Traurig which addressed "business purpose" [Exhibit 3-5, Greenberg Traurig tax opinion letter, p. 75-82], Ohle should not have been found criminally liable for reporting losses from the 1256 transaction on his 2002 income tax return or conspiring to defraud the IRS.  Ohle's reasonable reliance on the advice of counsel should have defeated these charges by the government, had Abrams presented such a defense.

### 3.  The government argued that Ohle willfully violated the at-risk rules of IRC Section 465.

In its argument, the government collapsed the 16 separate contracts that constituted the investment by 2002 JBO Trust No. 1 into the net economic exposure

of the basket of investments. [see Gov't Opposition to Abrams' Appeal, Case No. 1:11-0393-cr(L), 11-0395-cr(CON), Docket No. 144, p. 53-54]. In his deposition in the Conwill litigation, Kruse testified that at-risk did not necessarily mean the amount of economic exposure in the 1256 transaction but "[t]he term 'maximum amount of risk' could refer to the individual contracts as well as the overall group of contracts [Kr. Dep., p. 77]."

This explanation was consistent with Greenberg Traurig's tax opinion letter [see Exhibit 3-5, Greenberg Traurig tax opinion letter, para. M, p. 47-48]. This section of Greenberg Traurig's tax opinion letter addressed the complicated at-risk provisions and concluded, "The at risk rules of Section 465 will not limit [Ohle's] ability to deduct losses that result from the [1256] Transactions."

The government argued that IRC Section 465 limits the amount that Ohle could have properly deducted to the amount that the 2002 JBO Trust No. 1 was exposed to investment losses - one percent [see Gov't Opposition to Abrams' Appeal, Case No. 1:11-0393-cr(L), 11-0395-cr(CON), Docket No. 144, p. 54-56]. Had Abrams presented a defense on Ohle's behalf, the government's position would have been shown to be unsupported by the facts or the tax law.

The Second Circuit failed to adopt the government's position on Ohle's willful failure to violate the at risk rules under IRC Section 465, "we need not delineate the precise boundaries of the 'at risk' or 'primarily for profit' theories of evasion pursued by the government." [See Opinion in Ohle's Appeal, 2011 U.S.App. LEXIS 21275, 2nd Cir. Oct. 20, 2011, p. 4-5].

The analysis of the applicability of the at-risk provisions under IRC Section 465 are far more nuanced than the government's presentation. Greenberg Traurig's tax opinion letter provided an analysis of the application of these technical rules then concluded, "Accordingly, it is more likely than not that any losses recognized on the sale or termination of the Options and Forward Contracts [the sixteen separate contracts that constitute the 1256 transaction] will not be limited by Section 465(b)(4) [see Exhibit 3-5, Greenberg Traurig tax opinion letter, p. 47]."

Contrary to the government's assertion, Greenberg Traurig's tax opinion letter addressed the uncertainty related to the application of these at risk provisions under IRC Section 465, "The amount at risk is calculated separately for each activity engaged in by the taxpayer in carrying on a trade or business or for the production of income.  Section 465(c)(1) and (3).  Although Congress explicitly directed the Secretary to promulgate regulations to provide guidance on which activities should be aggregated or alternatively treated as separate activities, these regulations have not been forthcoming.  [There] is very little authority on the grouping of activities for purposes of Section 465.  Thus, if two activities are interrelated, it is not clear whether there are two activities or only one . . . Consequently, until Regulations are released defining parameters for aggregation and segregation of activities relating to the production of income, it is more likely than not that Investor would be permitted to combine Investor's directly-held investment activities into a single activity for tax purposes.  Based on the foregoing, it is more likely than not that Investor's loss deductions from the [1256] Transactions would not be limited by Section 465 [Id., p. 47-48]."

This section of Greenberg Traurig's tax opinion letter is also consistent with the IRS' understanding of the current state of tax law related to the at risk rules.  The IRS examined taxpayers which invested in the 1256 transaction.  In each tax audit notice, including Ohle's, the IRS acknowledged, "[T]he case law, however, is not in complete accord on this issue." [Tr. 3500-3501].

Simply, the tax law is unsettled on the issue of the application of the at risk rules under IRC Section 465 to the 1256 transaction.  While Ohle may or may not have been responsible for taxes related to his deduction of losses from the 1256 transaction upon the conclusion of his civil tax audit, there is simply no basis for Ohle being found criminally liable for a willful violation of the at risk rules under IRC Section 465.

Accordingly, Ohle reasonably relied on the advice of counsel in his tax opinion letter from Greenberg Traurig which addressed the at-risk rules under IRC Section 465 (see Exhibit 3-5, Greenberg Traurig tax opinion letter, p. 47-48) when

reporting losses from the 1256 transaction on his 2002 income tax return, thereby defeating this contention by the government.

Had Abrams presented a defense for Ohle, Ohle should not have been convicted of these charges in Counts One and Three.

## CONCLUSION

For all of the foregoing reasons, Petitioner John Brewster Ohle, III respectfully submits that his request for Section 2255 releif should be granted and his conviction vacated for inadequate assistance of counsel.

Alternatively, requests that this Court conduct an evidentiary hearing to resolve disputed factual issues the Court deems necessary and thereafter grant his motion to vacate and set aside his conviction and sentence under Section 2255.

DATED:  October 3, 2014.

Respectfully submitted,

/s/ Hiram C. Eastland, Jr.
EASTLAND LAW OFFICE, PLLC
307 Cotton Street
Greenwood, Mississippi 38930
662-897-0495
eastlandlaw1@gmail.com
MS. Bar # 5294

COUNSEL FOR JOHN B. OHLE, III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF filing system will be sent electronically on October 3, 2014, to the registered participants as identified on the Notice of Electronic Filing and that a paper copy will be sent via United States mail to Special AUSA Nanette L. Davis and AUSA Stanley J. Okula, Jr. on the above date.

<u>/s/ Hiram C. Eastland, Jr.</u>
COUNSEL FOR JOHN B. OHLE, III